AMERICAN TOBACCO COMPANY and AMERICAN CAR COMPANY, Appellants, v. MISSOURI PACIFIC RAILWAY COMPANY et al., Appellants, and CITY OF ST. LOUIS, Respondent.

**In Banc, December 31, 1912.**

1. **CITIES: Railway Grade Crossing: Necessity for Depression.** Whether or not a necessity exists for the separation of a railroad street crossing from the crossing for vehicles and pedestrians, by requiring the railroad tracks to be lowered below the surface street grade and its tracks bridged, is a question exclusively for the municipal assembly to determine.

American Tobacco Co. v. St. Louis.

2. ———: Railroads: Compelled to Restore Highways. The State has the power to compel railroad companies to restore highways and streets crossed by their tracks to such condition that the free, proper and safe use thereof by the public will not be interfered with. That was true at common law, and is a police regulation inherent in every sovereignty, which cannot be abrogated by statute, grant or contract. And that power has been given to St. Louis by the State in its charter, and that city has power to compel railroad companies to lower their tracks at street crossings, and to construct for such streets over and above the tracks substantial bridges, and to pay the costs thereof.

3. ———: ———: ———: Laid Out After Railroad Constructed. A railroad company receives and accepts its franchise subject to the implied right of the State to lay out and open new streets and highways over its tracks, and must be deemed, as a matter of law, to have assumed all burdens incident to new, as well as existing, crossings. Although the street was laid out and established and its grade fixed long after the railroad tracks were laid at such surface grade, the city has the power to compel the railroad company to lower its tracks and to construct over the tracks, at its own expense, a bridge whose floor is even with the street surface or grade, and to build whatever retaining walls may be necessary to protect the street or private property from falling into the excavation.

4. ———: ———: ———: Election by Railroad: To Elevate or Lower. Under the charter of the city of St. Louis, which elaborately provides for the establishment, opening, improvement and regulation of the streets and highways, by the city, the railroad company, on being required to separate the grade crossings of its tracks over a street from the ordinary travel of pedestrian and vehicle, does not have the right to elect whether it will elevate its tracks above or lower them below the surface of the street. In the face of such a charter, which the Constitution authorized to be framed and adopted by the city, the statute which provides that "such corporation may make such road or street to pass under its said railroad where the same can be done with equal convenience and safety to the traveling public" does not govern, but the charter must be considered as an exception to such statute, and does govern.

5. ———: ———: Impracticable Ordinance. The city's plan for depressing the railroad tracks under the streets must be reasonable and not oppressive. If the plan proposed is, if not impossible of performance, at least very impracticable; if it is destructive of the business of large manufacturing plants situated near the tracks; if it makes no provision for new tracks which expanding railroad business will make neces-

sary in the future, and those additional tracks can be had only by removing long reaches of retaining walls, widening the excavation and constructing new retaining walls; if the cost of a subway under the tracks will be so enormous as to plainly suggest it would be more economical for the railroads to seek switching yards elsewhere; if the amount of passenger travel on the railroads far exceeds the pedestrian and vehicle travel on the street, and the amount of freight hauled by them far exceeds that hauled by wagons, etc.; and if the cost of depressing the railway tracks beneath the streets will far exceed the cost of depressing the streets below the railway tracks, the court will hold the ordinance so unreasonable and oppressive as to be null and void.

6. ————: ————: **Compelled to Lower Tracks at Street Crossings: Ordinance: Must Originate with Board of Public Improvements.** Under the charter of the city of St. Louis all ordinances designed to compel railroad companies to lower their tracks below the grade of streets they cross, must originate with the Board of Public Improvements. The purpose of the charter provisions was to provide a comprehensive, durable and symmetrical system of public improvements, and that purpose was to be attained by placing the supervision and control of every kind of public works in the hands of a board of skilled, unbiased and scientific men, whose judgment and acts would be unaffected by local influences. Ordinances requiring the railway companies to excavate, for their tracks, ditches two miles or more in length and from twenty to twenty-five feet in depth and varying in width, to construct retaining walls along the ditches, and to build steel bridges across the tracks in the streets intersected, to be two feet above the existing grade of the streets, contemplate public works and public improvements, and a repair and reconstruction of a part of the streets, and under the charter are void unless recommended by the Board of Public Improvements.

7. ————: ————: ————: ————: ————: **Substitute for Board's Recommendation.** The Board of Public Improvements drew and recommended a bill providing for the depression of the streets below the railroad tracks. The Municipal Assembly enacted that bill, then on motion to reconsider, ordered reconsideration, and then the bill was withdrawn, and another bill providing for the depression of the railway tracks beneath the streets, without recommendation of the board, was introduced, and enacted. *Held*, that the last ordinance was void, because it was not recommended by the Board of Public Improvements.

Appeal from St. Louis City Circuit Court.—*Hon. James E. Withrow*, Judge.

REVERSED AND REMANDED (*with directions*).

*Boyle & Priest* and *W. B. & Ford W. Thompson* for appellant, Tobacco Company and Car Company.

(1) The power and authority given to the city of St. Louis under sec. 3141, R. S. 1909, for the separation of the grade crossing at Tower Grove avenue, was fully executed in the action of the Board of Public Improvements in recommending the depression of Tower Grove avenue, in accordance with House Bill 529. (a) Because the provisions of said bill were adopted and approved by the defendant railroads in this case, who appeared before the Board of Public Improvements, through their agents, and accepted the provisions of said bill, and agreed to pay all the cost and expense of the depression of the tracks in accordance with the provisions of said bill. (b) Because the said bill was approved and ratified by the owners of all the property adjacent to the crossing of Tower Grove avenue to the extent that said property holders waived all damages accruing to them by the change of the grade of all the streets affected. (c) Because the railroads expended the sum of $30,000 in acquiring the property injured and damaged on the proposed subway, and secured the consent and waiver in writing of all the property holders over the line of the proposed subway, who were injured and damaged by reason of the change of grade. R. S. 1909, sec. 3141; Powell v. Railroad, 215 Mo. 339. (2) The city of St. Louis had no power to pass any of the ordinances requiring a depression of the railroad tracks after a notice had been given to the Board of Public Improvements by the railroad companies that they elected to change the grade of the crossing at

Tower Grove avenue and to make such street pass under the said railroads. R. S. 1909, sec. 3141. Powell v. Railroad, 215 Mo. 339; Jones v. Seligman, 81 N. Y. 190; Wademan v. Railroad, 51 N. Y. 568; Clarke v. Railroad, 18 Barb. 350; Wademan v. Railroad, 51 N. Y. 568; Wheeler v. Railroad, 12 Barb. 227; Beardsley v. Railroad, 20 N. Y. Supp. 458, 142 N. Y. 173; Van Wagner v. Railroad, 30 N. Y. Supp. 165. (3) The ordinances for the depression of the tracks at Tower Grove crossing are mutually connected and dependent on each other, and were intended as one complete scheme, and if any one could not be carried into effect, then all of the ordinances which were dependent, or conditional, or connected with one another, must fail. St. Louis v. Railroad, 14 Mo. App. 225; St. Louis v. Railroad, 89 Mo. 44; Warren v. Charlestown, 2 Gray, 84; Allen v. Louisiana, 103 U. S. 84; Hannibal v. Tel. Co., 31 Mo. 32; Austin v. Murray, 16 Pick. 121; Dillon on Municipal Corporations (3 Ed.), sec. 421; Commonwealth v. Hutchins, 5 Gray, 482; Commonwealth v. Stoddart, 2 Cush. 562; Municipality v. Morgan, 1 La. Ann. 111; Commonwealth v. Dow, 10 Metc. 382; Rogers v. Jones, 1 Wend. 237; Sheldon v. Meyer, 30 Ala. 540; Thomas v. McVernon, 9 Ohio, 290; Grant on Corporations, 88. (4) The ordinances are void because they are in violation of the different provisions of the charter of the city, which require that all such ordinances in regard to all street improvements and all public works shall emanate from the Board of Public Improvements and shall be recommended to the Municipal Assembly for passage by said board. City v. Gleason, 89 Mo. 67, 93 Mo. 33; Railroad v. Campbell, 62 Mo. 365; Dillon on Municipal Corporations, secs. 245-604; Ellis v. Railroad, 51 Mo. 200; St. Louis v. Franke, 78 Mo. 41; Bambrick v. Campbell, 37 Mo. App. 464; Construction Co. v. Geist, 37 Mo. App. 507; State v. Butler, 178 Mo. 317; Verdin v. City of St. Louis, 131 Mo. 26;

Charter, art. 4, secs. 3, 33, 4; *Ibid.*, art. 6, secs. 1, 27, 14-19; State ex rel. v. St. Louis, 161 Mo. 371; Cole v. Skrainka, 37 Mo. App. 427, 105 Mo. 303; Telephone Co. v. Los Angeles, 211 U. S. 280. (5) The ordinances in this case are made up of unwarranted, unfriendly and unjust discriminations against the railroads and the industries involved, and are unreasonable and oppressive. Corrigan v. Gage, 68 Mo. 541; St. Louis v. Weber, 44 Mo. 547; Cape Girardeau v. Riley, 72 Mo. 220; Kelly v. Meeks, 87 Mo. 401; Morse v. Westport, 110 Mo. 502; Warren v. Paving Co., 115 Mo. 580; St. Louis v. Russell, 116 Mo. 258; Tarkio v. Cook, 120 Mo. 9; Halpin v. Campbell, 71 Mo. 493; Plattsburg v. Riley, 42 Mo. 22; Hannibal v. Tel. Co., 31 Mo. App. 32; White v. Railroad, 44 Mo. App. 540; James v. Pine Bluff, 49 Ark. 205; Waters v. Leech, 3 Ark. 110; Commissioners v. Gas Co., 12 Pa. St. 318; Ex parte Whitwell, 98 Cal. 73; St. Paul v. Laidler, 2 Minn. 190; Mankato v. Fowler, 32 Minn. 364; State Center v. Barenstein, 66 Iowa, 249; St. Louis v. Packing Co., 141 Mo. 375; Chaddock v. Day, 75 Mich. 527; Mason City v. Barngrover, 26 Ill. App. 296; Kip v. Patterson, 26 N. J. L. 298; Crawford v. Topeka, 51 Kan. 756; Bank v. Sarlls, 129 Ind. 201; Mayor v. Dry Dock Co., 133 N. Y. 104; Railroad v. Mayor, 47 N. J. L. 286; Nicoulin v. Lowery, 49 N. J. L. 391; Railroad v. Springfield, 85 Mo. 674; Railroad v. Jersey City, 47 N. J. L. 286; State ex rel. v. Birch, 186 Mo. 219; St. Louis v. Theatre Co., 202 Mo. 699.

*Martin L. Clardy, Henry G. Herbel, W. F. Evans, E. T. Miller* and *Robert T. Railey* for appellant railway companies.

(1) The city of St. Louis was authorized neither by the Constitution, the statutes of this State, the common law, nor its own charter, to pass any ordinance requiring a railroad company to abandon its

legitimate right of way upon the surface of the street, and to depress its tracks, as was attempted to be done by the passage of ordinances 24358 to 24361, inclusive. If it becomes necessary to separate the grade crossings at Tower Grove avenue and the other streets in controversy, the defendant railway companies have the legal right to determine for themselves whether said streets shall pass under or over their tracks, and the city of St. Louis has no legal authority, by ordinance or otherwise, to require them to depress their tracks without their consent. Laws 1885, pp. 87 and 88; Sec. 2609, R. S. 1889; Secs. 1035, 1103, R. S. 1899; Secs. 3049, 3141, R. S. 1909; Van Note v. Railway, 70 Mo. 641; Turner v. Railway, 78 Mo. 578; Terry v. Railway, 89 Mo. 586; Powell v. Railway, 215 Mo. 358; Pratt v. Railway, 139 Mo. App. 511; Regina v. Railway, 6 L. & Eq. R. 214; Turnpike Corp. v. Railway, 23 Pick. (Mass.) 326; People v. Railway, 74 N. Y. 304; Railway v. Oklahoma, 111 Pac. 396; Minneapolis v. Railway, 28 N. W. (Minn.) 4; Railway v. State, 32 N. J. L. 224.    (2)    The city of St. Louis can pass no ordinance which is in conflict with the Constitution, statutes, or common law of this State. Sec. 9582, R. S. 1909; Secs. 16, 20, 22, 23 and 25, art. 9, Constitution 1875; 1 Dillon on Municipal Corporations (5 Ed.), sec. 237 *et seq.*; Leach v. Cargill, 60 Mo. 316; Ewing v. Hoblitzelle, 85 Mo. 78; St. Louis v. Tel. Co., 96 Mo. 623; State ex rel. v. Field, 99 Mo. 352; Nevada v. Eddy, 123 Mo. 557; Kansas City v. Scarritt, 127 Mo. 642; St. Louis v. Dorr, 145 Mo. 477; State ex rel. v. Subway Co., 145 Mo. 551; Kansas City v. Stegmiller, 151 Mo. 189; Young v. Kansas City, 152 Mo. 661; St. Louis v. Kaime, 180 Mo. 321; St. Louis v. Meyer, 185 Mo. 583; State ex rel. v. Tel. Co., 189 Mo. 83; L. & G. Co. v. Kansas City, 200 Mo. 167; St. Louis v. Klausmeier, 213 Mo. 119; St. Louis v. Wortman, 213 Mo. 131; St. Louis v. King, 226 Mo. 334; 1 Dillon on Municipal Corporations (4 Ed.), sec. 89, p. 145.

(3)   Said ordinances 24358 to 24361, inclusive, are in derogation of the common law.   They are highly penal in their nature, and in cases of this character where the city is undertaking to exercise an alleged police right and to interfere with the use of the defendant's property, such ordinances and proceedings should be strictly construed.   Perry v. Strawbridge, 209 Mo. 638; L. & G. Co. v. Kansas City, 200 Mo. 167; Leach v. Cargill, 60 Mo. 316; Carpenter v. Realty Co., 103 Mo. App. 494.   (4)   The common law was adopted in Missouri in 1816.   Perry v. Strawbridge, 209 Mo. 635; Sec. 4151, R. S. 1899; Sec. 8047, R. S. 1909.   (5)   The defendant railway companies, at the time of the passage of the ordinance in controversy, had the legal right, if they desired to do so, to carry Tower Grove avenue, Old Manchester road, etc., under their tracks at the intersection of same with said streets, and the defendant city was not authorized, by its charter or otherwise, to deprive the railway companies of said option.   Sec. 9582, R. S. 1909.   Par: 2, sec. 26, art. 3, Charter of St. Louis, as amended in 1901, 4 Mo. Ann. Stat. 4809 et seq.   (6)   The St. Louis, Oak Hill & Carondelet Railway Company, by an ordinance approved June 15, 1886, was granted a right of way over Old Manchester road and the other streets in controversy for a term of fifty years from the passage of said ordinance.   An irrevocable contract was thereby entered into between said railway company and the city, which could not be altered or amended by the passage of ordinance 24,360, relied upon in this cause.   Hovelman v. Railway Co., 79 Mo. 632; State ex rel. v. Railway, 85 Mo. 263; Railway v. Springfield, 85 Mo. 674; Kansas City v. Corrigan, 86 Mo. 69; Kansas City v. Railway, 102 Mo. 633; Brown v. Railway, 137 Mo. 536; State ex rel. v. St. Louis, 145 Mo. 551; De Geofroy v. Railway, 179 Mo. 698; Kansas City v. Railway, 187 Mo. 146; Seibert v. Railway, 188 Mo. 657; St. Louis v. Railroad, 228 Mo. 712; Morie v.

Transit Co., 116 Mo. App. 12; Independence v. Water
Works Co., 153 Mo. App. 696; Railroad v. Savannah,
30 Fed. 646; St. Louis v. Tel. Co., 63 Fed. 68; New
Orleans v. Tel. Co., 40 La. 41; Chicago v. Sheldon,
9 Wall. 50; Railway v. Maine, 96 U. S. 499; Los
Angeles v. Water Works Co., 177 U. S. 558; Cleve-
land v. Railway, 194 U. S. 517; Adams v. Railroad,
60 L. R. A. 55; Paving & Supply Co. v. Railway,
128 Ind. 525; State ex rel. v. Jersey City, 49 N. J. L.
303; Light Co. v. Electric Light Co., 65 Vt. 377; 3
Dillon on Municipal Corporations (5 Ed.), sec. 1276,
p. 2076. (7) Ordinance 24,359 is invalid, because it
undertakes to repeal a valid ordinance passed by the
city of St. Louis, granting to the St. Louis & San Fran-
cisco Railroad Company the right to cross Tower
Grove avenue, etc., and providing that said Frisco
Company should pay fifteen thousand dollars for all
bridges which were necessary to be constructed. St.
Louis v. Railroad, 228 Mo. 712. (8) Ordinances
24,358 to 24,361, inclusive, require the defendant rail-
way companies, where their tracks intersect the streets
named therein, to remove from under each track the
surface of the earth to the depth of twenty or twenty-
five feet beneath the present grade crossing, and to
reconstruct and replace that portion of the street and
crossing so removed with expensive viaducts called
for in said ordinance. No improvements of the above
character can be legally required, unless recommended
in due form by the Board of Public Improvements of
said city. Construction Co. v. Geist, 37 Mo. App. 507;
Bambrick v. Campbell, 37 Mo. App. 464; St. Louis v.
Gleason, 89 Mo. 71, 93 Mo. 33; Verdin v. St. Louis,
131 Mo. 26; State v. St. Louis, 161 Mo. 378; State v.
Butler, 178 Mo. 298; Charter amended in 1901;
Sec. 1913, art. 1, chap. 24, Revised Code of
St. Louis (Woerner); Charter, art. 4, secs. 3,
33, 41; *Ibid.*, art. 6, secs. 1, 14-19, 27. (9) Each
and all of the four ordinances are invalid, for the rea-

son that the city has undertaken to compel the railway companies to construct retaining walls, not only within the street limits where said tracks are depressed, but likewise for the protection of private property adjacent to the tracks so depressed. St. Louis v. King, 226 Mo. 348; McGrath v. St. Louis, 215 Mo. 191; Geist v. St. Louis, 185 Mo. 208; Obert v. Dunn, 140 Mo. 476; Larson v. Railway, 110 Mo. 246; Eads v. Gains, 58 Mo. App. 591; Carpenter v. Realty Co., 103 Mo. App. 480; Mfg. Co. v. Levine, 42 Mo. App. 242; Thompson on Negligence, pp. 276-278. (10) Said ordinances do not undertake to declare that the crossings at the intersections of Tower Grove avenue and the other streets mentioned with the tracks of the defendant railway companies constitute a public nuisance; they do not even declare that said grade crossings are dangerous; nor do they disclose any ground whatever for requiring the separation of grade crossings at such places. St. Louis v. King, 226 Mo. 334; St. Louis v. Packing Co., 141 Mo. 383; State ex rel. v. Railway, 66 N. E. 168; Evansville v. Miller, 45 N. E. 1054; Railway v. Joliet, 79 Ill. 25; Bank v. Sarlls, 28 N. E. (Ind.) 434; Tiedeman's Lim. of Police Power, sec. 122; Wood on Nuisances, secs. 742, 744; Village v. Poyer, 14 N. E. (Ill.) 677; Denver v. Mullen, 3 Pac. 393; Everett v. Council Bluffs, 46 Iowa, 66; State v. Mayor, 29 N. J. L. 170; Beach's Public Corporations, secs. 1026, 1029, 1031; Lake View v. Letz, 44 Ill. 81; St. Paul v. Gilfillan, 36 Minn. 298; 2 Dillon's Municipal Corporations (5 Ed.), sec. 684; Dillon's Municipal Corporations (4 Ed.), sec. 374; Yates v. Milwaukee, 10 Wall. 497; Railway v. Duluth, 208 U. S. 583. (11) The four ordinances involved are each and all unreasonable, unjust, oppressive and contrary to the various provisions of both the State and Federal Constitutions, as well as the amendments thereto. (12) If said ordinances are complied with by the Missouri Pacific Railway Company and the grade crossings

mentioned therein are abolished, said railway company will of necessity be required either to buy or condemn a new right of way, as the abutting property owners have only been compensated for a surface easement. Kansas City v. Railway, 102 Mo. 633; Hook v. Railway, 133 Mo. 313; Railway v. Gordon, 157 Mo. 77; Railway v. Railway, 190 Mo. 254. (13) The Missouri Pacific Railway Company having acquired its title to the right of way mentioned in ordinances 24,358 and 24,361 from the State in the year 1849, and the city of St. Louis having extended its corporate limits many years thereafter and having been permitted to cross the railway company's tracks at the points aforesaid in some manner, the railway company has a paramount easement at the intersection of Tower Grove avenue and Old Manchester road with its right of way aforesaid, and the city would have no legal right to require it to abandon said right of way. St. Louis v. Railway, 66 Mo. 228; Boyce v. Railway, 168 Mo. 589; Railway v. Railway, 190 Mo. 254; 3 Dillon on Municipal Corporations (5 Ed.), sec. 1254; Snoddy v. Bolen, 122 Mo. 489; Grant v. Moon, 123 Mo. 43; Thomas v. Hunt, 134 Mo. 399; Gordon v. Park, 219 Mo. 600; In re Board of Comm'rs, 90 N. E. (N. Y.) 458. (14) The Missouri Pacific Railway Company and its predecessor were in possession of the hundred-foot right of way now crossed by Tower Grove avenue and Old Manchester road many years before that part of the city of St. Louis was extended or said streets established or opened. If, therefore, the grade crossings should be separated at the above intersection, it should not be done at the cost and expense of the Missouri Pacific Railway Company. Hopkins v. Railway, 79 Mo. 98; Kansas City v. Railway, 102 Mo. 633; Railroad v. Gordon, 157 Mo. 71; Albia v. Railway, 71 N. W. (Iowa), 541; Cleveland v. Augusta, 42 L. R. A. 639; Railroad v. Baltimore, 46 Md. 445; Railway v. Hough, 61 Mich. 508; Railroad v.

Bloomington, 76 Ill. 447; Rock Creek v. Railway, 23 Pac. (Kan.) 585; Dyer County v. Railway, 11 S. W. 943; Eyler v. Comm'rs, 49 Md. 269; Dygert v. Schenck, 23 Wend. 446; Railway v. State, 3 Head (Tenn.) 523; 1 Thompson's Negligence, pp. 328-343; Railway v. Milwaukee, 97 Wis. 418; Seattle v. Railroad, 33 Pac. (Wash.) 1048; Baltimore v. Cowen, 41 Atl. (Md.) 900; Railroad v. County, 31 Pac. (Kan.) 736; State ex rel. v. District Court, 7 L. R. A. 121; People v. Railway, 79 Mich. 471; Railway v. Railway, 121 Mass. 124; Railway v. Plymouth County, 80 Mass. 155; Railroad v. Bayonee, 51 N. J. L. 428; State ex rel. v. Railway, 108 N. W. (Minn.) 261; Railway v. Capner, 49 N. J. L. 555; State v. Railroad, 74 N. C. 143; Railroad v. Rowland, 70 Tex. 298; 3 Abbott on Municipal Corporations, secs. 860, 863, 1021; Railroad v. Commrs., 63 Oh. St. 23; Railway v. Troy, 68 Oh. St. 510.

*Lambert E. Walther* and *William E. Baird* for respondent.

(1) It is a common law rule that railroads must restore highways crossed by them, so that the free and proper use thereof by the public shall not be interfered with or impaired. State ex rel. v. Railway, 35 Minn. 131; Kansas City v. Railway, 102 Mo. 633. (2) The same duty is frequently imposed by statute or by the railroad's charter. Sec. 3049, R. S. 1909; Charter Pacific Railroad, Laws 1849, p. 221; State ex rel. v. Railway, 35 Minn. 131; State ex rel. v. St. Paul, 98 Minn. 387; Railroad v. Duluth, 208 U. S. 583; Railroad v. State, 32 N. J. L. 220; Railroad v. State, 158 Ind. 189. The statute applies not only to corporations subsequently created, but also to those existing at the time of its enactment. Sec. 3212, R. S. 1909. (3) And this duty does not relate solely to the original construction of the railroad; it is a continuing duty

and obligates the railroad company to make such changes in the crossing as may from time to time become necessary by reason of changing conditions; this duty only relates also to streets subsequently established or acquired by the public. Kansas City v. Railway, 102 Mo. 633; State ex rel. v. Railway, 35 Minn. 131; Railway v. Smith, 91 Ind. 121; Reed v. Camden, 53 N. J. L. 322; Railroad v. State, 32 N. J. L. 220; Railroad v. State ex rel., 149 Ind. 277; Railway v. Shelly, 163 Ind. 45; Railway v. Milwaukee, 97 Wis. 418; City v. Railway, 16 N. D. 313; Railway v. Chicago, 140 Ill. 309; Elliott on Roads (2 Ed.), secs. 779-80; Scanlan v. Boston, 140 Mass. 84; Railway v. State ex rel., 159 Ind. 510. (4) Railroad corporations, because of their public character, and because they receive from the State the privilege of exercising the power of eminent domain, may be subjected to such regulations in regard to the conduct of their business as the State may deem wise and proper for the public safety or general good. As a police regulation for the public safety, the Legislature may require the abolition of crossings at grade between streets and railroads, and may require the expense of such change to be paid by the railroad. Lewis on Eminent Domain, sec. 249; Niccolls on Eminent Domain, sec. 200. Northern Pacific v. Duluth, 208 U. S. 583; Railway v. Chicago, 140 Ill. 317; Railroad v. Bristol, 151 U. S. 556; Norwood v. Railroad, 161 Mass. 264; C. B. & Q. v. Nebraska, 170 U. S. 71, 47 Neb. 549; C. B. & Q. v. Chicago, 166 U. S. 226; Wabash v. Defiance, 167 U. S. 88; C. B. & Q. v. Commissioners, 200 U. S. 561; Woodruff v. Catlin, 54 Conn. 277; Cleveland v. City Council, 43 L. R. A. (Ga.) 641; People v. Railroad, 70 N. Y. 569; Harriman v. Railroad, 111 Tenn. 538; Detroit v. Osborn, 189 U. S. 390. (5) Sec. 3141, R. S. 1909, permitting railroads to make a road or street pass under its tracks is not a limitation upon the police power; it does not give an unconditional

option to the railroads. People ex rel. v. Railway, 177 N. Y. 337. (6) The city of St. Louis is vested with plenary power to establish, improve, and change the grade of its streets and to regulate and control the same. It was never intended by sec. 3141, R. S. 1909, to give to railroads the power to change the grade of the streets at crossings, and *pro tanto* to abrogate the city charter. State ex inf. v. Railway, 151 Mo. 162; Seibert v. Railroad, 188 Mo. 657; Charter, art. 3, sec. 26, cl. 3; Dillon Municipal Corp. (5 Ed.). sec. 235; Wills v. Railroad, 133 Mo. App. 625-634; State ex rel. v. Severance, 55 Mo. 378; In re Park Co., 50 N. Y. 493; E. St. Louis v. Maxwell, 99 Ill. 443; Wood v. Comrs., 58 Cal. 563; State v. Wilson, 80 Tenn. 251; Mayor v. Inman, 57 Ga. 370; Walworth County v. Williage, 17 Wis. 193. (7) Those affected by an exercise of the police power are required to conform to its mandate, although they may thereby incur expense; it is no objection that the railroads in this case may be required to pay damages to abutting owners, and, for that purpose, to employ the power of eminent domain. State ex rel. v. Railway, 35 Minn. 131; Railroad v. Corp. Com'n, 206 U. S. 1; State ex rel. v. Railway, 38 Minn. 246; Worcester v. Railroad, 109 Mass. 112; People ex rel. v. Railroad, 58 N. Y. 152; People ex rel. v. Railroad, 70 N. Y. 569; People v. Railroad, 104 N. Y. 67; Railway v. Jacobson, 179 U. S. 287. (8) The power to enact the ordinances in question in this suit has been delegated to the city. Sec. 9802, R. S. 1909; Charter, art. 3, sec. 26; cls. 2, 6, 11 and 14; Tiedeman on Municipal Corporations, sec. 116; Seibert v. Railroad, 188 Mo. 657; Bluedorn v. Railroad, 108 Mo. 439; City v. Galt, 179 Mo. 18; Carthage v. Garner, 209 Mo. 688; Springfield v. City, 85 Mo. 677; Carthage v. Block, 139 Mo. App. 386; State v. Fisher, 52 Mo. 178; City v. Schoenbush, 95 Mo. 618; Sluder v. Transit Co., 189 Mo. 107. And the city had the power to enact these ordinances in so far, at least, as the St. Louis

& San Francisco Ry. Co., and the St. Louis & Oak Hill Ry. Co., are concerned, under the power reserved in the franchise ordinances of these companies to alter, amend or repeal the same. All franchise grants to railroad companies by the city since the adoption of the present charter, are subject to this power, whether expressly reserved in the grant, or not. Norwood v. Railroad, 161 Mass. 264; People v. Railroad, 70 N. Y. 569. (9) The right of the city to thus exercise its police power could not be contracted away; for this reason the ordinances in question do not affect the ordinances granting the St. Louis & San Francisco Railroad Co., and the St. Louis, Oak Hill and Carondelet permission to operate across the city streets. Railroad v. Duluth, 208 U. S. 583; Railroad v. Bristol, 151 U. S. 556; Railroad v. Nebraska, 170 U. S. 71; Railway v. City, 85 Mo. 577; State ex rel. v. St. Paul, 98 Minn. 387; City v. Railway, 55 Kan. 735; Veazie v. Mayo, 45 Mo. 560; Railroad v. Railway, 152 Pa. St. 127. (10) The ordinances in question were not required under the charter to originate with the Board of Public Improvements. The ordinances do not direct a change of grade of the street. (a) They provide that the viaducts shall be constructed of design and character to be approved by the Board of Public Improvements, and that the viaducts may, to permit drainage, have a rise of 2 feet in the center above the extremities at either side, which extremities shall not be above the present grade of the street. The rise of 2 feet in the center is permissive only—not mandatory. (b) The rise is too insignificant to be considered by the court. At only one point—the center of the right of way of the railroads—is any rise permissible, and it must be sloped towards the ends so that the extremities of the viaduct will be on the present grade of the streets. Considering the length of the viaducts, this rise is almost infinitesimal, and warrants the application of the maxim "*de minimis non*

American Tobacco Co. v. St. Louis.

*curat lex."* Broom's Legal Maxims, p. 146. (c) Should the plan presented by the railroad companies, and approved by the board, actually involve a change of grade, a further ordinance authorizing such change could be passed. Atkinson v. Wykoff, 58 Mo. App. 86. (d) But even if the ordinance necessarily involved a change in the grade of the street or called for public work, it is not necessary under the present city charter that the same should first be recommended by the Board of Public Improvements. Charter, sec. 26, cl. 2, art. 3; *Ibid.,* sec. 17, art. 6; Sec. 17, art. 6 of the charter before amended in 1901; Kansas City v. Smart, 128 Mo. 272. (e) The ordinances in question here do not direct the doing of "public work" within the meaning of that term as used in the charter provisions requiring contracts for such work to be let by the Board of Public Improvements. (11) Under the statutes of this State, railroads are required to permit industries to have switch connections under certain conditions. The statutes do not, however, give the industries a vested right to a switch connection with the railroad tracks at any fixed grade, nor a vested interest in the railroad's location. So far as this statute is concerned, there is nothing in it that would prevent a railroad from raising or lowering its tracks adjacent to plaintiffs' property, or from removing its tracks therefrom altogether. Kinealy v. Railroad, 69 Mo. 658; Seattle v. Hurst, 50 Wash. 421; Elliott on Railroads, sec. 1057-A; Liedel v. Northern Pacific, 89 Minn. 290; Pratt v. Cleveland, 191 Fed. 65. And the contracts of the plaintiffs and the other industries with the railroads are subject to the public duty of the company and the police power. Swift v. Railroad, 66 N. J. Eq. 453. Although railways are by the Constitution and statutes declared public highways, they are not public highways in the sense of streets for pedestrians or public traffic. The object of the constitutional and statutory provisions "was

to lay the foundation for certain kinds of legislative regulation of railways.'' Hyde v. Railway, 110 Mo. 272; Clark v. Railway, 127 Mo. 197; City v. Eddy, 123 Mo. 546; Heman v. Railroad, 206 Mo. 172; Farber v. Railway, 116 Mo. 81. (12) Even if the property rights of the plaintiffs should be damaged by the making of the improvements required by the ordinances, plaintiffs cannot stop the work until such damage has been ascertained and paid. Clemens v. Ins. Co., 184 Mo. 46; Medley v. Berry, 143 Mo. App. 641. (13) If the rise of two feet on the bridges, permitted by the ordinances for drainage, be construed to call for a changing of the grades, still plaintiffs could not be heard to complain, because their properties do not abut upon the portions of the highways where the grades would be changed, nor would such changes of grade in any way interfere with access to the property of plaintiffs from those highways. Glasgow v. St. Louis, 107 Mo. 198; Knapp, Stout & Co. v. City, 156 Mo. 343; Rude v. City, 93 Mo. 408; Fairchild v. City, 97 Mo. 85; Van de Vere v. Kansas City, 107 Mo. 83; Gauss v. Railroad, 113 Mo. 309; Cummings v. Ice Co., 159 Mo. 28; Johnson v. St. Louis, 172 Fed. 40. (14) Plaintiffs have an adequate remedy at law. Christian v. City, 127 Mo. 109; Clemens v. Ins. Co., 184 Mo. 46. (15) It was not necessary that there should have been a finding by the Municipal Assembly of the fact that the grade crossing in question constituted a nuisance, or that there should have been a declaration to that effect by the assembly or other municipal agency, or that the railroads should have received a notice of the intention to enact the ordinance. Young v. City, 47 Mo. 492; Kiley v. Forsee, 57 Mo. 394; Railroad v. Maguire, 49 Mo. 480; Miller v. Anheuser, 2 Mo. App. 172; Harrelson v. Railroad, 151 Mo. 482; Railroad v. Interstate Co., 144 U. S. 585; 5 Pomeroy's Equity Juris., sec. 521; Railroad v. Nebraska, 47 Neb. 549; Health Dep. v. Trinity Church,

145 U. S. 32. (16) The public necessity for the exercise of police powers in any case is a matter addressed to the discretion of the Legislature. Railroad v. North Carolina, 206 U. S. 1. It is the duty of courts in testing the validity of a given regulation, to resolve all doubts in favor of the legislative action. Williams v. State, 108 S. W. (Ark.) 838. An ordinance to be void for unreasonableness must be plainly and clearly unreasonable. There must be evidence of weight that it took inception either in a mistake or in a spirit of fraud or wantonness on the part of the enacting body. Horr and Bemis, Municipal Police Ordinances, sec. 127; Skinker v. Heman, 148 Mo. 349; St. Louis v. Weitzel, 134 Mo. 600; Knapp, Stout & Co. v. St. Louis, 156 Mo. 343; Prior v. Construction Co., 170 Mo. 451; Block v. Chicago, 239 Ill. 251; Gratiot v. Railroad, 116 Mo. 450. With respect to the police power, there is a broad authority within the field of legislative discretion, wherein the law-making power is absolutely the master of its own discretion as to what is good and expedient. Railroad v. Hartford, 160 Ind. 674; C. B. & Q. v. Nebraska, 47 Neb. 549; City v. Weber, 44 Mo. 547; Abbott on Municipal Corporations, sec. 913; Gray v. Western Union, 12 Mo. App. 485. And the burden is upon the person asserting an ordinance to be unreasonable, to so show by facts. Carthage v. Garner, 209 Mo. 688. The fact that the method of separation of grades called for by the ordinances may put the railroads to greater cost than some other plan, does not prove the ordinances to be unreasonable. Railroad v. Corporation, 206 U. S. 1; State ex rel. v. Railroad, 98 Minn. 387. It is for the city, and the city alone, to say how it will treat its streets. It may use them as it pleases. St. Louis v. Terminal, 211 Mo. 390. (17) If, in the practical execution of the requirements of the ordinances, the changing of the grade of the railroad tracks at other streets than those named in the ordinances, becomes necessary, the defendant rail-

roads have the right to cross such streets without further legislation. State ex rel. v. Minnesota, 39 Minn. 223; State ex rel. v. St. Paul, 35 Minn. 131; State ex rel. v. St. Paul, 38 Minn. 253. Whether or not that would be necessary would depend upon the detail plan of depression adopted by the railroads. If further legislation respecting the changing of grades of other streets was found by the trial court to be advisable or necessary, it was competent for that court to enter a decree conditional upon such legislation being made. 5 Pomeroy Eq. Juris., sec. 534; Winchell v. Waukesha, 110 Wis. 101; York v. Davidson, 39 Ore. 81; Grand Rapids v. Weiden, 97 Mich. 82; Henderson v. Railroad, 78 N. Y. 423; Papenhaim v. Metropolitan Co., 128 N. Y. 436; Joy v. St. Louis, 138 U. S. 1; Railroad v. Railroad, 163 U. S. 564; Schmitt v. Railroad, 101 Ky. 441; Walden v. Badley, 39 U. S. 156; Neblett v. McFarland, 92 U. S. 101; Ramon v. Sharp, 33 Conn. 1; Clark v. Bell, 34 Ky. 15; Craig v. McMillin, 39 Ky. 311; Clark v. Drake, 63 Mo. 354; Daughtry v. Reddick, 40 N. C. 261; Fitzhugh v. Land Co., 81 Tex. 306; Economic P. & C. Co. v. Buffalo, 111 N. Y. Supp. 443; 2 Daniel's Chan. Pr., pp. 987-1001. (18) Evidence as to use of switching tracks on steep grades in other cities was admissible to show that such grades are not impracticable. Hoyt v. Jeffers, 30 Mich. 181; Hine v. Railroad, 149 N. Y. 154; Cass v. Railroad, 14 Ala. 448; Maynard v. Buck, 100 Mass. 40. Evidence respecting the damage which might be suffered by the owners of plants other than the complainants was inadmissible. Any possible interference with them or impairment of their switching facilities is no concern of the complainants. St. Louis v. Terminal Assn., 211 Mo. 390.

## STATEMENT.

WOODSON, J.—This action was instituted in the circuit court of the city of St. Louis, in October, 1909,

by the American Tobacco Company, a corporation organized and existing under the laws of the State, of New Jersey, duly authorized to do business in this State, and the American Car Company, organized and existing under the laws of the State of Missouri, plaintiffs, against the Missouri Pacific Railway Company, the St. Louis, Oak Hill & Carondelet Railway Company, the St. Louis & San Francisco Railroad Company, corporations organized and existing under the laws of this State, and the city of St. Louis, a municipal corporation, defendants.

The Tobacco Company is engaged in the manufacture and sale of tobacco, and the Car Company is engaged in the manufacture and sale of cars for street railways; the railroad companies are common carriers of freight and passengers for hire, and the city of St. Louis exists and is controlled by a special charter.

The object of the suit was to enjoin the railway companies, and each of them, from complying with or carrying out the provisions of four ordinances, Nos. 24358, 24359, 24360 and 24361, enacted by the city of St. Louis, relating to the separation of certain grade crossings, at and in the vicinity of the intersections of said defendants' lines of railroad with Tower Grove avenue, Park avenue, Old Manchester road, and other streets of the city, in that vicinity, and to enjoin the city from requiring said railroad to comply with said ordinances.

The general object and purpose of said ordinances was to compel said railroad companies to depress their tracks from twenty-two to twenty-five feet below the present grade crossings of said streets and avenues, and to construct and maintain retaining walls, bridges and viaducts along and over said tracks at the places aforesaid.

The plaintiffs own about thirty acres of land adjacent to or near the intersection of said railroads with the streets and avenues before mentioned, upon

which they have constructed and maintained large manufacturing plants, worth about three and a quarter million of dollars. Their said plants are connected with said railroads by means of spurs or switch tracks, which furnish them ample transportation and shipping facilities for all the raw material and the finished product of their factories, which aggregates from eighteen to twenty thousand carloads in carload lots annually. Practically the same is true of the car works.

The suit was brought jointly on behalf of the plaintiffs, and all others similarly situated, who might desire to join in the proceeding.

The pleadings in the case are exceedingly lengthy, covering about one hundred and sixty-five printed pages; and for that reason, among others, we will not undertake to set them out, but will sufficiently outline the issues tendered as to present the questions of fact and the propositions of law to be determined.

The petition sets out the four ordinances previously mentioned, and since almost every section of each and all of them is challenged for one cause or another, we deem it best to copy them here.

Ordinance No. 24358, approved April 8, 1909, is in words and figures as follows:

"An Ordinance to Provide for the Lowering of the Tracks of the Missouri Pacific Railway Company at its Crossing, at Tower Grove Avenue, Park Avenue and Old Manchester Road and to Abolish said Grade Crossings and to Provide Penalties for a Violation of this Ordinance.

"*Be it ordained by the Municipal Assembly of the City of St. Louis as follows:*

"Section One.—The Missouri Pacific Railway Company is hereby required to lower its tracks at the crossing thereof on Park avenue, Old Manchester road and Tower Grove avenue, and to construct for said

streets over and above said tracks a substantial steel bridge, of design and character as to material and workmanship approved by the Board of Public Improvements of the city of St. Louis. Said bridge may have a rise, to permit drainage, of two feet in the center above the extremities at either side, which extremities shall not be above the present grade of said streets and the elevation of said bridge at the center from the lowest chord thereof to the top of rail beneath shall be not less than twenty feet.

"Section Two.—The work of lowering the tracks shall commence within six months from the date of approval of this ordinance, and after said work has been commenced it shall be continuously prosecuted and the same shall be fully and finally completed on or before the thirty-first day of December A. D. nineteen hundred and ten, unless prevented by strike, or restrained by injunction or other order or process by a court of competent jurisdiction. The time during which said railway company shall be prevented by strike or strikes, or legal proceedings as aforesaid, shall be added to the time hereby limited for the completion of said work, provided said railway company give notice in writing to the city counselor of the city of St. Louis, of the institution of said legal proceedings, whereupon the city of St. Louis shall be permitted on behalf of said railway company to take part in the defense of any suits or proceedings brought by any person or persons seeking to enjoin or restrain, or in any manner interfere with the prosecution of said work, and move for dissolution of such injunction and restraining order and for any other proper order in such suit.

"Section Three.—The said railway company shall and is hereby required at its own proper cost and expense to build and construct retaining walls that may be necessary to protect the streets or private property from falling into such excavation as may be made.

Said retaining walls to be constructed of such dimension, such material and such workmanship, as shall be approved by the Board of Public Improvements of the city of St. Louis, provided that said railway company may make connections with any private property along the line of its said road between Chouteau avenue and Kingshighway, and for that purpose may build tracks or elevated switches from its tracks into such private property, subject to the directions of the Board of Public Improvements.

"Section Four.—It shall not be lawful for the Missouri Pacific Railway Company to operate any of its engines, cars or trains on, upon or across the surface of the streets heretofore named in this ordinance, namely: Park avenue, Old Manchester road and Tower Grove avenue, after the thirty-first day of December A. D., nineteen hundred and ten, unless the time for completion of the depression of said tracks is delayed as provided in section two of this ordinance.

"Section Five.—Said railway company shall repair, keep and maintain said bridge as is provided for, to be constructed by said railway company in this ordinance, without additional charge or cost to the city of St. Louis, and in such order and condition as will be satisfactory to the Board of Public Improvements, ordinary wear excepted, for a period of fifteen years from and after the completion and acceptance of the same, which keeping and maintaining shall include repairs or the entire reconstruction of the same, the necessity for which may be occasioned by or through faulty material or workmanship, provided, however, that the railway company shall not be required to keep or maintain any part of said improvement, which after its completion and acceptance, shall have been removed for the purpose of laying or repairing any gas, sewer, water or other pipe or conduit in accordance with a permit granted by the city of St. Louis, or to maintain or to renew any part of said improvement that may

have been damaged in any manner by any work which shall have been done in accordance with or under the authority of a permit granted by the city of St. Louis. If said railway company shall fail, neglect or refuse to repair, keep and maintain the said work, in accordance with this section, within thirty days after notice so to do, from the president of the Board of Public Improvements, the president of said board may proceed to do or cause to have done the work necessary to comply with the same, and collect the cost and the expense thereof from the said railway company.

"Section Six.—Should the Missouri Pacific Railway Company fail to depress its tracks under said crossing or otherwise to comply with all the provisions of this ordinance, or run any engine, car or trains over, on, along or across said Park avenue, Old Manchester road and Tower Grove avenue, upon the surface of such streets, after the first day of January A. D. nineteen hundred and eleven, such failure or act shall be deemed a misdemeanor, and said company shall be punished by a fine of not less than two hundred and fifty dollars nor more than five hundred dollars for such violation of this ordinance, and the passage of each and every car, engine or train, shall be considered a separate and independent misdemeanor. Should any engineer, conductor or other employee violate this ordinance by running or directing the movement of any engine, car or trains of the Missouri Pacific Railway upon grade across the streets named, Park avenue, Old Manchester road and Tower Grove avenue, such action shall be deemed and considered a misdemeanor and shall be punishable upon conviction in the police courts of the city of St. Louis, by a fine of not less than fifty dollars nor more than two hundred and fifty dollars."

We copy Ordinance No. 24361 in this connection because it relates to the same railroad that No. 24358 does:

"An Ordinance to Provide for Lowering the Tracks of the Missouri Pacific Railway at its Crossing at Tower Grove Avenue, Park Avenue and Old Manchester Road, and to Abolish said Grade Crossing and to Provide Penalties for a Violation of this Ordinance and to Amend a Portion of Ordinance Number Nineteen Thousand, Nine Hundred and Ninety-two, Entitled, 'An Ordinance Authorizing the Missouri Pacific Railway Company to Construct, Maintain and Operate Tracks Across Old Manchester Road, Tower Grove Avenue and Kingshighway, Race Course Avenue Along Tesson Street and Across Seventy Street, Ivory Avenue, Virginia Avenue, Michigan Avenue Minnesota Avenue, Pennsylvania Avenue and the Alleys in City Blocks Three Thousand One Hundred and Sixty-Five and Three Thousand One Hundred and Sixty-four.'

"*Be it ordained by the Municipal Assembly of the City of St. Louis, as follows*:

"Section One.—The Missouri Pacific Railway Company is hereby required to lower its tracks at the crossing thereof on Park avenue, Old Manchester road and Tower Grove avenue, and to construct for said streets, over and above said tracks a substantial steel bridge, of design and character as to material and workmanship, approved by the Board of Public Improvements of the city of St. Louis. Said bridge may have a rise, to permit drainage, of two feet in the center above the extremities at either side, which extremities shall not be above the present grades of said streets, and the elevation of said bridge at the center from the lowest chord thereof to the top of rail beneath shall not be less than twenty feet.

"Section Two.—The work of lowering the tracks shall commence within six months from the date of approval of this ordinance, and after said work has been commenced, it shall be continuously prosecuted and the same shall be fully and finally completed on or be-

fore the thirty-first day of December A. D. nineteen
hundred and ten, unless prevented by strike or strikes,
or restrained by injunction or other order or process
by a court of competent jurisdiction. The time dur-
ing which said railway company shall be prevented by
strike or strikes, or legal proceedings as aforesaid,
shall be added to the time hereby limited for the com-
pletion of said work, provided said railway company
give notice in writing to the city counselor of the city
of St. Louis of the institution of said legal proceed-
ings, whereupon the city of St. Louis shall be permit-
ted on behalf of said railway company to take part
in the defense of any suit or proceedings brought by
any person or persons seeking to enjoin or restrain,
or in any manner interfere with the prosecution of
said work, and move for dissolution of such injunction
and restraining order, and for any other proper order
in such suit.

"Section Three.—The said railway company shall
be and is hereby required at its own proper cost and
expense to build and construct retaining walls that
may be necessary to protect the streets or private
property from falling into such excavation as may be
made. Said retaining walls to be constructed of such
dimensions, such material and such workmanship as
may be approved by the Board of Public Improve-
ments of the city of St. Louis, provided that said rail-
way company may make connections with any private
property along the line of its said road, between Chou-
teau avenue and Kingshighway, and for that purpose
may build tracks or elevated switches from its tracks
into such private property, subject to the directions
of the said Board of Public Improvements.

"Section Four.—It shall not be lawful for the
Missouri Pacific Railway Company to operate any of
its engines, cars or trains on, upon or across the sur-
face of the streets heretofore named in this ordinance,
namely: Park avenue, Old Manchester road and

Tower Grove avenue, after the thirty-first day of December A. D. nineteen hundred and ten, unless the time for the completion of the depression of said tracks is delayed, as provided in section two of this ordinance.

"Section Five.—Said railway company shall repair, keep and maintain said bridge which is provided to be constructed by said railway company in this ordinance, without additional charge or cost to the city of St. Louis, and in such order and condition as will be satisfactory to the Board of Public Improvements, ordinary wear excepted, for a period of fifteen years, from and after the completion and acceptance of the same, which keeping and maintaining shall include repairs or the entire reconstruction of the same, the necessity for which may be occasioned by or through faulty material or workmanship, provided, however, that the railway company shall not be required to keep or maintain any part of said improvement, which after its completion and acceptance shall have been removed for the purpose of laying or repairing any gas, sewer, water or other pipe or conduit, in accordance with a permit granted by the city of St. Louis, or to maintain or to renew any part of said improvement that may have been damaged in any manner by any work which shall have been done in accordance with or under the authority of a permit granted by the city of St. Louis. If said railway company shall fail, neglect or refuse to repair, keep and maintain the said work, in accordance with this section, within thirty days after notice so to do, from the president of the Board of Public Improvements, the president of said board may proceed to do or cause to have done the work necessary to comply with the same and collect the cost and the expense thereof from the said railway company.

"Section Six.—Should the Missouri Pacific Railway Company fail to depress its tracks under said crossings or otherwise to comply with all the provi-

sions of this ordinance or run any engines, cars or trains over, on, along or across said Park avenue, Old Manchester road and Tower Grove avenue, upon the surface of such streets, after the first day of January, A. D. nineteen hundred and eleven, such failure or act shall be deemed a misdemeanor and said company shall be punishable by a fine of not less than two hundred and fifty dollars nor more than five hundred dollars for such violation of this ordinance, and the passage of each and every engine, car or train shall be considered a separate and independent misdemeanor. Should any engineer, conductor or other employee violate this ordinance by running or directing the movement of any engine, car or train of the Missouri Pacific Railway, upon grade across the streets named: Park avenue, Old Manchester road and Tower Grove avenue, such action shall be deemed and considered a misdemeanor, and shall be punishable upon conviction in the police court of the city of St. Louis by a fine of not less than fifty dollars nor more than two hundred and fifty dollars.

"Section Seven.—Section one of ordinance numbered Nineteen Thousand Nine Hundred and Ninety-two, entitled, 'An ordinance authorizing the Missouri Pacific Railway Company to construct, maintain and operate tracks across Old Manchester road, Tower Grove avenue, Kingshighway, Race Course avenue, and along Tesson street, and across Seventh street, Ivory avenue, Virginia avenue, Michigan avenue, Minnesota avenue, Pennsylvania avenue and the alleys in City Blocks Three Thousand One Hundred and Sixty-four and Three Thousand One Hundred and Sixty-five,' is hereby amended by striking out after the first word 'across' and the word 'Kings' the words 'the Old Manchester road, Tower Grove avenue and;' also by adding after the word 'sixty-four' at the end of said section one the words 'provided that said Missouri

Pacific Railway Company may operate the norther-most track across Old Manchester road and 'Tower Grove avenue until its said tracks are depressed at the crossings of said road and avenue in such manner as may be required by ordinance of the city of St. Louis,' so that said section one when thus amended shall read as follows: 'Section One. The Missouri Pacific Railway Company is hereby authorized to construct, maintain and operate a track, being an extension of its northernmost track westwardly across Kingshighway, and also a track across Race Course avenue; and also a track from a point on the north line of City Block Three Thousand One Hundred and Sixty-eight along Tesson street and across Seventh street, Ivory avenue, Virginia avenue, Michigan avenue, Minnesota avenue and Pennsylvania avenue, through City Blocks Three Thousand One Hundred and Sixty-five, Three Thousand One Hundred and Sixty-four, Three Thousand One Hundred and Sixty-three, Three Thousand One Hundred and Sixty-two, Three Thousand One Hundred and Sixty-one and Three Thousand One Hundred and Sixty, and across the alleys in City Blocks Three Thousand One Hundred and Sixty-five and Three Thousand One Hundred and Sixty-four, provided that said Missouri Pacific Railway Company may operate its said northernmost track across Old Manchester road and Tower Grove avenue until its said tracks are depressed at the crossings of said road and avenue in such manner as may be required by ordinance of the city of St. Louis.'

"Section Eight.—The city of St. Louis reserves the right to amend, alter or repeal this ordinance at any time."

Ordinance 24359, approved April 8, 1909, was and is in words and figures as follows, to-wit:

"An Ordinance to Provide for the Lowering of the Tracks of the St. Louis & San Francisco Railroad

Company at its Crossing, at Tower Grove Avenue, Park Avenue and Old Manchester Road and to Abolish said Grade Crossings and to Provide Penalties for a Violation of this Ordinance.

"*Be it ordained by the Municipal Assembly of the City of St. Louis as follows*:

"Section One.—The St. Louis & San Francisco Railroad· Company is hereby required to lower its tracks at the crossing thereof on Park avenue, Old Manchester road and Tower Grove avenue, and to construct for said streets, over and above said tracks, substantial steel bridges, of design and character as to material and workmanship, approved by the Board of Public Improvements of the city of St. Louis. Said bridges may have a rise, to permit drainage, of two feet in the center above the extremities at either side, which extremities shall not be above the present grade of said streets, and the elevation of said bridges at the center from the lowest chord thereof to the top of rail beneath shall be not less than twenty feet.

"Section Two.—The work of lowering the tracks shall commence within six months from the date of approval of this ordinance, and after said work has been commenced, it shall be continuously prosecuted and the same shall be fully and finally completed on or before the thirty-first day of December A. D. nineteen hundred and ten, unless prevented by strike or strikes, or restrained by injunction or other order or process by a court of competent jurisdiction. The time during which said railroad company shall be prevented by strike or strikes, or legal proceedings as aforesaid, shall be added to the time hereby limited for the completion of said work, provided said railroad company give notice in writing to the city counselor of the city of St. Louis of the institution of said legal proceedings, whereupon the city of St. Louis shall be permitted on behalf of said railroad company to take part in the defense of any suit or proceedings

brought by any person or persons seeking to enjoin or restrain, or in any manner interfere with the prosecution of said work, and move for dissolution of such injunction and restraining order, and for any other proper order in such suit.

"Section Three.—The said railroad company shall and is hereby required at its own proper cost and expense to build and construct retaining walls that may be necessary to protect the streets or private property from falling into such excavation as may be made. Said retaining walls to be constructed of such dimensions, such materials and such workmanship as shall be approved by the Board of Public Improvements of the city of St. Louis, provided that said railroad company may make connections with any private property along the line of its said road, between Chouteau avenue and Kingshighway, and for that purpose may build tracks or elevated switches from its tracks into such private property, subject to the directions of the Board of Public Improvements.

"Section Four.—It shall not be lawful for the St. Louis and San Francisco Railroad Company to operate any of its engines, cars or trains on, upon or across the surface of the streets heretofore named in this ordinance, namely: Park avenue, Old Manchester road and Tower Grove avenue, after the thirty-first day of December A. D. nineteen hundred and ten, unless the time for completion of the depression of said tracks is delayed as provided in section two of this ordinance.

"Section Five.—Said railroad company shall repair, keep and maintain said bridges as are provided for to be constructed by said railroad company in this ordinance, without additional charge or cost to the city of St. Louis, and in such order and condition as will be satisfactory to the Board of Public Improvements, ordinary wear excepted, for a period of fifteen

years, from and after the completion and acceptance of the same, which keeping and maintaining shall include repairs or the entire reconstruction of the same, the necessity for which may be occasioned by or through faulty material or workmanship; provided, however, that the railroad company shall not be required to keep or maintain any part of said improvement, which after its completion and acceptance shall have been removed for the purpose of laying or repairing any gas, sewer, water or other pipe or conduit in accordance with a permit granted by the city of St. Louis, or to maintain or to renew any part of said improvement that may have been damaged in any manner by any work which shall have been done in accordance with or under the authority of a permit granted by the city of St. Louis. If said railroad company shall fail, neglect or refuse to repair, keep and maintain the said work in accordance with this section, within thirty days after notice so to do from the president of the Board of Public Improvements, the president of said board may proceed to do or cause to have done the work necessary to comply with the same, and collect the cost and the expense thereof from the said railroad company.

"Section Six.—Should the St. Louis & San Francisco Railroad Company fail to depress its tracks under said crossings or otherwise to comply with all the provisions of this ordinance, or run any engine, car or trains over, on, along or across said Park avenue, Old Manchester road and Tower Grove avenue, upon the surface of such streets, after the first day of January A. D. nineteen hundred and eleven, such failure or act shall be deemed a misdemeanor, and said company shall be punished by a fine of not less than two hundred and fifty dollars nor more than five hundred dollars for such violation of this ordinance, and the passage of each and every car, engine, or train, shall be considered a separate and independent misde-

meanor. Should any engineer, conductor or other employee violate this ordinance by running or directing the movement of any engine, car or trains of the St. Louis and San Francisco Railroad Company upon grade across the streets named: Park avenue, Old Manchester road and Tower Grove avenue, such action shall be deemed and considered a misdemeanor, and shall be punishable upon conviction in the police courts of the city of St. Louis, by a fine of not less than fifty dollars nor more than two hundred and fifty dollars."

Ordinance 24359, approved April 8, 1909, was and is in words and figures as follows, to-wit:

"An Ordinance to Provide for the Lowering of the Tracks of the St. Louis, Oak Hill and Carondelet Railway Company at its Crossings at Tower Grove Avenue, Old Manchester Road, McRee Avenue, Eager Road and Shaw Avenue, to Abolish Grade Crossings thereat and to Provide Penalties for the Violation of this Ordinance, and to Repeal Ordinance Number Eighteen Thousand One Hundred and Eighty-five, Entitled, 'An Ordinance Authorizing the St. Louis, Oak Hill and Carondelet Railway Company to Construct, Maintain and Operate a Track Across McRee Avenue, Old Manchester Road and Tower Grove Avenue.'

"*Be it ordained by the Municipal Assembly of the City of St. Louis as follows*:

"Section One.—The St. Louis, Oak Hill and Carondelet Railway Company is hereby required to lower its tracks at the crossing thereof on Tower Grove avenue, Old Manchester road, McRee avenue, Eager road and Shaw avenue and to construct for said streets over and above said tracks, substantial steel bridges, of design and character as to material and workmanship approved by the Board of Public Improvements of the city of St. Louis. Said bridges may have a rise, to permit drainage, of two feet in the center above

the extremities at either side, which extremities shall not be above the present grades of said streets, and the elevation of said bridges at the center from the lowest chord thereof to the top of rail beneath shall be not less than twenty feet.

"Section Two.—The work of lowering the tracks shall commence within six months from the date of approval of this ordinance, and after said work has been commenced, it shall be continuously prosecuted and the same shall be fully and finally completed on or before the thirty-first day of December A. D. nineteen hundred and ten, unless prevented by strike or strikes, or restrained by injunction or other order or process by a court of competent jurisdiction. The time during which said railway company shall be prevented by strike or strikes, or legal proceedings, as aforesaid, shall be added to the time hereby limited for the completion of said work, provided said railway company give notice in writing to the city counselor of the city of St. Louis of the institution of said legal proceedings, whereupon the city of St. Louis shall be permitted on behalf of said railway company to take part in the defense of any suit or proceedings brought by any person or persons seeking to enjoin or restrain or in any manner interfere with the prosecution of said work, and move for dissolution of such injunction and restraining order, and for any other proper order in such suit.

"Section Three.—The said railway company shall and is hereby required at its own proper cost and expense to build and construct retaining walls that may be necessary to protect the streets or private property from falling into such excavation as may be made. Said retaining walls to be constructed of such dimensions, such material and such workmanship as shall be approved by the Board of Public Improvements of the city of St. Louis, provided that said railway company may make connections with any private

property along the line of its said road between the property of the Liggett and Myers Tobacco Company in City Block Four Thousand Nine Hundred and Seventy-three and Kingshighway as provided by ordinance number Eighteen Thousand One Hundred and Eighty-five and for that purpose may build tracks or elevated switches from its tracks into such private property, subject to the directions of the Board of Public Improvements.

"Section Four.—It shall not be lawful for the St. Louis, Oak Hill and Carondelet Railway Company to operate any of its engines, cars or trains on, upon or across the surface of the streets heretofore named in this ordinance, namely: Tower Grove avenue, Old Manchester road, McRee avenue, Eager road and Shaw avenue, after the thirty-first day of December A. D. nineteen hundred and ten, unless the time for completion of the depression of said tracks is delayed as provided in section two of this ordinance.

"Section Five.—Said railway company shall repair, keep and maintain said bridges as are provided for, to be constructed by said railway company in this ordinance, without additional charge or cost to the city of St. Louis, and in such order and condition as will be satisfactory to the Board of Public Improvements, ordinary wear excepted, for a period of fifteen years from and after the completion and acceptance of the same, which keeping and maintaining shall include repairs or the entire reconstruction of the same, the necessity for which may be occasioned by or through faulty material or workmanship; provided, however, that the railway company shall not be required to keep or maintain any part of said improvement, which after its completion and acceptance shall have been removed for the purpose of laying or repairing any gas, sewer, water or other pipe or conduit in accordance with a permit granted by the city of St. Louis, or to maintain or to renew any part of said

improvement that may have been damaged in any manner by any work which shall have been done in accordance with or under the authority of a permit granted by the city of St. Louis. If said railway company shall fail, neglect or refuse to repair, keep and maintain the said work, in accordance with this section, within thirty days after notice so to do, from the president of the Board of Public Improvements, the president of said board may proceed to do or cause to have done the work necessary to comply with the same, and collect the cost and the expense thereof from the said railway company.

"Section Six.—Should the St. Louis, Oak Hill and Carondelet Railway Company fail to depress its tracks under said crossing or otherwise to comply with all the provisions of this ordinance, or run any engine, car or trains over, on, along or across Tower Grove avenue, Old Manchester road, McRee avenue, Eager road and Shaw avenue, upon the surface of such streets, after the first day of January A. D. nineteen hundred and eleven, such failure or act shall be deemed a misdemeanor and said company shall be punished by a fine of not less than two hundred and fifty dollars nor more than five hundred dollars for such violation of this ordinance, and the passage of each and every car, engine or train, shall be considered a separate and independent misdemeanor. Should any engineer, conductor or other employee violate this ordinance by running or directing the movement of any engine, car or trains of the St. Louis, Oak Hill and Carondelet Railway, upon grade across the streets named: Tower Grove avenue, Old Manchester road, McRee avenue, Eager road and Shaw avenue, such action shall be deemed and considered a misdemeanor, and shall be punishable upon conviction in the police courts of the city of St. Louis, by a fine of not less than fifty dollars nor more than two hundred and fifty dollars.

"Section Seven.—Ordinance Number Eighteen Thousand, One Hundred and Eighty-five, entitled: 'An ordinance authorizing the St. Louis, Oak Hill and Carondelet Railway Company to construct a railroad track across McRee avenue, Old Manchester road and Tower Grove avenue,' is hereby repealed, provided that said St. Louis, Oak Hill and Carondelet Railway Company may operate said track across McRee avenue, until its said tracks are depressed at that point as provided in the foregoing sections of this ordinance."

The validity of all of these ordinances is assailed by the petition for numerous reasons, the following among others:

(a) That said ordinances did not originate with the Board of Public Improvements of the city of St. Louis, as required by the charter thereof.

(b) The lowering of said streets will greatly and irreparably damage the plaintiffs and all others similarly situated.

(c) That the city has no power under its charter to require the defendant railroads to lower their tracks as provided by said ordinances.

The answer of the city of St. Louis admits many of the allegations of the petition, but denies the invalidity of said ordinances.

For further answer this defendant alleged that the said intersection of the tracks of defendant railroad companies is also the point of convergence of Old Manchester road, Park avenue, Tower Grove avenue and Race Course avenue, all public highways; that said point of convergence is in a thickly populated section of said city; that through said section, and along said highways, there passes, at all hours of the day, a great volume of traffic from other sections of said city, and from beyond the limits thereof, amounting to and averaging more than two thousand vehicles and more than five thousand pedestrians per day;

that upon the surface and established grade of Tower
Grove avenue and Old Manchester road are laid the
tracks of the United Railways Company of St. Louis,
a street railway company operating two lines of cars
thereon for the transportation of passengers; that un-
der the provisions of ordinance 21113, approved April
6, 1903, said United Railways Company of St. Louis
is required to run its cars on said lines and across said
intersection, between the hours of five-thirty a. m. and
twelve midnight, at intervals of six and seven minutes;
that if so operated its cars would cross said intersec-
tion more than six hundred times each day; that the
average number of passengers carried by said cars
is ten; that said intersection is less than one mile dis-
tant from Forest Park and Tower Grove Park, two
of the principal public parks of this defendant, and
that said intersection is within less than one-half of a
mile from the Missouri Botanical Garden, which said
Forest Park, Tower Grove Park and Missouri Botan-
ical Garden are three of the principal pleasure grounds
of the people of said city and of others who may be
temporarily visiting or resident therein; that the de-
fendant railroad companies operate passenger, freight
and switching trains on the tracks of their said roads
and crossing the said highways upon the same grade
with the said street cars and vehicles and pedestrians,
and that the number of said trains averages more than
one hundred and fifty per day.

This defendant alleges that because of the pres-
ence of the tracks of the said defendant railroad com-
panies, the operation of their said trains thereon, up-
on the same grade with the said public highways, did,
at the time of the passage of the said ordinances, ren-
der the said intersections, and still does render the
same unsafe for use by the public; that the operation
of the trains of the said defendant railroad companies
at said intersections is a constant source of delay to
the traffic on said highways, and a source of great in-

convenience to the public, and the presence of the said
tracks and the operation of said trains did, at the time
of the passage of said ordinances, constitute, and still
constitutes, a nuisance dangerous to the public, a con-
stant menace and source of terror to persons crossing
the tracks of the said defendants at said intersections;
and in addition to creating an unsafe condition, occa-
sioning delays to public traffic and being a nuisance
and a menace as aforesaid, the said tracks and the
said trains operated thereon, upon the said grade,
have greatly depreciated, and if not abated will still
further depreciate, the value of property of citizens
of this defendant situated in the neighborhood of said
intersections. This defendant further alleges that the
amount of traffic on said highways and at said inter-
section for a long time past has been and is now
steadily increasing.

The answer and cross-bill of the St. Louis & San
Francisco Railway Company assailed the validity of
said ordinance No. 24359, for various reasons, and
among others the following:

That the right to operate its lines of railroad in
the city of St. Louis was acquired under authority of
the Constitution and laws of the State of Missouri,
the ordinances of the city of St. Louis and the provi-
sions of the railroad's charter. That in connection
with the main tracks of its line and in the vicinity
of Tower Grove avenue and Old Manchester Road,
and for some distance west thereof, it has constructed
and operates at large expense, yards, switches, tracks,
passing tracks and various other improvements nec-
essary to the proper and successful operation of its
line of railroad; and that numerous industries, includ-
ing those of the plaintiffs, are located at or near its
lines of railroad, to which industries various spur
tracks have been constructed conforming to the estab-
lished grades of said streets and tracks of this defend-
ant railroad and connecting with its tracks, the loca-

tions of said industries having been determined largely by the accessibility thereof to defendant's said line of railroad as a means for the receipt of materials and supplies and as an outlet for their products; that said industries were erected and are maintained and operated at great expense and the business thereof amounts to many millions of dollars per annum; that such spur tracks were constructed and have been and are now operated under and pursuant to contracts entered into between this defendant and the owners of said industries, and that from said industries this defendant derives a large and constantly increasing revenue in freight charges. The answer then alleges the passage of the four ordinances numbered 24358, 24359, 24360 and 24361, referred to in plaintiffs' bill, stated the substance thereof and pleads the provisions of sections 14, 15, 16, 17 and 27 of article 6 of the charter of the defendant city, and section 1800 of its General Ordinances (Woerner's Revised Code, 1907, sec. 1913), and charges that said ordinance numbered 24359, which has particular reference to this defendant, is void because it was not passed in pursuance to such charter and ordinance provisions.

It is further alleged that said ordinance is invalid because it provides for the construction of a bridge by this defendant over Park avenue, which said Park avenue is not crossed by the line of defendant railroad.

It is further charged that said ordinance is oppressive and unreasonable in that, to depress the tracks of this defendant as required thereby, it will be necessary to destroy in whole or in part a large public sewer of the defendant city, the general course of which is under the surface of the street of said Park avenue and extending under the right of way of defendant, by cutting into the same to a depth of approximately six and one-half feet, thereby practically destroying said sewer for drainage purposes, to the great detri-

ment of the health of the inhabitants of defendant city, and to the great damage, injury and inconvenience of this defendant in the use and enjoyment of its property and the operation of its said line of railroad, by depriving it of adequate facilities for the drainage of its said product.

That the said ordinance is also oppressive and unreasonable because it requires this defendant to guarantee for a period of fifteen years the judgment of the Board of Public Improvements of defendant city with respect to the material and workmanship used in the construction of the steel bridges therein referred to; because it requires this defendant to bear all the cost and expense of the public work therein provided for and to repair, keep and maintain and, if necessary, reconstruct the bridges provided for in said ordinance, likewise at its own expense; because in attempting to require this defendant by said ordinance to construct necessary retaining walls to protect the streets or private property from falling into such excavations as may be made in depressing this defendant's said tracks and prescribing the material and workmanship to be used for that purpose, an attempt is made to exercise by the defendant city a power not vested in it under its charter; because the provisions of said ordinance, if enforced, would unreasonably, oppressively and arbitrarily interfere with the rights, privileges, property and business of this defendant and would subject it to great and irreparable loss, damage and expense, without securing any benefit to the public or said defendant the city of St. Louis, or its inhabitants; because complying with said ordinance in depressing its tracks as required therein would cause said tracks to be much lower than any outlet for drainage to be found in the vicinity where said depression is required, and would render it impracticable for this defendant to maintain railroad tracks at said de-

pressed grade, because of its inability to secure proper drainage facilities.

It is also pleaded that said ordinance is void because violative of sections 21, 25 and 30 of article 2, of the Constitution of Missouri, and section 10 of article 1 of the Constitution of the United States, and articles 5 and 8, and section 1 of article 14, of the amendments to the Constitution of the United States. That the said ordinance is inconsistent with the grant of authority to this defendant under the general laws of the State of Missouri.

It is further alleged that the ordinance is oppressive, unreasonable and illegal in that it attempts to require this defendant to depress its tracks at the places in said ordinance mentioned, in the absence of any legal proceeding to determine that the present grade crossings constitute a nuisance, thereby depriving this defendant of its property without due process of law, in violation of the laws of this State and of the constitutional provisions hereinbefore invoked.

It is further averred that that portion of its said line which is sought to be depressed under the terms and provisions of said ordinance No. 24359 was constructed by the St. Louis and San Francisco Railway Company under authority of an ordinance of the city of St. Louis approved June 22, 1881, being ordinance No. 11725, in and by which said ordinance it was provided that said St. Louis and San Francisco Railway Company should pay into the city treasury for each bridge constructed across its railroad tracks in the city of St. Louis west of Tayon avenue and including said avenue the sum of $15,000, said payments to be made within thirty days after the construction of said bridges should be commenced; that said Tower Grove avenue, Park avenue and Old Manchester road are west of said Tayon avenue (now Eighteenth street) in said city of St. Louis; said bridges to be constructed under the terms and provisions of said ordinance No.

24359, and each of said bridges will cost an amount far in excess of $15,000. That this defendant is the successor in title, interest and estate of the property, franchises, rights, privileges and immunities of the said St. Louis and San Francisco Railway Company, having duly acquired the same by purchase, and is entitled as such to the benefit of said ordinance No. 11725; wherefore this defendant avers that said ordinance No. 24359 is void, in that it violates the contract rights acquired by this defendant under and through said ordinance No. 11725.

That unless the defendant city be permanently restrained and enjoined from enforcing the terms and provisions of said ordinance No. 24359, this defendant will suffer special damage, for which no remedy exists save in a court of equity, and that it will be subjected to a multiplicity of suits. Wherefore it is prayed that the ordinance be adjudged null and void, and the city and its officers and agents be perpetually enjoined from enforcing said ordinance.

The answer and cross-bill of the St. Louis, Oak Hill & Carondelet Railway Company likewise attacks the validity of ordinance No. 24360 substantially for the following reasons:

That it owns and operates a line of railroad connecting with the main line of the Missouri Pacific Railway Company at a point where said main line of said Missouri Pacific Railway Company is intersected by Tower Grove avenue in said city, and extending thence in a southwestwardly and southerly direction through said city to a point near Broadway street in said city and there connecting with the main line of the St. Louis, Iron Mountain & Southern Railway at what is called Ivory Avenue Junction. That its railroad is a standard gauge double-track steam railroad used in the transportation of passengers and property. That under proper traffic arrangements and agreements between this defendant and said Missouri Pa-

-cific Railway Company and the St. Louis, Iron Mountain & Southern Railway Company, all the passenger trains and passenger traffic of this defendant and of the said St. Louis, Iron Mountain & Southern Railway Company have, ever since the construction of this defendant's road, been operated, and are now being operated, over its rails from its said connection with the said St. Louis, Iron Mountain & Southern Railway Company, at Ivory Avenue Junction, to Tower Grove avenue, and thence eastwardly over the rails of the Missouri Pacific Railway to Eighteenth street and the passenger depot known as the Union Station in said city; that this defendant has no other means or way of securing an inlet to said station except over the lines of the said Missouri Pacific Railway Company; that this defendant and said Iron Mountain road operate a great number of local and through passenger trains in and out of said station over the route named, and in addition to said passenger traffic move heavy freight traffic from the points of its connection with the said St. Louis, Iron Mountain & Southern Railway Company to said point of connection with the Missouri Pacific. That its railroad was constructed and is being operated as a means of safe and direct communication between the said Missouri Pacific Railway Company and said Iron Mountain road and for suburban service in the running of passenger trains for the convenience and accommodation of the people of St. Louis and its suburbs.

That by ordinance No. 13657, approved June 15, 1886, and an ordinance amendatory thereof, No. 14739, approved July 30, 1889, the right, privilege and authority was granted by said city to this defendant to construct, maintain and operate a railroad by steam power with a double track of standard gauge across and upon certain streets, which include Old Manchester road, McRee avenue, Eager Road, Shaw avenue,

Kingshighway and other streets. That by said ordinance it is provided that, said railroad may begin at a point in the city of St. Louis west of Old Manchester road that would permit a connection with either the Wabash Railroad Company, St. Louis & Pacific Railroad Company, the Missouri Pacific or the St. Louis & San Francisco Railroad, and extend thence in a southwestwardly direction across the streets above named. That said ordinance as amended provides as a consideration for the privileges therein granted the payment of an annual compensation to said city. That it is further provided in said ordinance that whenever the city of St. Louis should declare, by ordinance, the necessity of bringing over or tunneling under any street on the line of the said railroad, the company owning said railroad should be obliged to pay one-half the cost of any such structure or bridge and the whole cost of the grading necessary to be done in connection therewith. That this ordinance constitutes a binding and irrevocable contract between the city of St. Louis and this defendant, and the agreement of this defendant to make such payments and contributions toward the cost of constructing such bridges constitutes one of the controlling considerations for said grant.

That said railroad authorized by said ordinance was fully completed and in operation by this defendant in the year 1889, and when built was constructed at and according to the established grades of the city of St. Louis at Tower Grove avenue and the other streets, avenues and highways crossed and intersected by it at the time. That this defendant on the 8th day of April, 1909 (the date of approval of the grade separation ordinances in suit) and for a long time prior thereto owned and operated and now owns and operates lines of railroad in said city and crossing Tower Grove avenue, Old Manchester road, McRee avenue, Eager road, Shaw avenue and other streets and high-

ways of said city at the surface grades of said streets and for some distance south and east of said Tower Grove avenue and reaching the Union station.

Then follow allegations regarding industrial switch tracks and connections in substantially the same language as are the allegations in the cross-bill of the St. Louis and San Francisco Railroad Company.

It is further alleged that about April 8, 1909, the city of St. Louis formed a plan to require all of the defendant railroads to depress their tracks at Tower Grove avenue, Park avenue, Old Manchester road, Mc-Ree avenue, Eager road, Shaw avenue and other streets in that vicinity; that while separate ordinances were attempted to be enacted by said city with reference to each railroad, yet the plan formed a connecting whole and it is impracticable to carry out that part required of any one of said railroads without having the others join in the general work required. That with the purpose in view of effectuating said plan for depressing the tracks of all of said railroads the city of St. Louis passed the ordinances numbered 24358, 24359, 24360 and 24361, which ordinances were approved April 8, 1909, being the ordinances referred to and accompanying plaintiffs' petition. That said ordinances numbered 24358, 24359 and 24361 relate more particularly to this defendant's co-defendants' roads. The terms of ordinance No. 24360 are then set out, and it is charged that to comply with the provisions of said ordinances requiring the depression of this defendant's tracks will necessitate either the bringing over or the tunneling under of the streets in said ordinances named, to-wit: Tower Grove avenue, Old Manchester road, McRee avenue, Eager road and Shaw avenue. It is averred that the ordinance is void in that it fails to make any provision by appropriation out of the city treasury or otherwise for payment of such portion of the cost of bringing over or tunneling under said roads, streets and avenues as

is provided by ordinance No. 13657 to be borne by the city of St. Louis.

It is further alleged that to depress its railroad tracks at Tower Grove avenue, Old Manchester road, McRee avenue, Eager road and Shaw avenue, in the manner and to the extent required by said ordinance, there being no authority in said ordinance to depress its tracks at its intersection with Kingshighway, would necessitate and cause a grade between Shaw avenue and Kingshighway over and upon which it would be dangerous and impracticable to operate any of its trains.

The remaining allegations and the prayer of this cross-bill are substantially the same as contained in the cross-bill of the St. Louis and San Francisco Railroad Company.

The answer and cross-bill of the Missouri Pacific Railroad Company attacks the validity of ordinances Nos. 24358 and 24361, for the reason before stated, and for some additional grounds, which are substantially as follows:

That by an act of the General Assembly of the State of Missouri, approved March 12, 1849, entitled, "An Act to incorporate the Pacific Railroad," the State of Missouri incorporated the Pacific Railroad and granted to said corporation a charter bestowing upon it certain rights, powers, privileges, franchises and immunities, and that thereafter several acts of the General Assembly of the State were passed amending said charter, which amendatory acts are enumerated in the cross-bill. That by said Act of March 12, 1849, as amended, as well as other acts hereinafter mentioned, there was given and granted to said Pacific Railroad, among other things therein enumerated, the right, power, privilege and authority to take, hold, use, possess and enjoy the fee simple and other title in and to any real estate, and sell and dispose of the same; to survey, mark, locate and construct a railroad

in and through the city of St. Louis, to the city of Jefferson, and thence to a point on the western boundary line of Van Buren county (now Jackson county) in this State, with a view that said road be thereafter continued westwardly to the Pacific Ocean, and for that purpose to acquire, own and hold lands for its right of way and other railroad purposes, and to locate its line of road upon such route as it may deem most advantageous and to extend branch railroads to any point in any of the counties in which said road should be located; to build the railroad so authorized along or across any State or county road, or the streets or wharves of any town or city. The cross-bill then enumerates the various special acts of the General Assembly of the State of Missouri respecting the giving by the State of aid in the construction of the Pacific Railroad, foreclosure of the State's lien, etc., and it is charged that under the provisions of its charter as amended and the last-mentioned acts the Pacific Railroad had power and authority to mortgage, lease, sell and convey all of its lines of railroad or any part thereof; that all of the rights, powers, privileges and immunities so granted were and are irrevocable and irrepealable. That the Pacific Railroad, its lessees, grantees and successors because of and relying upon the irrevocable and irrepealable provisions of said charter did, by the outlay of vast sums of money, construct, complete and proceed to operate the line of railroad as authorized from a point on the Mississippi river in the city of St. Louis, to the city of Jefferson and thence west to the boundary line of this State in Jackson county. That said road was so completed and in operation through the city of St. Louis and St. Louis county in the year 1853, and completed and in operation to the western boundary of the State in the year 1865. That the granting of said charter and amendments thereof by the State and the construction contract between the State of Missouri and said Pa-

cific Railroad Company, its lessees, grantees and successors constituted and still constitute an irrevocable contract between the State of Missouri and said Pacific Railroad Company, its lessees, grantees and successors, the conditions and provisions of which cannot be derogated, breached or impaired by the exercise of any power vested by law in the said city of St. Louis. That in originally constructing its railroad between a point three-fourths of a mile east and a point three-fourths of a mile west of where its right of way and tracks are now intersected by Tower Grove avenue, said Pacific Railroad constructed the same at a grade substantially conforming to the then and now natural surface of the earth, and has ever since maintained and operated said railroad at said grade. That at the time said railroad was so constructed between the points last mentioned, the city of St. Louis did not extend to and had no jurisdiction over any part of said territory. That when said city extended its limits so as to include what is now Tower Grove avenue, Old Manchester road and Park avenue, it duly enacted ordinances whereby it established the grade of Tower Grove avenue, Park avenue, and Old Manchester road and all other streets and highways in that vicinity, at the same grade as the surface of the tracks of said railroad, and constructed, graded, paved and has ever since maintained said streets and highways at the grade so established. That it also by ordinance duly established the elevation thereof, and constructed and now maintains its public sewers and other public improvements so as to conform to the street grades so established.

That this defendant has lawfully succeeded to and now owns all the said railroad of said Pacific Railroad, together with its appurtenances, and under its charter and the laws of this State has the power and authority and is entitled to own, hold and enjoy all of the rights, powers, privileges, franchises and immunities granted

by the State in and by said Act of March 12, 1849, as the same has been amended, and is therefore the owner of and entitled to all of the benefits and protection granted by the said contract between the said State of Missouri and the said Pacific Railroad, its lessees, grantees and successors, and it now claims the benefits and protection of said contract as against the enforcement of said ordinances mentioned in the petition.

The city filed a separate answer and cross-bill to each of the defendant railroads. These cross-bills of the city set out the facts respecting the tracks at the crossing in question and the nature of the surrounding property, the absence of any other highway crossing over the tracks of the defendant railroads on the east nearer than Chouteau avenue, a distance of more than three-fourths of a mile; that the presence of the tracks of the defendant railroads and the operation of their trains thereon upon the same grade with the said public highways did, at the same time of the passage of the said ordinances, render the said intersections, and still do render the same, unfit for use by the public; that the operation of the trains of said defendant railroad company at said intersections is a constant source of delay to the traffic on said highways and a great inconvenience to the public. That the presence of said tracks and the operation of said trains did, at the time of the passage of said ordinances constitute and still constitute a nuisance which is dangerous to the public; and a constant menace and source of terror to the persons crossing the tracks of the defendants at said intersections; and that said tracks and the operation of trains thereon upon said grade have greatly depreciated, and if not abated will still further depreciate, the value of property of citizens of this defendant situated in the neighborhood of the said intersections.

That the ordinances numbered 24358, 24359, 24360 and 24361 were passed by the defendant city as a comprehensive plan for the abatement of each and all of the said nuisances at and upon said crossings. and intersections of said tracks over and upon certain other public highways in said immediate vicinity.

The ordinance applicable to the particular defendant railroad company is then set out, and it is charged that it was the duty of such company to lower its tracks and construct above them substantial steel viaducts as in said ordinance directed, and that the defendant has failed to comply therewith.

The prayer is that the defendant railroad be perpetually enjoined from further failing and neglecting to commence the work of lowering its said tracks and the work of continuously prosecuting the same until fully and finally completed, and for an order and decree commanding the defendant to commence the lowering of its tracks and to comply with all of the provisions of said ordinance.

The replies and answers of the defendant railroad companies to the answers and cross-bills of the defendant city of St. Louis are general denials.

A trial was had which resulted in a finding of facts for the defendant city, and against the plaintiffs and all the other defendants; and on July 25, 1910, after dismissing plaintiffs' bill, the court issued a conditional mandatory injunction against all the defendants, as appears from the following paragraph of the decree, viz.:

"Upon condition, however, that the defendant, the city of St. Louis, shall within four months from the date of the entry of this decree, by ordinance grant to the said defendant St. Louis, Oak Hill & Carondelet Railway Company permission to cross, with its tracks, the public street of defendant the city of St. Louis, known as Kingshighway, and any other street southwest of said Kingshighway across which the said

tracks of said defendant St. Louis, Oak Hill & Carondelet Railway Company are now laid, at such elevations and grades as may be necessary to the depression required by the said ordinance numbered 24360 at Shaw avenue at substantially a uniform ascending grade of one per cent, with compensation for necessary vertical curves.''

This conditional decree was afterwards, on motion of the defendant the city of St. Louis, to-wit, on the 5th day of October, 1910, made final and absolute, as appears from the following language of the decree:

"That the city of St. Louis has, within the time limited by the decree of July 25, 1910, by ordinance, granted to the said defendant St. Louis, Oak Hill & Carondelet Railway Company, permission to cross with its tracks the public street of defendant the city of St. Louis, known as Kingshighway, and any other street southwest of said Kingshighway, across which said tracks of said defendant St. Louis, Oak Hill & Carondelet Railway Company are now laid, at such elevations and grades as may be necessary to permit said tracks to reach the present elevation thereof from the depression required by ordinance of said defendant numbered 24360 at Shaw avenue, at substantially a uniform ascending grade of one per cent with compensation for necessary vertical curves, said ordinance being numbered 25388, approved September 22, 1910, and entitled 'An ordinance authorizing and permitting the St. Louis, Oak Hill & Carondelet Railway Company to cross Kingshighway, Bischoff avenue, Old Manchester road, Columbia avenue, Arsenal street and Kemper Park, and to relay its tracks thereon at new elevations.' ''

After moving unsuccessfully for a new trial, the plaintiff and the three railroad defendants duly appealed the cause to this court.

This is by far the largest record ever presented to this court. The evidence covers many thousand

pages of printed matter, besides a volume of two hundred and fifty exhibits, making a thousand pages or more, to say nothing of the statements, briefs and printed argument of counsel, which probably equals a thousand more.

It will, therefore, be almost impossible for us to even state the substance of all the evidence, and consequently we must be contented with stating just sufficient thereof, with each legal proposition discussed, to make it intelligible.

## OPINION.

I. Since the rights of the plaintiffs-appellants, the American Tobacco Company and the American Car Company (which will hereinafter be designated as Tobacco Company and the Car Company respectively), are somewhat dependent upon the mutual rights and duties of the city of St. Louis (which will be designated as the city) and the defendants-appellants, the St. Louis and San Francisco Railroad Company, the Missouri Pacific Railway Company, and the Oak Hill and Carondelet Railway Company (which hereinafter will be designated as the Frisco, Oak Hill and the Missouri Pacific, respectively), we will first dispose of the appeals of the defendant railway companies.

As previously stated, the trial court found the issues for the city, and rendered a decree accordingly, commanding said defendants to depress their tracks beneath the streets and avenues mentioned in the evidence, according to the provisions of ordinances numbered 24358 to 24361 inclusive, heretofore copied.

The following plat, defendant railways' Exhibit No. 2 and hereto attached and made a part hereof, shows the present location of the streets and avenues, the tracks of the several railway companies, and the private industries mentioned in the evidence, as well

as the points where the railway tracks cross said streets and avenues, and connect with the various manufacturing establishments located along their respective lines of railroad.

The various white figures appearing along the lines of the various railways indicate the number of feet the tracks are to be depressed, at the respective points.

The streets and avenues to be affected by the improvements are Park avenue, Old Manchester road, Tower Grove avenue, McRee avenue, Eager road, and Shaw avenue. There are also some others, but in the view we take of the case, they need not be specially mentioned.

Old Manchester road runs in a northeasterly and southwesterly direction; Tower Grove avenue runs north and south and Park, McRee and Shaw avenues and Eager road run east and west, and cross the various railroad tracks at the points designated on the plat.

Tower Grove avenue and Old Manchester road cross each other near a point where Park avenue would intersect them, if extended westward to that point; and the tracks of all three of the defendant railway companies cross Tower Grove avenue and Old Manchester road at that point.

The red lines represent the tracks of the Missouri Pacific and the Oak Hill & Carondelet Railway Companies, the white dotted lines represent the tracks of the Frisco Company, and the yellow lines represent the spur or switch tracks of all three companies leading from their respective tracks to the plants of the various manufacturing companies located in that vicinity.

Tower Grove crossing is situated on an elevated point, in a valley, located in the central-western part of the city. The nearest streets opened for travel from the northern to the southern parts of the western

section of the city, are Kingshighway, on the west, three-fifths of a mile away, and Grand avenue, on the east, a mile away.

The evidence shows that bridges have been built over the railroad tracks on Kingshighway and Grand avenue, over which the traffic thereof passes, and that all other streets crossing the railroads in question are at grade; also that all traffic from the northern to the southern and from the southern to the northern parts of the western section of the city which cannot conveniently cross over Kingshighway or Grand avenue, is compelled to pass over the railroad tracks at Tower Grove avenue and Old Manchester road.

There is much vacant property in that vicinity, and that which is occupied is largely used for manufacturing, industrial and mercantile purposes, and occupied by small residences. Yet there are some good residences and good building sites in that locality, back a distance from the railway tracks, both north and south thereof. Tower Grove Park, and Shaw's Garden, two of the most beautiful places of the kind in the world, are not far removed.

From the year 1901 to 1909, 2360 buildings were erected in an area of one mile around Tower Grove crossing; also within that same area there were at the time of the trial of this cause 7564 voters, and if we allow five inhabitants to each voter, then there were more than 37,000 residents in a radius of one mile of that crossing at that time, and there were many more north and west of that.

The evidence further showed that there were eleven streets opened and constantly used which lead into Old Manchester road north of this crossing, and five which lead into Tower Grove avenue south of the same. In fact, the evidence shows that the largest territory of the city, which is tributary to any diagonal highway therein, in the southwestern part of the city, is tributary to Old Manchester road, and the

traffic thereof passes over the Tower Grove avenue and the Old Manchester road crossing.

John F. Christophel, introduced as a witness by the city, testified: that he had lived in the city all his life, and was employed by the McKelvey Construction Company, and that he was a member of the Tower Grove Improvement Association (an association, I judge from the record, composed of persons who were financially and otherwise interested in the development and improvement of that section of the city lying within a radius of one mile of the Tower Grove avenue and Old Manchester road crossing), and believed that the congested condition of traffic at that point not only jeopardized the safety of the people and property, but also materially retards the development of that part of the city, which was rendered more or less undesirable for residential purposes by the presence of the railroads and grade crossings in that vicinity. Continuing, Christophel testified that he observed the traffic at Tower Grove crossing on November 2 and 3, 1909, when nothing unusual transpired to affect travel; that 2842 pedestrians going south and 2673 going north passed the crossing on the 2d of November, and 2743 going south and 2783 going north passed the crossing on the 3d of November, 1909; 1167 vehicles going south and 1153 going north passed the crossing on the 2d of November, and 1190 vehicles going south and 1264 going north passed the crossing on the 3d of November; that 195 street cars going south and 192 going north passed the crossing on the 2d of November, and 196 street cars going south and 199 going north passed the crossing on the 3d of November. That he made every effort to discover the occupation and place of work of the persons passing and discovered that of the persons passing on the 2d of November only 395 were employed in the tobacco factory, and 485 on the 3d of November.

This testimony was uncontradicted, and we may accept it as true.

It appears further that during the past ten years the amount of through freight business transacted by the Missouri Pacific over this crossing has increased about twenty-five per cent, and that the number of trains operated by all of the railroads has greatly increased in the past ten years. It appears from the evidence of Mr. Conley, superintendent of the terminals for the Frisco Railroad, that at the time of the trial the Frisco was operating forty-four passenger trains past the crossing each day, i. e., twenty-two each way, averaging five passenger coaches, excluding mail and express cars; sixteen through freights per day, that is, eight each way, averaging twenty-five cars; six local freights per day, i. e., three each way, averaging fifteen cars; and six extra freights per day on an average, three each way, with a varying number of cars. That in addition there were on the Frisco about twenty-six switch movements per day, averaging ten cars in each movement. The Missouri Pacific and the Oak Hill Companies handled as many, if not more, cars and trains across this crossing as did the Frisco. And that in 1909 there passed this crossing, excluding switching movements, 93,000 cars, making 41760 trains going west, and 108,000 cars, excluding switching movements, making 4500 trains, going east. That on all three of the roads 124 passenger trains daily passed this crossing.

As previously stated, the American Tobacco Company, the American Car Company and numerous other industrial establishments are located in that vicinity, and each and all of them connect with one or more roads, by means of side or spur tracks. The establishments of the plaintiffs are larger than any of the others. The former cover about thirty acres of ground, and the latter ten or twelve; and the value of all of said establishments aggregate about $1,500,-

000, and their annual products aggregate about $4,000,000.

The record does not disclose the number of cars that are annually required to handle the raw material and the fabrics of all of said plants, but it does show that it requires from 1900 to 2000 to handle that of the American Tobacco Company, and about 600 to handle that of the American Car Company, for all of which the defendants receive annually about $1,250,-000 in freights.

Briefly, but substantially, that was the condition of things that existed at and within a radius of one mile of Tower Grove crossing, when ordinances numbered 24358 to 24361 inclusive, were enacted by the city council of the city of St. Louis, which at that time had a population of about 675,000 persons, and was and is still growing rapidly.

Under those conditions the city council, in order to protect the lives and secure the safety of the people, deemed it necessary to abolish the grade crossings of said railroads at the points indicated, and in order to accomplish that purpose, the ordinances mentioned were enacted.

.The validity of those ordinances is assailed for many reasons, which will be hereinafter stated and considered separately. Some of the reasons are common to, and are presented by all of the appellants, while others are pressed by only one or more of them; and logically and for convenience we will first consider those presented by all of the appellants.

Counsel for appellants make the general contention that there is no necessity for a separation of the railroad crossings from the crossing of vehicles and pedestrians on the grades of the various streets mentioned.

Whether that is true or not, we are convinced that the expedience or public necessity for such separation of grades was a question exclusively for the city coun-

cil to determine, and that its determination is conclusive upon everyone, and the courts have no voice in the matter.

That is so universally declared and accepted by all the courts, that a citation of authorities in support thereof would be more than useless.

II. The validity of these ordinances is assailed by counsel for appellants for many reasons; first, because the State in the exercise of its police powers could not require railroad companies to construct, at their own cost and expense, suitable crossings at streets and highway intersections, in cases where the streets or highways have been laid out subsequent to the railroads; second, if that power is vested in the State it has not by any legislative enactment imposed those obligations upon the railroad companies, nor does it rest upon them by virtue of the common law. In other words, appellants insist that there is no such obligation resting upon them by virtue of the common law; that the State has no power to cast such a burden upon the railroad companies; and that if any statute or charter provision exists which authorized any such imposition, it is violative of both the State and Federal Constitutions, in that it denies to such companies the equal protection of the law, and operates to take from them their private property for public use, without compensation first being paid.

There are other objections lodged against said ordinances, namely, that they were not legally enacted, and that they are unreasonable and oppressive.

For the present, we will pass these two objections, and consider the case as though they had never been made; but later they will receive due consideration at our hands.

This position of counsel calls for the construction of certain statutes of the State, and certain provisions

of the charter of the city of St. Louis, bearing upon the questions presented.

At this late date, in the light of the numerous adjudications upon the subject, it seems to me that it cannot be seriously contended that the State has not the power to require railroad companies to restore highways crossed by them to such condition that the free, proper and safe use thereof by the public will not be interfered with.

Such is the common law; also, a police regulation inherent in every sovereignty, which cannot be abrogated by statute, grant or contract. [State ex rel. v. St. Paul, Minneapolis & Manitoba Ry. Co., 35 Minn. 131; Kansas City v. Belt Ry. Co., 102 Mo. 633.]

The same authorities hold that incorporated cities, towns, and villages have the same authority in that regard, under the common law, that the State has; but be that true or not, under the statutory laws of this and most other states of the Union, they unquestionably possess that authority. [Sec. 3049, R. S. 1909: Charter Pacific Railroad, Acts 1849, p. 221, sec. 11; State ex rel. v. St. Paul, etc., Ry. Co., supra; State ex rel. v. St. Paul, etc., Ry. Co., 98 Minn. 380; Northern Pacific v. Duluth, 208 U. S. 583; Central R. R. Co. v. State, 32 N. J. L. 220; Chicago, etc., Ry. Co. v. State, 158 Ind. 189.]

Attending the case in hand: Paragraph two of section 26 of article 3 of the charter of the city of St. Louis, as amended in 1901 (4 Mo. Ann. Statutes, p. 4809 et seq.), in defining the powers of the city of St. Louis reads as follows:

"To establish, open, vacate, alter, widen, extend, pave or otherwise improve and sprinkle all streets, avenues, sidewalks, alleys, wharves and public grounds and squares, and provide for the payment of the costs and expenses thereof, in the manner in this charter prescribed; and also to provide for grading, lighting,

cleaning and repairing the same, and to condemn private property for public use, as provided for in this charter; to construct and keep in repair all bridges, streets, sewers and drains, and to regulate the use thereof," etc.

It would be difficult to conceive language which could more clearly and completely intrust the city with the care and keeping of the streets and highways thereof, than that just quoted. Evidently it was the design of the Legislature to give the city the full charge and control of all the streets thereof, with power to establish, open, extend, and improve them so as to secure the lives and the safety of the people, and to protect and promote her commercial interests. That idea is emphasized and made clearer, if possible, by reading in connection therewith, the "General Welfare Clause" of the charter of the city, which is paragraph fourteen of section 26 of article 3 of said charter (4 Mo. Ann. Statutes, pages 4818 and 4819) which reads as follows:

"General Welfare Clause—General Authority to Pass and Enforce Ordinances—Census of Inhabitants. Finally, to pass all such ordinances, not inconsistent with the provisions of this charter, or the laws of the State, as may be expedient, in maintaining the peace, good government, health and welfare of the city, its trade, commerce, and manufactures, and to enforce the same by fines and penalties not exceeding five hundred dollars, and by forfeitures not exceeding one thousand dollars."

If we stop and consider the enormous amount of traffic that daily passes over the streets at Tower Grove crossing, consisting of more than 5000 pedestrians, 2300 vehicles, 400 loaded street cars, about 1000 freight cars, loaded, to say nothing of the switching movements across the same, and 125 passenger trains, it would seem that there is nothing more reasonable that could be done, by which the city of St. Louis

could protect the lives of her people and secure their safety, or to maintain and protect her commerce, than by separate grade crossings at the points mentioned in said ordinances.  And that the city had the authority to separate them, I think there is no longer any question for reasonable doubt.

The fourth clause of section 3049, Revised Statutes 1909, provides that any railroad company may "construct its road across, along or upon any stream of water, watercourse, street, highway, plank road, turnpike or canal which the route of its road shall intersect or touch, but the company shall restore the stream, watercourse, street, highway, plank road and turnpike thus intersected or touched to its former state, or to such state as not unnecessarily to have impaired its usefulness.  Nothing herein contained shall be construed to authorize the erection of any bridge or other obstruction across or over any stream navigated by steamboats at the place where any bridge or other obstruction may be proposed to be placed, so as to prevent the navigation of such stream, nor to authorize the construction of any railroad not already located in, upon or across any street in a city or road of any county, without the assent of the corporate authorites of said city, or the county court of such county."

And the statute just quoted applies not only to corporations organized subsequent to its enactment, but also to all those that existed at the time of and prior to its passage, as will be seen by reading section 3213, Revised Statutes 1909, which is as follows:

"All existing railroad corporations within this State, and such as may be hereafter chartered or formed, shall, respectively, have and possess all the powers and privileges contained in this article; and they shall be subject to all the duties, liabilities and provisions not inconsistent with the provisions of their charter herein contained."

In construing these two statutes, it should be borne in mind, that under those provisions of the charter of the city before quoted, said city was given the full possession of, charge and control over all the streets and highways thereof, and no one had the authority or right to interfere with any of them except by authority of the city, and only then upon such terms and conditions as the city might prescribe by ordinance.  That being true, it seems to me, as before stated, that there can be no room for reasonable doubt but what the city had the power and authority to compel the railway companies, at their own cost and expense, to separate the grade crossings mentioned, in the manner provided for in the ordinances before set out.

The great weight of authority sustains these views.

At an early date this question came before the Supreme Court of Minnesota, in the case of State ex rel. v. St. Paul, Minneapolis & Manitoba Railway Co., 35 Minn. 131; and in that case it will be observed that the statutes construed are not nearly so full and authoritative as are the statutes and charter provisions we have here under consideration.    In that case MITCHELL, J., in speaking for the full court said:

"This appeal is from an order quashing an alternative writ of mandamus, on the ground that the relator did not state facts sufficient to warrant the issuance of a writ.

"The charter of respondent provides that 'the said company shall have the right and authority to construct their said railroad and branches upon and along, across, under, or over any public or private highway, road, street, plank-road, or railroad, if the same shall be necessary; but the said company shall put such highway, road, street, plank-road, or railroad *in such condition and state of repair as not to impair or interfere with its free and proper use.*'

[Laws 1857, Ex. Sess. c. 1, subc. 1, sec. 7.]   The principal question raised by the appeal is the construction to be put upon this statute as to the extent of the rights conferred, and of the duty imposed, upon the company.

"The common law rule is that where a person or corporation is given the right to build a railroad, or make a canal, across a public highway, this gives them no right to destroy it as a thoroughfare, but they are bound to restore or unite the highway at their own expense, by some reasonably safe and convenient means of passage, although the statute contains no express provision to that effect. This duty includes the doing of whatever is necessary to be done to restore the highway to such conditions; as, for instance, in case of a bridge, the approaches or lateral embankments, without which the bridge itself would be useless.   This duty is founded upon the equitable principle that it was their act, done in pursuit of their own advantage, which rendered this work necessary, and therefore they, and not the public, should be burdened with its expense. *Qui sentit commodum sentire debet et onus.* [King v. Inhabitants of Lindsey, 14 East, 317; King v. Kerrison, 3 Maule & S. 526; Leopard .v. Chesapeake & Ohio Canal Co., 1 Gill, 222; Northern Cent. Ry. Co. v. Mayor of Baltimore, 46 Md. 425; Eyler v. Co. Commrs. Allegany Co., 49 Md. 257; In re Trenton Water-Power Co., 20 N. J. Law, 659; People v. Chicago & Alton R. R. Co., 67 Ill. 118; Queen v. Inhabitants of Isle of Ely, 15 Q. B. 827; Paducah, etc. R. R. Co. v. Commonwealth, 80 Ky. 147.]

"The provision of this statute imposing a duty on the company in favor of the public, while it is to receive a reasonable construction, must be liberally construed in favor of the public. There is no presumption that the Legislature intended to limit or lessen the duty which would have existed in the absence of any provision expressly imposing it. On the contrary, their evident object was to make the duty

more explicit and definite, and free from doubt.  The fact stands out prominent that the Legislature intended to preserve to the public the free and proper use of highways and streets, without impairment or interference, and that the use of streets and highways by the railway company should be permitted only on condition that this right of the public should be preserved.  Of course, this is not to be understood in the absolute sense that the company could do nothing that would in any degree interfere with the use of the street by the public.  The statute must receive a reasonable construction, and the Legislature must be presumed to have understood that the construction and operation of a railroad upon, across, under, or over a street is necessarily attended with some incidental inconvenience.  What was meant was merely that the company should put the street in such condition as to furnish the public a thoroughfare reasonably safe and convenient, and substantially as capable of free and proper use as it was before.  Whatever accomplishes this end is a performance of the duty; what does not is an infraction of it.  Hence, in view of the manifest object of this provision in favor of the public, it is evident that the expression, 'in such condition and state of repair as not to impair or interfere with its free and proper use,' has reference, not merely to the physical condition of that particular part of the street actually occupied by the company with its tracks, but also to the street as a thoroughfare of public travel, and to the uses to which the company put the street in operating its road.

"For example, suppose the company construct their railroad under the street, which they carry over their road by a bridge.  The bridge immediately over their tracks might itself be properly built, and yet, without the necessary approaches, would be inaccessible to the public. This would not be a performance of the duty imposed by the statute.  So, again, if the

company constructed their tracks on the surface of the street, they might plank or pave between the tracks so as to furnish a perfectly smooth surface for the passage of travel, and yet the tracks might be so numerous, and the passage of trains so constant, as to obstruct travel across the street as effectually as if a Chinese wall were built across it. This would not be putting the street in such a condition 'as not to impair or interfere with its free and proper use,' within the meaning of the statute.

"While the company has the right, according as its necessities or conveniences may require, to construct its tracks either on the surface of the street, or over the street, or under it, yet this right is subject to the condition that it can be done so as not to impair or interfere with the free and proper use of the street. The right to lay their tracks on the surface of the street is *sub·modo;* that is, by doing it so as not to impair or interfere with the use of the street. Whatever mode they adopt, they are bound to fulfill this condition, and if it cannot be fulfilled by laying their tracks on the surface of the street, they must adopt some other plan. [See King v. Kerrison, supra; Johnson v. Providence, etc., R. Co., 10 R. I. 365; People v. Dutchess, etc., R. Co., 58 N. Y. 152.]

"It is also clear, upon both reason and authority, that this duty is a continuing one. It is not fulfilled by simply putting the street, at the time the railroad is built, in such condition as not to impair or interfere with its free and proper use at that time, nor even by maintaining it in such condition as would have accomplished that end had the circumstances and conditions originally existing continued. The requirement of the statute has a wider scope than this, and has reference to all future exigencies. The Legislature never intended to fix or limit the duty of the company by the necessities of the public at any one time, or under any particular state of circumstances. They intended

to impose upon the company the duty, from time to time, of putting the street in such condition and state of repair as changed circumstances—such as the increased travel on the street, or increased traffic on the railroad—might render necessary to its free and proper use. A condition of the street or mode of crossing the railroad might be entirely adequate for the accommodation of the public under one condition of things, and entirely inadequate under another; and, consequently, a provision which at one juncture would be a discharge of this statutory duty, would at another amount to its violation. For example, a single track laid on the surface of a street, in a small town, where the traffic on the railroad and the travel on the street were limited, might not, and probably would not, seriously interfere with the use of the street; while numerous tracks in constant use, thus laid upon a crowded thoroughfare of a populous city, might almost entirely deprive the public of the use of the street. In the latter case it would be a mere technical quibble for the railway company to say that it had performed its duty because it had put the surface of the street in proper condition, although, by reason of constantly passing trains, the public were as completely prevented from crossing it as if the street had been divided by an impassable gulf.

"The duty prescribed is to keep, at all times and under all circumstances, the streets, at points where they are intercepted by the railroad, 'in a condition and state of repair so as not to impair or interfere with their free and proper use;' and if this cannot be done with a surface crossing, the company must do it either by carrying their tracks under or over the highway, or the highway under or over their tracks; and the duty of thus restoring or preserving the free use of the street includes the doing of whatever is needed to accomplish the required end, and which is rendered necessary to be done by reason of the pres-

ence of the railroad in the street. [Parker v. Boston
& Maine R. Co., 3 Cush. 107, 115 (50 Am. Dec. 709);
Com. v. Proprietors New Bedford Bridge, 2 Gray, 339;
Cooke v. Boston & Lowell R. Co., 133 Mass. 185; Cott
v. Lewiston R. Co., 36 N. Y. 214; People v. New York
Cent., etc., R. Co., 74 N. Y. 302; Welcome v. Inhabs.
of Leeds, 51 Me. 313; English v. New Haven, etc., Co.,
32 Conn. 240; Burritt v. City of New Haven, 42 Conn.
174; Central R. Co. v. State, 32 N. J. Law, 220; Rail-
road v. Commissioners, 31 Ohio St. 338; Maltby v.
Chicago & W. M. Ry. Co., 52 Mich. 108 (17 N. W. Rep.
717); Chicago, R. I. & P. R. Co. v. Moffitt, 75 Ill. 524;
Farley v. Chicago, R. I. & P. R. Co., 42 Iowa, 234;
Manley v. St. Helen's Canal & Ry., 2 Hurl. & N. 840.]

"The application of these principles to the pres-
ent case leads us to the conclusion that the court be-
low erred in quashing this writ. The petition upon
which the writ was issued alleges, in substance, the
following facts: In 1868 the respondent constructed
its road through the city of Minneapolis, and, under
the authority given by its charter, laid its track upon
and across Fifth street north, at the intersection of
that street with Fourth avenue north. It has now
nine tracks and two switch tracks on this crossing,
which are in constant use by the cars and engines of
respondent, which are constantly passing and repass-
ing, and upon which the company is doing an immense
business, running many hundred cars and scores of
trains daily. Immediately adjacent to these tracks,
and southeast of them, and upon the same street cross-
ing, the Minneapolis & St. Louis Railway Company
has, under like charter rights and duties, constructed
eight tracks, making in all nineteen tracks upon the
crossing, and all laid on the surface of the street. The
city of Minneapolis has a population of about 100,000,
(now 130,000) many thousand of whom live in what
is called North Minneapolis, north and west of the
crossing. Fifth street north is one of the main

thoroughfares from North Minneapolis to the business center of the city, over which thousands of people and hundreds of vehicles pass and repass daily, this street being the most convenient and shortest route for a large part of the inhabitants of the city between North Minneapolis and the business centre of the city. Owing to the condition of the ground, it will be impossible for many years to have good or convenient crossings over these tracks for several blocks west of this crossing.

"The great number of cars and engines so occupy this street crossing, and use up so much time in passing and repassing nearly every hour of the day, as to greatly impede, interfere with, hinder, and delay the public, and to render travel on Fifth street north very dangerous and unsafe. The street is not now in such condition and state of repair as not to impair or interfere with its free and proper use. The contour of the ground to the northwest of these tracks is such that it is impracticable to carry the street by bridge over the railroads. By reason of the premises, it has become necessary, in order to put the street in such condition as not to impair or interfere with its free and proper use, to carry it, by a viaduct, under the railroad tracks, according to a plan prepared by the city council, and made a part of the application for the writ of mandamus. This involves the excavation of approaches to the viaduct on either side, on one side commencing at the northwest line of Third avenue north, and on the other side at the southeast line of Fifth avenue north; also the construction of supporting walls for the soil along the sides of these excavations, and of abutments for the bridge or viaduct proper, on which to carry the railway tracks.

"The city council passed an ordinance authorizing a change of grades of Fifth street north, between Third avenue north and Fifth avenue north, so as to conform to the bottom of the proposed viaduct and

approaches. This was passed since the commencement of these proceedings; but as both parties desire a decision on the merits, it was stipulated that no point should be made upon that fact. Of course, the city could not, by changing the grade of a street for some purpose of its own, impose new or additional duties upon the railroad company. Its duty is to be measured by the requirements of its charter. But in this case the sole purpose of the change of grade was to allow the construction of a proposed viaduct, the necessity for which was created by the presence of the railroad in the street. Hence the materiality of the ordinance, if it be material, consists solely in the fact that it gives the authority of the city for the change of grade necessary in the construction of the proposed viaduct. The city council then demanded of respondent that it should construct its share of this viaduct, viz., the part northwest of the dividing line between its tracks and those of the Minneapolis & St. Louis Railway Company, together with the abutments, approaches, and sustaining walls on that side. This being refused, the city applied for a mandamus to compel the respondent to do it. Similar proceedings have been commenced against the Minneapolis & St. Louis Railway Company to compel it to construct its share on the opposite side.

"Whether respondent has in fact complied with the requirements of its charter is a question which neither it nor the city can determine absolutely without the assent of the other. Like all other matters involving a controversy concerning public duty and private right, it is to be adjusted and settled by judicial inquiry and determination. [Com. v. Proprietors New Bedford Bridge, supra; Cooke v. Boston & Lowell R. Co., supra.] Hence the decision of the city council is not conclusive upon the questions of the duty of the company to build this viaduct, or that it should be built upon the plan proposed. These are matters,

if put in issue, for the determination of the court, upon the hearing. But, for the purposes of this appeal, all the allegations of the petition must be taken as true,— to-wit, that the street cannot be used by the public with either safety or convenience, with these railroad tracks crossing it on the same grade; that the only way by which the street can be put in such condition 'as not to impair or interfere with its free and proper use' is by carrying it under the tracks by viaduct, on the plan proposed. If so, then the duty imposed upon the company by its charter requires them to construct this work, and the whole of it—the abutments and approaches, as well as the bridge for their tracks. Lateral embankments or excavations necessary as approaches to a bridge or viaduct, to carry a street under or over a railway, are as much a part of the work required to be done by the company as the bridge or viaduct itself. Without the approaches,.the mere passageway under the tracks would be useless. The one is as necessary to furnish an uninterrupted thoroughfare as the other. The necessity for each is alike created by the construction of the railroad upon the street. The public derives no benefit from either which they did not enjoy before the railroad was built.

"The duty imposed by the statute is, at all times and under all circumstances, to put the street 'in such condition and state of repair as not to impair or interfere with its free and proper use,' and whatever structures are necessary for that purpose must be erected and maintained at the expense of the company. There is no foundation in law or reason for dividing the expense between the company and the city. If the company is bound to build the viaduct under its tracks, it is equally bound to build the necessary approaches.

"It is suggested that to make this excavation on Fifth street north would render the railroad company liable as a trespasser for damages to the owners of abutting lots; that the company has no power to ex-

ercise the right of eminent domain to take private property for any such purpose; and hence that a mandamus, if issued as prayed for, would compel the company to do an illegal act. This seems to have had much weight with the court below, who suggest that, before the company can be required to build the proposed viaduct, the city should take such action as would relieve respondent from liability for damages resulting from changing the grade of the street. Whether, upon the facts of the case, it will be necessary for the railroad company to exercise the right of condemnation, or whether it will be liable to pay compensation to the owners of property abutting on this street, are questions not now before us, and upon which we express no opinion. But if the company has the legal right to do the work, the fact that it would involve the expense of paying compensation to property owners would be no ground for denying the writ. This expense would be just as legitimate a part of the cost of restoring the street as would the expense of making the excavation or building the bridge; and there would be no more reason for imposing this expense upon the public than that of any other part of the work; and, if necessary, we have no doubt of the power of the company under its charter to condemn private property for this purpose. The duty imposed carries with it the power to perform it, and in the exercise of that power all other needful auxiliary powers given by the charter may be exercised; and of these is the power to take lands compulsorily, when necessary for the purposes of the incorporation. When required by its charter, the construction of this viaduct and approaches for the purpose of carrying the street under its railroad is as much a part of the enterprise authorized by the charter as the railroad bed or track itself, and land taken for the former is as much taken for the purposes of the incorporation as land taken for the latter. [People v. Dutchess, etc.,

R. Co., 58 N. Y. 152. See, also, Parker v. Boston & Maine R. Co., supra.]

"We wish to remark, in conclusion, that we have found no case which is in all respects exactly like the present one, both on the facts and the language of the statute; but in all the cases, without exception, we find announced certain principles, founded, as we think, in reason and justice, which seem to lead up logically and irresistibly to the conclusion at which we have arrived. The only discordant note that we find in any case is a casual remark, which was mere obiter, made in State v. New Haven & N. Co., 45 Conn. 331, 348. But an examination of that case will show that what was there decided is not at all in conflict with our views.

"It can hardly be necessary to add that the statute, and what we have said regarding its construction, has reference only to cases where the railroad has been constructed in a street, and not to cases where new streets have been laid out over or across the railroad subsequent to its construction."

In that case the court in express terms limited its ruling to cases where the railroad had been constructed in a street previously established, and did not include cases where *new streets* were extended over a railroad previously constructed. The limitation in that case was proper for the reason that the railroad there was constructed in a street previously established; but the court did not intend to hold, nor did it hold, that the same rule of law would not apply to cases where new streets were extended over railroads previously constructed, as is true as to some, if not to all of the streets in the case at bar.

In the case of State ex rel. v. St. Paul, Minneapolis & Manitoba Railway Co., 98 Minn. 380, this direct question was presented to the court. The court in discussing the questions on page 387, used this language:

"The question as to the power of the State, as respects streets and highways existing at the time of the construction of a railroad and over which it passes, to require the latter to construct and maintain suitable crossings, by bridges, viaducts, or otherwise, at its own expense, has been before the courts in numerous cases, and the uniform rule, so far as our examination of the authorities has extended, is that the State possesses that power. The obligation of the company in such cases arises from the rule of the common law that, where a new highway is laid out across one already in existence and use, the crossing must not only be made with as little injury as possible to the old way, but whatever structures may be necessary for the convenience and safety of the crossing must be erected and maintained by the person or corporation constructing and using the new way. [Northern v. City, 46 Md. 425, 445; Dyer v. Railway Co., 87 Tenn. 712, 11 S. W. 943.] The obligation exists in such cases independent of statute, and, as observed, the authorities enforce it in all cases where the streets were laid out and in existence before the advent of the railroad, and it extends to grade crossings, bridges, and viaducts, or whatever may be essential and necessary to make the crossing safe. If the duty to construct and maintain the bridge in question rests upon the railroad company, either by force of the provisions of its charter, or at common law, it is clear that the city may enforce it. Its specially delegated supervision and control over streets and highways, with authority to lay out and open new ones, vest in it authority to enforce all appropriate regulations sanctioned by the police power of the State. The obligation was enforced by the city of Minneapolis in the case of State v. Minneapolis & St. L. Ry. Co., 39 Minn. 219, 39 N. W. 153, without special statutory authority, the obligation existing, as it is contended it does in the case

at bar, by force of the provisions of the charter of the railroad company.

"The authorities are not fully agreed upon the question whether the State may, in the exercise of the police power, compel a railroad company, without compensation, to construct and maintain suitable crossings at streets extended over the right of way subsequent to the construction of the railroad. Our examination of the books, however, leads to the conclusion that the great weight of authority sustains the affirmative of that proposition. The right of the State so to act is maintained in the states of Maine, Connecticut, Illinois, New York, Tennessee, Indiana, Texas, Mississippi, Ohio, Nebraska, New Jersey, Vermont, Wisconsin, and by the Supreme Court of the United States. It involves an exercise of the police power, and the inquiry is whether such a requirement is a proper exercise of that power. It is unnecessary to enter into an extended discussion to show the extent to which the Legislature may go in the exercise of this governmental prerogative. The property, rights, and liberty of the citizen are to be enjoyed in subordination to the general public welfare, and all reasonable regulations for the preservation and promotion thereof are uniformly sustained by the courts. 'Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious and to such reasonable restraints and regulations, established by law, as the Legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient.' [Com. v. Alger, 7 Cush. 53, 85; Thorpe v. Rutland, 27 Vt. 140, 62 Am. Dec. 625; New Orleans Gas Co. v. Drainage Commission of New Orleans, 197 U. S. 453, 25 Sup. Ct. 471, 49 L. Ed. 831.] The reasonable limits of the exercise of the power are not readily defined, but generally speaking it extends to all matters

where the general public welfare, morals, and health of the community are involved. [Butler v. Chambers, 36 Minn. 69, 30 N. W. 308, 1 Am. St. 638.]

"A reference to a few of the adjudged cases will show the general trend of judicial opinion upon the subject before us. In Boston v. County Commrs., 79 Me. 386, 10 Atl. 113, the court had before it a statute imposing upon the railroad companies of that state the duty of constructing crossings at subsequently laid-out highways, and its validity was affirmed. The court there said: 'The power of the Legislature to impose uncompensated duties and even burdens upon individuals and corporations for the general safety is fundamental. It is the police power. Its proper exercise is the highest duty of government. The State may in some cases forego the right to taxation, but it can never relieve itself of the duty of providing for the safety of its citizens. This duty and consequent power override all statute or contract exemptions; the State cannot free any person or corporation from subjection to this power. All personal as well as property rights must be held subject to the police power of the State.'

"In the case of Chicago v. City, 140 Ill. 309, 29 N. E. 1109, the court had before it a case where the city instituted condemnation proceedings for the purpose of opening and extending a street across a railroad already in existence, and the question presented was whether the company owning the railroad was entitled as a part of its compensation for opening the street across its tracks, to the cost of constructing and maintaining the crossing. It appeared that the railroad was constructed prior to the passage of a statute which required all railroad companies thereafter to construct and maintain such crossings and all approaches thereto. It was insisted that the statute was invalid, and had no application to the defendant be-

cause its road was constructed prior to the opening of the street and prior to the enactment of the statute. In that case the court said: 'Government owes to its citizens the duty of providing and preserving safe and convenient highways. From this duty results the right of public control over highways. Railroads are public highways, and in their relations as such to the public are subject to the right of the public to extend the public highways and streets across such right of way. . . . If railroads so far as they are public highways are, like other highways, subject to legislative supervision, then railroad companies in their relations to highways and streets which intersect their rights of way are subject to the control of the police power of the State; that power of which this court has said that "it may be assumed that it is a power coextensive with self-protection, and is not inaptly termed the law or overruling necessity." [Lake View v. Rose Hill Cemetery Co., 70 Ill. 191, 22 Am. 71.] The requirement embodied in section 8 (2 Starr & C. Ann. St. 1885, p. 1937, c. 114), that railroad companies shall construct and maintain the highway and street crossings and the approaches thereto within their respective rights of way, is nothing more than a police regulation. It is proper that the portion of the street or highway which is within the limits of the railroad right of way should be constructed by the railroad company and maintained by it, because of the dangers attending the operation of its road. It should control the making and repairing of the crossing for the protection of those passing along the street and of those riding on the cars. . . . The items of expense for which appellant claims compensation are such only as are involved in its compliance with a police regulation of the statute. It is well settled that "neither a natural person nor a corporation can claim damages on account of being compelled to render obedience to a police regulation designed to secure the

common welfare.'' [C. & A. R. R. Co. v. J. L. & A. R. R. Co., 105 Ill. 388, 44 Am. 799.] It has been held by this court in a number of cases that railroad corporations may be required to fence their tracks, to put in cattle guards, to place upon their engines, a bell, and to do other things for the protection of life and property, although their charters contained no such requirements. . . . [G. & C. U. R. R. Co. v. Dill, 22 Ill. 264; O. & M. R. R. Co. v. McClelland, 25 Id. 140; P. & P. U. Ry. Co. v. P. & F. Ry. Co., 105 Id. 110.] . . . Uncompensated obedience to a regulation enacted for the public safety under the police power of the State is not a taking or damaging without just compensation of private property, or of private property affected with a public interest. . . . The language of section 8 is broad enough to include streets to be thereafter opened or extended as well as to existing streets. . . . There is no reason for supposing that the Legislature intended to refer exclusively to a railroad crossing, created by running a new railroad across an existing street. The language includes also a railroad crossing created by running a new street across an existing railroad.'

''The Supreme Court of the United States, in 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979, in reviewing the case of Chicago, B. & Q. R. Co. v. Chicago, 149 Ill. 457, 37 N. E. 78, after quoting the above excerpt from the prior Illinois decision, said: 'We concur in these views. The expenses that will be incurred by the railroad company in erecting gates, planking the crossing, and maintaining flagmen, in order that its road may be safely operated—if all that should be required —necessarily result from the maintenance of a public highway, under legislative sanction, and must be deemed to have been taken by the company into account when it accepted the privileges and franchises granted by the State. Such expenses must be regarded

as incidental to the exercise of the police powers of
the State.' [See, also, Detroit, F. W. & B. I. Ry. v.
Osborn, 189 U. S. 383, 23 Sup. Ct. 540, 47 L. Ed. 860;
New York & N. E. R. Co. v. Bristol, 151 U. S. 556, 14
Sup. Ct. 437, 38 L. Ed. 269.]

"In Chicago v. City, 97 Wis. 418, 72 N. W. 1118,
the Supreme Court of Wisconsin reviewed the subject
at length and reached the conclusion that the subject
of crossings at streets laid out after the construction
of the railroad was a proper subject for legislative
control, within the police power, and the obligation to
construct them might be imposed upon the railroad
company without compensation. The opinion in that
case points out that the decisions of the Supreme Court
of the State of Massachusetts, which apparently laid
down a different doctrine, were founded upon a stat-
ute of that State, by which the expense of such cross-
ings was imposed upon the municipality. In the course
of the discussion the court said: 'The correct policy
in our judgment, is that held by the courts of New
York, Maine, Illinois, and Iowa, that the probable re-
sults of a failure of duty, respecting the safety of
railway crossings, are so serious that the public in-
terests require, as between municipalities and railway
corporations, that such duty be lodged in some one
place, undivided, absolute, and with certainty, and
that such place be the one where, in the estimation of
legislative authority, it can be most readily, economic-
ally, certainly, and efficiently performed. Whichever
place is designated, the municipalities owning the high-
ways, or the railway corporations, the expense directly
or indirectly falls on the public. These considera-
tions are abundantly sufficient, judicially considered,
to legitimately locate the whole subject of maintain-
ing safe crossings within the domain of the police reg-
ulations, so far as the legislative branch of the gov-
ernment may see fit to exercise its authority. It needs

no extension of well-settled principles to reach this conclusion. But if it did, the increase of railroad operations, the growth of population and social and business activities, with consequent increasing dangers to persons and property, might reasonably warrant the extension. This tendency of modern development is in the direction of greater, rather than more restricted, use of police power, and necessarily so in order to meet the new dangers, and increase of old dangers, constantly occurring as natural incidents of advancing civilization. We think the weight of modern authority is in accord with the views just expressed, and to the effect that everything that goes to make up a crossing, safe for public use, is as essentially within police regulations as any part of it.'

. ''It was held immaterial, as respects the right of the State to require those things to be done, whether the highway be laid out before or after the construction of the railroad. Their statutes were, however, strictly construed, and held not broad enough to include subsequently laid-out streets, though an 'obvious legislative policy' so imposing the obligation upon the railroads was recognized. In People v. Boston, 70 N. Y. 569, the railroad company long after it had constructed its road, was required by statute to construct a bridge over its track at an intersecting highway, and the act was sustained as a proper exercise of the police power. The court in that case said, in substance, that while the Legislature could not confiscate property under a pretence of an exercise of the police power, yet it might impose upon railroad corporations such reasonable restrictions, regulations, and burdens as the public good required; could regulate the speed of trains, the way in which they should cross highways, and make all regulations proper to protect the lives of persons carried by them or passing upon the highways across the track. [See, also, Al-

bany v. Brownell, 24 N. Y. 345; Boston v. Greenbush, 5 Lans. 461.]

"It was held by the Supreme Court of Tennessee, in City v. Southern (Tenn.), 82 S. W. 213, that an act of the Legislature of that State empowering cities to require railroad companies to construct bridges at places where their tracks crossed the public streets, being referable to the police power, applied to railroads whose tracks were laid before the streets were opened or the city was incorporated. In that case the railroad was constructed and in operation many years before the city of Harriman, which sought therein to compel the company to construct a bridge, was founded. It was incorporated by the Legislature long after the appearance and location of the railroad, and numerous streets were laid out over the railroad right of way. In Illinois v. Swalm, 83 Miss. 631, 36 South. 147, the court held that a railway company might be required to place a bridge over its road and to grade approaches thereto for a highway crossing it, though the railroad was in operation for many years before the highway was laid out. It appeared, in that case, that the proposed new highway crossed the tracks of the railroad company at a point where there was a cut fifteen feet deep and fifty feet wide, in which the double tracks of the road were located. The court applied the rule of the cases already referred to, following a prior decision of that court. [Illinois v. Copiah, 81 Miss. 685, 33 South. 502.]

"The same doctrine is affirmed in Texas v. Milam, 90 Tex. 355, 38 S. W. 747. The court in that case sustained an act of the Legislature imposing the duty upon railroad companies of constructing crossings over public highways, and held that it applied to cases where the highways were laid out by the county subsequent to the building of the railroad, as well as to previously existing highways, and that the expense of

grading such crossings, putting in cattle guards, drain pipes, sign boards, and crossing planks formed no part of the damages which the company was entitled to recover on account of the condemnation of its right of way for highway purposes. Such is the law in Connecticut (Woodruff v. Catlin, 54 Conn. 277, 6 Atl. 849), in Nebraska (State v. Chicago, 29 Neb. 412, 45 N. W. 469; Chicago v. State, 47 Neb. 549, 66 N. W. 624, 41 L. R. A. 481, 53 Am. St. 557), in Ohio (Railway Co. v. Sharpe, 38 Ohio St. 150), in Vermont (Thorpe v. Rutland, 27 Vt. 141, 62 Am. Dec. 625), and in Indiana (Evansville v. State [Ind. Sup.], 49 N. E. 2; Lake Erie v. Cluggish, 143 Ind. 347, 42 N. E. 743; Lake Erie v. Shelley, 163 Ind. 36, 71 N. E. 151). [See, also, Chicago v. People, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596.]

"A contrary doctrine may be said to be the law in the States of Kansas, Louisiana, and Michigan, but the great weight of authority, as shown by the foregoing citations, sustains the general proposition that the police power will uphold legislation of this kind. That the State has such authority, as respects all devices necessary for the safety and protection of the public, has been held by this court. [State v. District Court for Hennepin Co., 42 Minn. 247, 44 N. W. 7, 7 L. R. A. 121; State v. Minneapolis & St. L. Ry. Co., 39 Minn. 219, 39 N. W. 153; State v. Minnesota T. Ry. Co., 80 Minn. 108, 83 N. W. 32, 50 L. R. A. 656.] In the case first cited the court held that, where the highway was laid out over and across the railroad tracks, the company was not entitled to compensation for providing and maintaining cattle guards and sign boards at the new crossing, but was entitled to compensation for planking the roadway where it crosses the railroad tracks and for the maintenance of the same. The decision in that case is in harmony with the rule laid down in Kansas and Massachusetts, but is at variance

with all other courts whose decisions we have cited. The theory of this court in that case was that planking the tracks was a part of the work of constructing the highway, and in no sense a safety device or necessary for the protection of the traveling public, and did not come within a proper exercise of the police power. That case, however, sustains the general proposition that safety devices may be required at new streets; and sustains the contention of relator, if the bridge in question comes within the meaning of a safety device. But the decision rested upon the general statutes requiring cattle guards and gates to be constructed, and is not here directly in point. What was said in State v. St. Paul, M. & M. Ry. Co., 35 Minn. 131, 28 N. W. 3, 59 Am. 313, with reference to the construction of the statute there before the court, as respects streets laid out after the location of the railroad, was not intended as a decision of the question. That question was not involved in the case, and the remark was made for the purpose of indicating that the decision was intended to be limited to existing streets only.

"Counsel for defendants attempted to distinguish many of the cases cited as supporting the contention of the relator, on the ground that they involved grade crossings only. The cases cited from Tennessee, Indiana, and Mississippi involved the construction of bridges over the tracks of the railroad company, but, as urged by counsel, the other cases concerned only grade crossings. But there can be no difference on principle, in so far as an exercise of the police power is concerned, between a grade crossing and a bridge over the tracks. The difference between the two is one of degree, relating solely to the matter of expense. But the expense incident to a compliance with police regulations is not an element of consideration, except, perhaps, where arbitrary and unreasonable, or resulting in a practical confiscation of property. Cases

where one railroad crosses another have no application, because both stand on an equality respecting rights and obligations, while in cases like that at bar the rights of the public are superior.

"If, then, it is within the authority of the State, in the exercise of its police power, to require railroad companies to construct and maintain crossings, either at grade, or above or below the tracks, at streets laid out after the construction of the road, it becomes necessary to inquire whether the Legislature of this State has so declared or ordered by any statute, or whether the obligation rests upon the railroad company at common law.

"The charter of the Minnesota & Pacific Railroad Company, predecessor of defendants, provides as follows:

" 'The said company shall have the right and authority to construct their said railroad and branches upon and along, across, under or over, any public or private highway, road, street, plank road, or railroad, if the same shall be necessary; but the said company shall put such highway, road, street, plank road, or railroad, in such condition and state of repair as not to impair or interfere with its free and proper use.' [Laws Extra Sess. 1857, p. 6, c. 1, sec. 7.]

"A statute very similar to this was held applicable to new streets by the Indiana Supreme Court (Louisville v. Smith, 91 Ind. 119), and the rule announced by that court may be said to have been applied in effect, by other courts, as shown by the cases cited (Chicago v. City, 140 Ill. 309, 29 N. E. 1109).

"While the statute on its face might be construed as intended to apply to existing highways only, a fair and reasonable construction thereof, in view of the legislative policy of the State on this subject, and the propriety and necessity for some specific regulation, will bring within its scope and purpose streets and highways subsequently laid out and opened. It is ele-

mentary that charters of public corporations, in which
the rights of the public are involved, are to be con-
strued with strictness against the corporation, and
liberally in favor of the public. [St. Louis R. D. Imp.
Co. v. C. N. Nelson Lumber Co., 51 Minn. 10, 52 N. W.
976; Com. v. Erie, 27 Pa. St. 339, 67 Am. Dec. 471.]
Or, as said by the New York Court of Appeals, in
Tracy v. Troy, 38 N. Y. 433, 98 Am. Dec. 54, an act
of the Legislature, induced by public considerations,
the purpose of which is to protect the traveling pub-
lic, would receive a liberal construction to effectuate
the purpose of its framers. 'A rigid and literal read-
ing would in many cases defeat the very object of the
statute and exemplify the maxim that "the letter
killeth, while the spirit keepeth alive." ' The opera-
tion of statutes is often extended, by construction, to
matters of subsequent creation and applied to condi-
tions that accrue after their passage, as well as to
those that existed before. [Wilberforce, St. L., 166;
Kline v. Minnesota Iron Co., 93 Minn. 63, 100 N. W.
681; Schus v. Powers-Simpson Co., 85 Minn. 447, 89
N. W. 68, 69 L. R. A. 887.] In those cases we con-
strued the fellow-servant statute, which, on its face,
applied to commercial railroads, to apply to 'logging'
railroads, though they were unknown when the stat-
ute was enacted; and the construction there given was
sustained by the Supreme Court of the United States
in Minnesota Iron Co. v. Kline, 199 U. S. 593, 26 Sup.
Ct. 159, 50 L. Ed. 322.

"The language of statutes, when under liberal con-
struction, is flexible, and general words admit of more
than one interpretation. The court may carry the
statute beyond the natural import of its words when
essential to answer the purpose of the Legislature.
[Black, Inter. Laws, 307, 315; 2 Sutherland, Stat.
Const. (2 Ed.), 582, et seq.; Avery v. Town, 36 Conn.
304; Smith v. Stephens, 82 Ill. 554; Vigo's Case, 21
Wall. 648, 22 L. Ed. 690.] It is an 'old and unshaken

rule in the construction of statutes, to-wit, that the intention of a remedial statute will always prevail over the literal sense of its terms, and therefore when the expression is special or particular, but the reason is general, the expression should be deemed general.' [Brown v. Pendergast, 89 Mass. 427.] A large construction is to be given to statutes having for their end the promotion of important and beneficial public objects. [Town v. Pond, 19 Conn. 597.] In Silver v. Ladd, 7 Wall. 219, 19 L. Ed. 138, the Supreme Court of the United States applied this rule to an act of Congress granting lands to certain settlers, and held that the words 'single man' included unmarried women. A statute of Alabama provided that whenever an officer, required by law to give an official bond, acts under a bond 'which is not in the penalty payable and conditioned as prescribed by law,' such bond is not void but stands in the place of the official bond, subject, on its conditions being broken, to all the remedies which the person aggrieved might have had upon the bond, had it been executed in conformity with the law. The court held that the statute, being a remedial one, should be construed to apply to a bond properly conditioned, but defectively executed. [Sprowl v. Lawrence, 33 Ala. 674, 865.] Numerous illustrations of the application of this rule to various statutes will be found referred to in 2 Sutherland, Stat. Const. (2 Ed.), sec. 593, et seq. [See also Charles River Bridge v. Warren Bridge, 11 Pet. 420, 9 L. Ed. 773, 938.]

"The purpose of incorporating this particular provision in the charter of the railroad company was in the interests of the public and to require the railroad company to keep in good repair all crossings at the intersection of highways; and, though it may be said to be declaratory of the common law, the general rules of statutory construction apply to its interpretation. At the time the Legislature granted the char-

ter of the railroad company in 1857, the city of Minneapolis was a small village, and the territory to the north and west through which the proposed line of railroad was to extend was a vast wilderness, occupied by roving bands of Indians. It was in the mind of the Legislature, at that time, that the city of Minneapolis would increase in population and ultimately become a large city; that the State through which the road was to be constructed would develop and improve; that settlers would make their homes upon the public lands; and that villages and cities would spring up along the line of the railroad, thus rendering new streets and highways an absolute necessity for public use. Respondent's charter was granted with the reserved right on the part of the State to construct new highways and streets over its line of railroad, wherever made necessary by the future development of the State. It is not, therefore, in view of this condition, which was in the mind of the Legislature and the railroad company, unreasonable to believe that they contemplated, when providing for the care of highway and street crossings, not only those then existing, but such as might thereafter, in the course of the growth and development of the State, become necessary to be laid across the railroad's right of way. The evils intended to be guarded against are the same and apply equally to both new and old streets. There was no reason why the Legislature should deem it prudent to provide for existing highways only; and we do no violence to the rules of statutory construction in holding that the provisions of defendant's charter were intended to include all streets and highways intersected by railroads, whether laid out before or after the building of the railroad. The expression of the statute is special, perhaps; but the reason therefor is general. The expression must therefore be deemed general. [Brown v. Pendergast, supra.]

"A railroad company accepts and receives its franchise subject to the implied right of the State to lay out and open new streets and highways over its tracks, and must be deemed, as a matter of law, to have had in contemplation at the time its charter was granted, and is bound to assume, all burdens incident to new, as well as existing, crossings.

"This feature of the case was before this court in State v. District Court for Hennepin County, 42 Minn. 247, 44 N. W. 7, 7 L. R. A. 121. That case involved the general statutes requiring cattle guards and sign boards to be erected at crossings, which, on their face, like the provisions of respondent's charter, have at least apparent reference to highways crossed by railroad lines. It was there insisted that the requirement had no application to new streets, and that the railroad company was entitled to compensation for their construction to be allowed as damages for opening the new street over the right of way. The court held that the statute applied to new streets, but that the company was entitled to compensation for planking the crossing. In the course of the opinion, the court said, in substance, that, although the street involved in that case was not in existence when the railroad was constructed, and hence the requirement of the statute referred to did not impose the duty of putting in cattle guards and sign boards at the particular place at that time, yet as soon as the street was laid out and opened, the existing statute became applicable and required those things to be done; that the circumstances, with reference to which the statute as a police regulation applied, came into existence by the location of the new street, and the requirements of the statute became operative. 'When the railroad company accepted its charter, it received its franchises subject to the authority and power of the State to impose such reasonable regulations concerning the use, in matters affecting the common safety, of its danger-

ous enginery, and not merely subject to the then existing regulations as applicable to then existing conditions; and whether the obligation now in question had been imposed at this time by direct act of the Legislature, or, as is the case, arises from the laying out of a new highway, to which the previously existing law becomes applicable, can make no difference.' The court further said that, when the franchise was granted to the railroad company to construct and operate its railroad, it was not contemplated either by it or by the State that no more public highways should be laid out which would increase the number of places where the ordinary police regulations would have to be. complied with by the railroad company to its inconvenience and expense; on the contrary, that it must have been understood and contemplated, especially in a new State, rapidly advancing in population and in the development of its resources, where new towns were springing up and new avenues for travel and traffic were becoming necessary, that new streets and roads would and must be laid out, and that many of these would necessarily cross existing railroad lines; and 'we cannot resist the conclusion that, so far as concerns the matter now under consideration, the charter of the relator was taken subject to the right of the State to impose this duty whenever, by reason of the establishing of new highways, it should become necessary; and hence the relator is not entitled to compensation for obedience to this requirement'—citing Lake Shore v. Cincinnati, 30 Oh. St. 604; Chicago v. Joliet, 105 Ill. 388, 44 Am. 799; City v. Hannibal, 49 Mo. 480; City v. New York, 36 Conn. 255, 4 Am. 63.

"The reasoning of the court in that case applies to the case at bar. In conclusion, on this branch of the case, we say, as was said by the Indiana Supreme Court in Louisville v. Smith, 91 Ind. 119, that the provisions of the railroad charter should not receive the

literal and restricted construction contended for by respondent. Neither the interest of the railroad company nor of the public require it.

"Again, we are clear that the obligation is imposed upon the railroads at common law. The common law doctrine, that where a street or highway is laid over one already in existence, the expense of making the crossing safe rests upon the company or corporation using the new way, had its origin when railroads were unknown, at a time when the use of all highways, generally speaking, was of the same general nature, the traffic or use of either not being inherently dangerous to the free use and enjoyment of the other. Not so where a railroad crosses a public street, or a street a railroad. In such a case the operation of trains over the latter, particularly in our large cities, is highly dangerous and a menace to the public using the intersecting street. The railroad company is alone responsible for this condition, and, though it has an unquestioned right to operate its trains in such manner as the practical conduct of its business may require, the dangers resulting therefrom are of its own creation, and on every principle of right and wrong it should bear the burden of protecting the public so far as practicable from accident or injury.

"The common law is not a codification of exact or inflexible rules for human conduct, for the redress of injuries, or protection against wrongs, nor yet a mere figment of judicial genius; but, on the contrary, is the embodiment of broad and comprehensive unwritten principles, inspired by natural reason, an innate sense of justice, adopted by common consent for the regulation and government of the affairs of men. It is the growth of ages, and an examination of many of its principles, as enunciated and discussed in the books, discloses a constant improvement and development in keeping with advancing civilization and new conditions of society. [Holmes, Common Law, 1-5, 36,

*et seq.*] Its guiding star has always been the rule of
right and wrong, and in this country its principles
demonstrate that there is in fact, as well as in theory,
a remedy for all wrongs. The principles governing
the rights and liabilities of individuals are often in-
applicable to railroad companies, or other corpora-
tions, clothed as they are by the State with special
rights, powers, and privileges, not enjoyed by indi-
viduals. The nature and character of the business of
railroad companies, the numerous hazards and dan-
gers connected with the conduct of their affairs, ren-
der the law for the individual inappropriate and ineffi-
cient, and the courts, in testing the various pertinent
principles in connection with their peculiar features,
have, by methods of differentiation and analogy,
evolved new and appropriate rules for the detemina-
tion of their rights and liabilities. [5 Harvard Law
Rev. 189.]

"It is insisted that the rule of the common law
above referred to applies to and governs the position
of relator in the case at bar, imposing the obligation
of constructing the bridge in question upon the city,
because the street was laid over the existing railroad.
The rule in its abstract form can have no application
to facts and conditions such as here shown, and can-
not be held to impose upon the municipality the bur-
den of constructing safety devices to protect pedes-
trians from dangers caused solely by the railroad com-
pany. In view of the fact that the railroad company
takes its franchise subject to the reserved right of
the State to lay new streets over and across its tracks,
and in contemplation that it may do so (Chicago &
N. W. Ry. Co. v. City of Chicago, 140 Ill. 309, 29 N. E.
1109; Chicago, B. & Q. R. Co. v. Chicago, 166 U. S.
226, 17 Sup. Ct. 581, 41 L. Ed. 979; State v. District
Court for Hennepin County, 42 Minn. 247, 44 N. W. 7,
7 L. R. A. 121), and the further fact that the company
is solely responsible for the necessity of safety de-

vices at street crossings, the same being occasioned by the operation of its trains over and across the street, and the further elementary principle that he who creates and maintains upon his premises a condition dangerous and inimical to others is under legal obligation to so guard and protect it that injury to third persons may not result therefrom, the rule of the common law as to existing, must be held to apply equally to new, streets. The right of the State to lay out and open new streets is a condition attached by implication of law to the charter and franchise of the railway company, and the obligation to maintain the street intersections in good repair is a continuing one, follows the franchise, and applies to new streets or highways as soon as they come into existence.

"It follows, from what has been said, that the obligation to construct and maintain the bridge in question rests upon defendant, unless it is a part and portion of the crossing, for which, within State v. District Court for Hennepin County, supra, it is entitled to compensation, and in no sense a safety device. The court, in the case just referred to, held that the railroad company might be required to construct safety devices at new streets, the planking for the crossing being held in that case not to come within the scope of that expression. So, if the proposed bridge constitutes a safety device, within the meaning of that term, relator's contention must be sustained, and the order of the court below reversed. That it comes within the meaning of that expression we have no serious doubt. It appears from the record that a number of railroad tracks cross this particular street, which is in a populous part of the city and constantly used by the citizens; that trains are frequently operated over and across the same, rendering the crossing dangerous and unsafe for public use. The purpose of planking between the rails is to make the street passable over the

track. But the purpose of a bridge over the tracks is for safety, and for safety alone. There can be no distinction between it and gates or sign boards. They answer the same purpose. 'Everything that goes to make up a crossing safe for public use is as essentially within police regulations as any part of it.' [Chicago v. City, 97 Wis. 418, 72 N. W. 1118.]

"In the year 1892 the city council of the city of Minneapolis enacted a certain ordinance requiring the respondents to construct certain bridges and approaches thereto at the intersection of certain streets with the railroad tracks. By section 8 of that ordinance, the city council, on behalf of the city, expressly agreed that, in consideration of the performance of the conditions of the ordinance by the respondents, the city would thereafter construct and maintain all crossings or approaches made necessary by the opening of new streets. It is contended by respondents that this ordinance constituted a valid contract with the city, and, having been complied with on their part, it is beyond the power of the city to now require them to construct the bridge in question; that to require it to do so would impair the obligations of the contract, in violation of both State and Federal Constitutions. In this we do not concur. The power of the State to require the defendants to construct the bridge in question, or any other bridge, at streets crossing the right of way, is an exercise of the police power, which can be neither contracted away nor lost by inaction on the part of the public authorities. The contract was beyond the authority of the city council and *ultra vires* and void. [State v. Minnesota T. Ry. Co., 80 Minn. 108, 83 N. W. 32, 50 L. R. A. 656; 5 Current Law, 637, note 71; City v. Rochester, 182 N. Y. 99, 74 N. E. 953, 70 L. R. A. 773; 36 Cent. Dig. cols. 1760, 1761, section 1315.] See also Chicago B. & Q. R. Co. v. Omaha, 170 U. S. 57, 18 Sup. Ct. 513, 42 L. Ed. 948, where the subject is fully considered. Though the

contract before the court in the case last cited was held valid so long as acted on by the parties, the court said that it might be repudiated at any time by the municipality. In the case at bar, the contract was repudiated by the city when its council adopted the resolution requiring defendants to construct the bridge. The resolution was sufficient for that purpose. [City of Alma v. Guaranty Sav. Bank, 19 U. S. App. 622, 60 Fed. 203, 8 C. C. A. 564; Atchison Board of Education v. De Kay, 148 U. S. 591, 13 Sup. Ct. 706, 37 L. Ed. 573; City v. Chicago, 92 Ill. 21.]''

To the same effect is the case of State ex rel. v. Northern Pacific Railway Co., 98 Minn. 429. This case was carried to the Supreme Court of the United States on writ of error, and is reported in the 208 U. S. 583. That court in affirming the judgment of the Supreme Court of Minnesota, on page 592, used this language:

''Passing to the merits, it is the contention of the railroad company that when this contract was made the Supreme Court of Minnesota had decided that, as to highways which were constructed after the railroad was built, there was no obligation upon the company to construct overhead bridges or crossings, and whatever the rule might be as to requiring a railroad company to construct overhead bridges in the interest of public safety as to streets in existence when the railroad was built, it could not be required to so do when the highway was constructed after the railway had acquired its right of way and laid its tracks.

''It is difficult to perceive how a judicial determination that the railroad company could not be charged with the expense of such structures as this viaduct as to streets laid out after the railroad was built, could have induced the agreement to pay $50,000 towards the improvement in question in a street first occupied by the railroad company. And the recitals of the contract of September, 1891, are to the effect that the

payment of the $50,000 was in lieu of assessments for benefits in excess of damages for the taking of property of the railroad company to be caused by said public improvement, which might be imposed upon the property of the railroad company.

"But was there such settled judicial construction? In the case of State ex rel. City of Minneapolis v. St. Paul, Minneapolis & Manitoba Railway Company and Another, 98 Minnesota, 380, a case decided by that court upon the same day it handed down its decision in the case at bar, the subject was elaborately examined and a conclusion reached that the charter of a railroad, similar to the one granted the Lake Superior and Mississippi Railroad Company above set forth, imposed an obligation upon the railroad company as to highways, roads and streets, over which the railroad was constructed, to keep the same in good condition and repair, whether laid out after the building of the railroad or before, and that such requirement in the interest of public safety embraced an overhead bridge necessary for the public safety, and that a requirement that it should be built at the expense of the railroad company was an exercise of the police power of the State, and did not amount to taking property without due process of law. In that case the cases relied upon by the learned counsel for the plaintiff in error in this case as establishing a contrary doctrine, prior to the making of the contract, were reviewed. They are: State of Minnesota ex rel. City of Minneapolis v. St. Paul, Minneapolis & Manitoba Railroad Co., 35 Minnesota, 131, and State of Minnesota ex rel. St. Paul, Minneapolis & Manitoba Railroad Company v. District Court of Hennepin County, 42 Minnesota, 247. It was there pointed out, and we think correctly, that while the learned court, in State of Minnesota ex rel. St. Paul, Minneapolis & Manitoba Railroad Company, limited its ruling to cases where the railroads had been constructed in

streets already laid out and expressly disclaimed that the doctrine there announced would necessarily apply where a new street had been laid out over the railroad after its construction, the question now made was not involved in the case, and the decision then made was limited to existing streets only. In the second case above cited (42 Minn. 247), while it was held that planking the tracks at crossings was a part of the construction of the highway, and not a safety device for the protection of the thoroughfare, and therefore not within the proper exercise of the police power, so that the cost thereof could be required from the company, the court did say in the most emphatic manner that safety devices might be required at new streets, and that cattle guards and gates were such safety devices, the construction of which would be required at the expense of the company. And the court said:

" 'When the railroad company accepted its charter it received its franchises subject to the authority and power of the State to impose such reasonable regulations concerning the use, in matters affecting the common safety, of its dangerous enginery, and not merely subject to the then existing regulations as applicable to then existing conditions; and whether the obligation now in question had been imposed at this time by direct act of Legislature, or, as is the case, arises from the laying out of a new highway, to which the previously existing law becomes applicable, can make no difference.

" 'The fallacy involved in the claim of the relator, and, as we think, in some decisions by which its claim is supported, arises from a failure to distinguish between rights of property, which confessedly are protected under the Constitution from being divested or appropriated to other purposes without compensation, and the very different matter concerning the manner in which the owner may use his property so as not to unnecessarily endanger the public.

The claim of the relator involves an assumption that when the railroad constructed its line of road, conforming to the requirements of the law as to all then existing highway crossings, it. had a constitutional right, by virtue of its priority, to always afterwards operate its road unembarrassed by being required to observe like precautions with respect to highways that might be thereafter laid out across the railroad, except upon the condition that it should receive compensation, not merely for whatever of its acquired property might be taken for the other use, but also for the expense and burden of conforming its own conduct to the newly-existing conditions—of conforming to a general police regulation of the State, not before applicable. There was no such exclusive or superior right acquired by priority of charter, or of the construction of this railroad highway. It cannot be supposed that, when its franchises were granted to this relator to construct and operate this railroad, it was contemplated, either by it or by the State, that no more public highways should be laid out which should increase the number of places where the ordinary police regulations would have to be complied with by the railroad company to its inconvenience and expense. On the contrary, it must have been understood and contemplated, especially in a new State rapidly advancing in population and in the development of its resources, where new towns were springing up, and new avenues for travel and traffic were becoming necessary, that new streets and roads would be' and must be laid out, and that many of these would necessarily cross existing railroad lines. We cannot resist the conclusion that, so far as concerns the matter now under consideration, the charter of the relator was taken subject to the right of the State to impose this duty whenever, by reason of the establishing of new highways, it should become necessary; and hence the relator is not entitled to compensation for obedience to

this requirement. [Lake Shore, etc. Ry. Co. v. Cincinnati, etc. Ry. Co., 30 Oh. St. 604; Chicago & Alton R. Co. v. Joliet, etc. R. Co., 105 Ill. 388, 400, 404; City of Hannibal v. Hannibal & St. Joseph R. Co., 49 Mo. 480; City of Bridgeport v. New York & New Haven R. Co., 36 Conn. 255.]'

"As the Supreme Court of Minnesota points out in the opinion in 98 Minnesota, 380, above referred to, the state courts are not altogether agreed as to the right to compel railroads, without compensation, to construct and maintain suitable crossings at streets extended over its right of way, after the construction of the railroad. The great weight of state authority is in favor of such right. [See cases cited in 98 Minn. 380.]

"There can be no question as to the attitude of this court upon this question, as it has been uniformly held that the right to exercise the police power is a continuing one; that it cannot be contracted away, and that a requirement that a company or individual comply with reasonable police regulations without compensation is the legitimate exercise of the power and not in violation of the constitutional inhibition against the impairment of the obligation of contracts. In New York & New England Railroad Company v. Bristol, 151 U. S. 556, 576, the doctrine was thus laid down by Chief Justice FULLER, speaking for the court:

" 'It is likewise thoroughly established in this court that the inhibitions of the Constitution of the United States upon the impairment of the obligation of contract, or the deprivation of property without due process, or of the equal protection of the laws, by the States, are not violated by the legitimate exercise of legislative power in securing the public safety, health and morals. The governmental power of self-protection cannot be contracted away, nor can the exercise of rights granted, nor the use of property, be withdrawn from the implied liability to governmental

regulations in particulars essential to the preservation of the community from injury. [Beer Co. v. Massachusetts, 97 U. S. 25; Fertilizing Co. v. Hyde Park, 97 U. S. 659; Barbier v. Connolly, 113 U. S. 27; New Orleans Gas Company, v. Louisiana Light Company, 115 U. S. 650; Mugler v. Kansas, 123 U. S. 623; Budd v. New York, 143 U. S. 617.]'

: "The priciple was recognized and enforced in Chicago, Burlington & Quincy R. R. Co..v. Chicago, 166 U. S. 226, where it was held that the expenses incurred by the railroad company in erecting gates, planking at crossings, etc., and the maintenance thereof, in order that the road might be safely operated, must be deemed to have been taken into account when the company accepted its franchise from the State, and the expenses incurred by the railroad company, though upon new streets, might be required as essential to the public safety. In Detroit Railroad Co. v. Osborn, 189 U. S. 383, it was held that the State of Michigan might compel a street railroad to install safety appliances at an expense to be divided with a steam railroad company occupying the same street, notwithstanding the steam railroad was the junior occupier of the street. The subject was further under consideration in New Orleans Gas Light Co. v. Drainage Commission of New Orleans, 197 U. S. 453, where it was held, that although the gas company had permission from the city to lay its pipes under the streets, it might be required to remove the same at its own expense, in the exercise of the police power in the interest of the public, in order to make way for a system of drainage which was required, in the interest of the public health, without compensation to the gas company; and that uncompensated obedience to regulations for public safety under the police power of the State was not a taking of property without due process of law.

"The same principles were recognized and the previous cases cited in Chicago, Burlington & Qunicy Ry. Co. v. People of the State of Illinois ex rel. Drainage Commissioners, 200 U. S. 561, and again in Union Bridge Co. v. United States, 204 U. S. 364. The result of these cases is to establish the doctrine of this court to be that the exercise of the police power in the interest of public health and safety is to be maintained unhampered by contracts in private interests, and that uncompensated obedience to laws passed in its exercise is not violative of property rights protected by the Federal Constitution.

"In this case the Supreme Court of Minnesota has held that the charter of the company, as well as the common law, required the railroad, as to existing and future streets, to maintain them in safety, and to hold it charter rights subject to the exercise of the legislative power in this behalf, and that any contract which undertook to limit the exercise of this right was without consideration, against public policy and void. This doctrine is entirely consistent with the principles decided in the cases referred to in this court. But it is alleged that at the time this contract was made with the railroad company it was at least doubtful as to what the rights of the parties were, and that the contract was a legitimate compromise, between the parties, which ought to be carried out. But the exercise of the police power cannot be limited by contract for reasons of public policy, nor can it be destroyed by compromise, and it is immaterial upon what consideration the contracts rest, as it is beyond the authority of the State or the municipality to abrogate this power so necessary to the public safety. [Chicago, Burlington & Quincy R. R. Co. v. Nebraska ex rel. Omaha, 170 U. S. 57.]"

To the same effect are the cases of Central R. R. Co. v. State, 32 N. J. L. 220; Chicago, etc., R. R. Co. v. State, 158 Ind. 189. And there are scores of others

announcing the same doctrine. See authorities cited in briefs published with this opinion.

The great weight of authority is in harmony with the views expressed by the Supreme Courts of the United States and Minnesota, and in our opinion those views are sound and unanswerable.

There are some authorities to the contrary, but as shown by the quotations made from the cases cited by counsel for the city, they are in the minority, not well considered, and in my opinion, they announce an erroneous doctrine, and should not be followed.

III.     Counsel for appellants insist that, even though this court should hold that the city council had the authority to compel the railroad companies to separate the grade crossings, nevertheless, it had no authority to require them to depress their tracks beneath the surface of the streets in order to accomplish that purpose; their contention being that when the city ordered a separation to be made, the authority of the city ceased, and it then became the right of the companies to elect whether they would depress the tracks beneath the streets or depress the streets beneath the tracks, and that after having done so, it then became their duty to construct and maintain good and sufficient crossings where their roads cross the streets and highways of the city.

In support of that contention we are cited to section 807, Revised Statutes 1879, which, excepting the proviso below mentioned, is practically the same as section 3141, Revised Statutes 1909, which, in so far as is here material, reads as follows:

"Every such corporation shall construct and maintain good and sufficient crossings, where its railroad crosses public roads or town streets, now or hereafter to be opened for public use, which crossings shall be constructed of the materials and in the manner following: . . . Provided, that such corporation

may make such road or street to pass under its said railroad where the same can be done with equal convenience and safety to the traveling public.''

Also to section 3049, Revised Statutes 1909, which, in so far as is material, is copied in paragraph two of this opinion.

Counsel cite many cases from this court and others, construing statutes which require certain persons to do one of two things, not both, for instance, the statute which requires the bell of a locomotive to be rung eighty rods from a public crossing and to be kept ringing until the crossing is passed, or that the whistle thereof be sounded eighty rods from said crossing and be sounded at intervals until the crossing is made. Those cases properly hold that in proceedings instituted for the violation of that statute, it was not sufficient to show that the bell was not so rung, for the reason that the company had the right, in the exercise of the option given by the statute, to sound the whistle instead ringing the bell, which, in the absence of proof, the law would presume was done.

We are also cited to the case of Regina v. Southeastern Railway Co., 6 Law & Equity Rep. 214. In that case the relator instituted mandamus proceedings on behalf of the realm, to compel the respondent to construct a bridge in a certain highway over the railway, in the county of Kent, as required by the laws of England. Counsel for respondent insisted that the railway company had the option to carry the highway over the railway or the railway over the highway by means of a bridge, and consequently mandamus would not lie. In discussing that question, PARKE, B., said:

''We have no difficulty in saying that the act of Parliament gave an option to the company. Mr. Needham contended that the proper construction of the 46th section was, that if the highway was above the level of the line of the railway, a bridge was to be

made for it over the railway; if below, for the railway over it. But this is not the ordinary meaning of the language contained in the clause, which, according to the usual rule of construction, directs either one thing or the other to be done, which is a case of election, when, according to the rule of law, the party to do the act is to have the choice which act he will do. . . .We have no doubt the Legislature meant what they have said, that in such a case the company were to judge for themselves, thinking that they would determine what was best, according to the varying circumstances in which the choice would have to be made.''

The cases cited from this and other States of the Union are hardly in point, for the reason that they relate to the State generally, whereas the case at bar is governed by the charter and ordinances of the city of St. Louis.

There is a well-settled rule of statutory construction, which is recognized in this State, and elsewhere, to the effect, that where there are two acts, the provisions of one specially applying to a particular subject or condition, which clearly applies to the case in hand, and the other general in its provisions, and such that if standing alone it would include the same subject or condition which is embraced in the former, and thus conflict with each other, then the former act must be taken as constituting an exception to the latter or general act, and not a repeal of the former; and especially is this true when the general and special acts are contemporaneous, or where the special act was enacted subsequent to the general. [City of St. Louis v. Lane, 110 Mo. 254; State ex inf. v. Dabbs, 182 Mo. l. c. 366; State ex rel. v. Slover, 134 Mo. l. c. 19.]

It is perfectly clear that the charter and ordinances of the city of St. Louis apply particularly to the streets and highways of that city. That is expressly made so by the Constitution of the State, which authorized it to adopt a charter providing for its own

government; and that charter, as we have previously seen, has most elaborately provided for the establishment, opening, improvement and regulation of the streets and highways of the city of St. Louis.

We are unable to say whether the case of Regina v. Railway, supra, supports appellants' contention or not, for the reason that the act of Parliament which the court there had under consideration, is not before us; but it does appear from the opinion, that said act related to highways in the rural districts, and not to incorporated towns and cities, which have full care and control over their streets and highways like the city of St. Louis and most other American cities.

We are, therefore, of the opinion that this insistence is not well taken.

IV.   Counsel for appellants contend that said ordinances numbered 24358 to 24361, inclusive, are void, because they are unreasonable and oppressive in that it would be almost, if not actually, impossible for them to comply with the terms thereof; but if possible, then the cost and damages to them and to the manufacturing and business institutions in that vicinity of the city would be so great, that it would practically confiscate their property and completely stop the expansion and future growth of their business.

This contention calls for a close study and careful consideration of the various plans and specifications for doing the work introduced in evidence by the city.

I have heretofore called attention to the railroad companies' "Exhibit No. 2," showing the general plan of the work to be done under said ordinances; but in order to correctly understand the present contention of counsel, we will have to take up in detail some of the most important things required to be done by the ordinances mentioned.

The first of those matters that we will take up and consider will be the work to be done by the railroad companies in the vicinity of the American Tobacco Company, and the effect it will have upon all parties interested. But before doing so, I wish to state that the hundreds of exhibits introduced in evidence, covering more than a thousand pages, if reduced to the size of pages in ordinary books, contain so much useless and confusing matter, that I have brushed most of them aside, and only considered those which bore directly upon the questions in hand.

City Exhibits Nos. 67, 68 and 69, are the most important introduced in evidence, but even they contain so much surplus matter when considered separately (which is the only way they can be considered) that I have retraced them (from the originals) and omitted therefrom all of said surplusage, but have retained the numbers of the exhibits in said tracings.*

The tracing of Exhibit 67, which is hereto attached, and numbered "Exhibit No. 67," and made a part hereof, shows, in general, the location of the American Tobacco Company's plant, with respect to the intersections of Tower Grove avenue, Old Manchester road, Park avenue and the St. Louis & San Francisco Railroad Company and the Oak Hill & Carondelet Railway Company.

It shows in particular at the letter A, the Frisco connection leading into the plant of the American Tobacco Company, and the grade (at A 1) proposed by the city for this connection is 3.5%: The letter B wherever it appears, indicates by the arrow drawn

---

*Note.—These tracings are extensive and complicated. They are on file with the clerk and are a part of the original opinion. Copies of them could be made only by an expert draftsman. They are too large to be printed on one page of this book, and to be reproduced in colors, as they must be to be intelligible and satisfactory, they should be printed on large, separate sheets and bound in the book as inserts. At the request of the judge who wrote the opinion, they have been omitted from this publication. These statements apply also to tracing of "Exhibit No. 68" discussed at page 495.—*Reporter.*

therefrom the Oak Hill connection leading into said plant, this track being also the Missouri Pacific means of access to said plant, which is frequently referred to in the evidence as the railroad track on the "13 or 14-foot strip" of ground. The proposed grades of this track east of Tower Grove avenue are shown at B 1, which are 3.2% and 3.5%. But the grade of this road west of Old Manchester road is not definitely shown on any exhibit, and consequently does not appear upon this tracing.

At the letters C and D are shown (in red lines) the location of the bridges to carry Old Manchester road and Tower Grove avenue over the Oak Hill connection (track B.)

The heavy black line marked E 1, E 2, and E 3, shows the location of the retaining walls required to preserve those connections and buildings of the Tobacco Company.

The remainder of this plat is not material so far as the Tobacco Company is concerned.

Edward B. Halsey testified on behalf of plaintiffs, that he was connected with the Baldwin Locomotive Works of Philadelphia, and had been for twenty-two years. And when asked about the grade from Tower Grove avenue to Chouteau avenue, he stated:

"I guess there might be one per cent grade. I have been thinking about the inclines which would run anywhere from three per cent up to five per cent. I think, when you get to inclines like that, that you strike a very serious proposition in regard to switching.

"I think anything you can do to overcome grades is an advantage. There are few roads which are built with less than one per cent grades out west, and a one per cent grade is not considered very serious; I mean you have got that to encounter all along in railroading, in most of the roads in the country, except a road like the Pennsylvania railroad; that was built on a low

grade line, but when you start with grades that would run into three per cent, and if you have got to do shifting and breaking of trains, and you have heavy grades, I think it is the hardest thing that you can put upon railroads.''

He was asked what interest he had in the matter, and stated:

''It was purely a matter of personal interest with me. Then, I am interested in anything connected with railroading, in a general way, because we sell a great many locomotives, and I know a great many railroad men; but I have not been approached by any railroad men to give any testimony on this.

''I said that grades would be required if the subway were built, and I knew what trouble we have had at Baldwin's to get our switching done, and what the Philadelphia & Reading Railway has done, and I know what a five per cent grade means; and it was, I think, in connection with that, and the American Car Company, that interested me, and following it up generally as a proposition.''

Speaking of the difficulty of operating a plant with five per cent grades, the witness stated that there is great difficulty due to the grade on account of a number of reasons. One is that the grade itself cuts down the hauling capacity of a locomotive tremendously. He then proceeded to give the figures of the Baldwin Locomotive Works' published hauling capacities of weights of locomotives, which figures, he says, he knows are correct, stating:

''I have knowledge of this sort of work for ten years, and have been doing it continuously. For example, a switching locomotive, such as the Philadelphia & Reading Railway Company has, switching into our yards, which weighs about 154,000 pounds, will haul a train, under normal conditions, on a level track, of approximately 3900 tons. The figures here are 3960. That same engine *on a five per cent grade,* a

*straight grade,* will haul *a train* of 215 tons. In other words, an engine will haul *nearly eighteen times as great a load on a level* track as it will haul up a five per cent grade. Before the subway was built the shifting was done at our plant by little four-wheel switchers. That is, I say four-wheel connected switchers, four driving wheels. On account of the grades *which enter our plant it was* necessary for the *Philadelphia & Reading* Railway Company to have *us build engines for them, special engines,* very heavy engines, which weigh about 154,000 pounds.

"Q. How many of those very heavy engines have the Philadelphia & Reading Railroad Company on these inclines? A. I think three. I mean for the blocks here for the subway, between Broad street and Eighteenth street. That is my recollection. Those engines may be, once in a while, taken to run below Broad street. They have some lighter engines that never come up our grades, but I think practically for our work, that they are chiefly used for our work, the three engines. I do not want to state that they do not do any other work; that I am not sure about."

He stated that the cost of these engines varies from $12,000 to $14,000.

"Q. I will ask you whether or not, in the operation of these engines, it is necessary for you to employ any men on these inclines in addition to those employed by the Philadelphia & Reading Railway? A. Yes. We have a man employed at our lower work, down there at the block below Sixteenth street, and also up at the block at Seventeenth street, who chiefly looks after the shifting for our interests—that is, to get the cars in. Of course, the shifting is handled by the Philadelphia & Reading Railway Company; they are responsible for it, but we have our own men to live with that work and to guard the tracks, and to keep watch out ahead, to see that the tracks are clear,

and all that, as the train comes up. We put up electric bells, which I think were automatically started by the trains as they entered the lower works, the lower switch, and then these men I spoke of were particularly employed to take charge from our end and act as watchmen, to see that their track was clear, to forewarn anybody.

"Q. Did you have to construct at your works any additional anchors to your buildings by reason of the danger due to this shifting on the five per cent grade? A. Yes. At our Seventeenth street plant we re-enforced one of the columns, which is about half way up this grade where the curve is going into our plant, with a very large re-enforcement, something in the shape of a pilot on the front of a locomotive, so that if a car was to jump the track there it would not hit the column square—it would be thrown up the column, and avoid damage. We have re-enforced that column. We also re-enforced a column in our upper works, on the north of Hamilton street, for the same reason—in case a car should jump the track at that point, coming in at high speed, and hit the post; I mean at Seventeenth street. I should say in our shop north of Hamilton street, for the same reason, and down in our lower entrance, between Broad and Fifteenth street; we designed that building particularly with a view to the entrance of these tracks, and we made those columns very strong at that point, particularly strong on account of anything like that.

"Q. Did you construct any bulkheads? A. That is what I mean by that up at Seventeenth street; we did, if you choose to call them bulkheads, I said 'pilot,' but it comes down on an angle, so that if a car struck it it would climb the post; it would not come square.

"Q. Do you know whether or not you ever did have an accident there where a locomotive did climb the post? A. I understood there was such an accident.

"Q. In what way does the locomotive handle the cars on those grades? A. They push them up, push the cars up, the locomotive always remaining at the rear. There are curves entering into our works on those grades. The engines haul up those grades about two cars. I believe under difficulties they can push a third car."

He stated that there is level ground at the bottom of the subway, which extended out on the main side line track, not the main track of the subway on which the passenger trains are run, but another track, and an engine can take a good start there, in the neighborhood of a quarter of a mile.

"Q. Do you know whether or not at first they did run there at a high rate of speed or not? A. At the beginning, I *believe they took runs* for *those grades,* and started down there anywhere from in the neighborhood of fifteen to twenty miles an hour, but it was *decided that it was such a* dangerous *practice that they are now* restraining the loads, and they are pushing them up under control. They are restricting the loads to whatever the locomotive can push up this five per cent grade. It is restricted practically to two cars. A normal haul, with loaded cars, is two, I think, for a load. I think with these very heavy engines that they will push a third car, although not probably fully loaded. I can figure it, but that is very close."

On cross-examination he stated that he understood pretty thoroughly the hauling capacity of locomotives on grades under those conditions, and he was familiar with the subway here. He was asked on what he was basing his views as to the conditions in St. Louis and replied:

"Simply this: I say in St. Louis you have got one street going across there, and you are to spend a whole lot of money for a subway pretty near three-fourths of a mile long, to do away with one street crossing on Tower Grove avenue, when you could

lower one street. Then you interefere with these manufacturing plants. They remain as they are, as I understand it, now. I think that subway there is going to harm the property there, just from the observation that I have made out there. You take that terra cotta works out there; if they want to expand, I should think they might buy the ground and expand, on the east side of Kingshighway. If you put a subway in there and retaining wall on the side, you make it hard for them to put in spur tracks into the plant. I think you are going to depreciate the property. I think it is going to cause that ground to deteriorate in value or usefulness for manufacturing purposes. I think if you can preserve the levels that you have there, the main levels, and run in off that grade just as you are, I think that property stands a chance of being much more valuable than otherwise, than if there is a subway there."

Speaking about the traffic in St. Louis carried across Tower Grove avenue, he said: "I would look at that this way: If you have got Kingshighway on the west and Grand avenue on the east, and here is Tower Grove (illustrating), I suppose the most you could say for Tower Grove would be that it would carry half the distance on either side. It would not take care of all that traffic. The other half would go to Kingshighway, and the other half down to Grand avenue. In other words, Tower Grove is only half the distance between Kingshighway and Grand avenue."

He stated that a person could come under the tracks as well as over them; that he had never seen evidence of Tower Grove avenue being overly congested; if Tower Grove avenue had a good crossing underneath these tracks he had never seen it in a condition that it was so congested that you could not take care of it, from the way the city is now.

He was asked in regard to wagons being blocked and stated: "If you take Thirteenth street here to-day, the condition is practically no different from what it is anywhere else in Philadelphia. There are grades of, we will say, three or four per cent. A three or four per cent grade is not a serious thing for wagon hauling, because you meet it anywhere, but I do not see why there should be any congestion at Tower Grove avenue on account of the railroad tracks if Tower Grove avenue were depressed."

He said that the fire department would have to go through the subway. He said that there were four per cent grades all over here; on Grand avenue, going from the bridge on Grand avenue up to Laclede, there is a heavier grade than there would be by depressing Tower Grove avenue, and stated:

"In Philadelphia we are built up solidly, both north of Pennsylvania avenue and on the south, all the way from Twenty-third street down to Thirteenth street, and below, just solid blocks of houses; and in St. Louis you have got open fields there at Kingshighway on the south side; you are open all around west of Tower Grove avenue, from the south of it. You have got Shaw's Garden down there, which is a park. I do not think you have got any comparison with the Philadelphia subway here, which is built up all around it, on both sides.

"If it had been decided, in the building of the subway, to depress Broad street, I do not know of any reason that we could not drive out Fairmount Park, and have gone under the tracks to Fairmount Park, and there would be no more element of danger in that, from horses and things of that sort, than we would have by going over it.

"I do not believe you could have done it as economically as the subway here, because you would have to underpin the buildings on every block; you would have to do that; you would have that condition to meet

in every block.  And you would have enormous dam-
ages if you depressed the cross streets; and you
would have the sewers to take care of all the way
along.''

The grades of the spur or side tracks of the Frisco
and the Oak Hill leading into the Tobacco Company's
plant, before mentioned, are materially increased, be-
cause the engineer who established those grades did
not make any allowance for the vertical curves, which
all the witnesses said were necessary at those points,
and without them no train could be drawn over them.

A vertical curve, if I understand it correctly, is
a curved line used to join two grade lines, one ascend-
ing and the other descending, which, without the
curve, would meet at the apex, more or less pointed,
according to the degree of the ascending and descend-
ing grades, and a train of cars in passing over such a
grade without the vertical curve would have one end
thereof going down grade while the other end would
be going up grade, with the apex somewhere between
the two ends.  For instance, suppose in the following
figure, track A to B ascends on a 3% grade.  Now if
it were not for the vertical curve indicated by line
D, E and F  a train passing over said track would have
to pass over the apex at B, which would break the
couplings as fast as they reached that point, but with
the vertical curve the train instead of passing over
the apex at B would pass under that point on the
curved line D E  F without injury to the train.  The
same vertical curve is used when a train descends on
a steep grade into a valley and ascends on a similar
grade on the other side thereof, which will be illus-
trated by inverting the figure before mentioned.

Charles P. Purdon, introduced as a witness for defendants, regarding vertical curves said:

"Q. You are familiar with the amount of traffic and character of trains, engines and business done on the line of all these roads within the vicinity of Tower Grove? A. Yes, sir. From City's Exhibit 101, starting with profile at the top, the grades are constructed as angles without any vertical curves and vertical curves are absolutely necessary for the proper operation, because with the trains going up these grades the drawbars would have too much play, if the grades are not eased off, it would be like striking a car on this angle (indicating) and it makes a difference in the drawbar. The master car builder's rule allows a difference of three inches in height in drawbars and you ought not to exceed that, and, of course, if vertical curves are introduced there the rate of grade must be made steeper to reach the same point, or with a less distance the change of grade would be greater and that would apply to all of these. Another thing that would mislead a layman is that the roads are indicated as simple lines and instead of being lines they are planes, instead of two lines meeting you have two planes of certain width. Now, for instance, at this

point here, which is where the Frisco crosses the Oak
Hill & Carondelet, the Oak Hill grade is shown as·
coming up to a point and that would not be practical
because there are two tracks of the Oak Hill crossing
three tracks of the Frisco at that point; now, these
two tracks of the Oak Hill crossing and wings would
occupy a space of fifty-eight or fifty-nine feet wide. .

"Q. Why, on account of the curve? A. No; we
have three tracks of the Frisco.

"Q. And the Oak Hill has two tracks? A. Four-
teen feet; it is eight feet, fourteen feet plus that is
twenty-two feet, and the wings at the crossings; this
crossing is made, that much of it, made in one piece;
the wings extend five feet to each side, so you would
have thirty-two feet of crossing, but it is on a consid-
erable angle and would occupy the space of fifty-nine
feet, the Frisco and the Oak Hill occupy a space of
eighty feet, so you do not come up to a point, you have
got to provide for that space of eighty feet.

"Q. There is plenty of room for it? A. Not to
come to a point. If you made it on a lighter grade,
change the grade, you could make it longer. You
would have to change the grade because you are lim-
ited.

"Q. Can't you change the grade? A. The plans
are not right."

He stated that under the plans it could not be
done; that there was no allowance made for vertical
curves on the plat; there is no indication of it; it is
not implied because the points are fixed. One of the
witnesses stated the profiles were projected from this
plan. "Q. You do not know whether a vertical curve
is implied there or not? A. It is not; I can see it
very plainly."

The witness stated there was nothing on the plan
that would indicate where the vertical curves would
be, it is simply a line showing the track; there is no
profile showing the American Tobacco Company's

grade. He was asked what the grade of the American Tobacco Company's spur track will be if proper vertical curves were put in and asked for the plan showing the proposed track, and upon City Exhibit 67 being shown him, he stated:

"A. Yes; that shows it, that shows 3.2 per cent (See B 1 on Exhibit 67) grade for about half the distance and a 3½ per cent grade for the balance, which ends just about the end of their main building; the west end; if verticals were used where the grades join at the top and bottom, this grade would have to be steeper or extend further.

"Q. On City's Exhibit 67 you have drawn certain yellow lines? A. This is a vertical curve of the length that I would consider proper, it would make the grade a little over five per cent—5.1 per cent—between Tower Grove and the west end of the main building, confined between there. Those are the points given in City's Exhibit 67.

"By the Court (Q): Do you remember the testimony of Mr. Lucas, concerning the crossing of the tracks at Seventeenth street; there were two curves there on a five per cent grade? A. Commonly called a switch back.

"Q. He said that was on a five per cent grade, didn't he? A. I think so.

"Q. If that can be accomplished there, why can't it be accomplished here? A. You can't put a switch back here because you have not the room to do it.

"Q. What would be the grade of the two main line tracks of the Oak Hill road if the depression was made according to these ordinances, at Shaw avenue and McRee avenue, by having the tracks reach the present surface at Kingshighway? A. If no vertical curves were used?

"Q. No; I am talking about if proper vertical curves were used? A. If no vertical curves were used from the west side of Shaw avenue to the east side

of Kingshighway the grade would be two and one-half per cent; if there was no room to put in vertical curves such as the American Railway Engineers' Maintenance of Way Association use, it would be absolutely impossible to put them in, but you could put in some kind of a vertical curve as the city shows on the plat here, and it would make the grade 3.2 per cent.''

E. F. Mitchell, introduced as a witness for defendants, testified as follows:

''By the Court (Q): Why couldn't they remedy that by ordinance changing the highway grade? A. Yes, sir; they could provide for depression as the plan shows if they so desired, but the engineer taking the ordinance and going on the ground to execute it would take laborers and tools and he would meet with this specification as defined in the ordinance. If he did that, went to Kingshighway at its grade and depressed his track it would result in court trouble and then he might go to get a ruling and might get it and might not get it. I have talked of it from an engineering standpoint as to results and that is the way we look at it in the construction of engineering work.

''Q. Look at the plan City's Exhibit 67, and state whether there are any objections to that as to the number of switches? A. The objections to that are, as I have already testified to here before, that a 3.5 per cent grade would not result between Tower Grove avenue and the westerly end of the American Tobacco Company works, it would necessarily have to be extended much further into the works of the American Tobacco Company. According to this plan there is a grade of 3.5 *per cent and vertical curves* would be *absolutely necessary* to prevent the cars from becoming detached from each other. One can figure, as Mr. Purdon has said, that a *two per cent grade is the limit.* That is the limit in the rate of grade before the

draw-bar, before the couplers would get to a point where they would become twisted and separated, but that contemplates physical perfection, which is not practicable in ordinary railroad operations. Tracks cannot be maintained perfect, cars cannot be maintained perfect, and there would be very much difference in the grade due to imperfections in the track and it would be necessary for the introduction of vertical curves which would result in a much steeper grade than indicated here. I examined the grade on the plan and it is upwards of five per cent."

The witness says:

"If it is not digressing I would like to correct what seems to be a misapprehension about the plan submitted by the railroads. It does not contemplate a practically level grade from Chouteau avenue or a uniform grade from Chouteau avenue to the depression at Old Manchester road and Tower Grove avenue, the estimate was based on a plan which left a hump and followed ascending towards the west, the existing grade of the Missouri Pacific to a certain point here, but eliminating them from the Old Manchester road on towards the west, eliminating the second hump so that it does not contemplate an ideal condition.

"Q. Now, you have not said anything about this Exhibit 67? A. I was speaking of the rate of grade as shown in the American Tobacco Company's plant on Exhibit 67.

"Q. That shows a 5.1 per cent grade. A. A five per cent grade resultant, in my opinion; that is what would actually result between those by using a vertical curve that would be within the absolute limits of safety.

"Q. The vertical curves would increase the grade? A. Yes, sir; *and change the relation to the rest of the plant and throw so much of the track be-*

*low the working surface of the ground that it cannot* be reached and will not be available.

"Q. The same objection would maintain and exist in reference to operating over the grade, even though it be as low as five per cent that you have suggested in reference to the American Car Company? A. Yes, sir; you cannot switch on a five per cent grade."

I have drawn a red grade line at the bottom of tracing which shows how these grades would run if the necessary vertical curves were used. The red X between the buildings of the Tobacco Company indicates where said red grade line would reach the present line of said company's tracks.

While it does not appear from the testimony of the witness, yet a study of City Exhibits 67 and 68 shows that there is another serious difficulty in reaching the plant of the Tobacco Company. In constructing the connection for entering the north end of the American Car Works, it will be necessary to put a hump in the Oak Hill connection to the Tobacco Company's works, each having about a five per cent grade. This hump would be located west of the Old Manchester road and north of the Car Works where the Frisco connection to the Car Works crosses the Oak Hill to the Tabacco Works. Some light will be thrown on this subject by looking at the following diagram:

American Tobacco Co. v. St. Louis.

In that connection Purdon testified:

"Q. The crossing of the Oak Hill and Frisco would not affect the run to the spurs leading into the American Car Company's plant at all, would it? A. At the Frisco going in the Car Company's plant from the switch lead, the third south track, it would have to cross the Oak Hill-Tobacco Company's track before they get into the plant.

"Q. I show you City's Exhibit 68, which shows the character of the car plant and ask you to point out where and explain why it is necessary to cross the Oak Hill in order to get into the plant of the Car Company? A. Here (indicating) is what we call the Tobacco track off of the Oak Hill parallel with the Frisco.

"Q. That is the one of the 14-foot strip? A. Yes, sir.

"Q. Running across Tower Grove avenue into the Tobacco Company's plant? A. Yes, sir; here (indicating) is the Frisco track into the Car Company, it leaves that switch lead and crosses the track.

"Q. I wish you would indicate it in some way so we can get it into the record which track you had in mind crossing, because I want you to state various distances. A. The American Tobacco Company's track on the Oak Hill runs on the 14-foot strip along the north side of this building; the Frisco track into the Car Company leaves the switch lead near Tower Grove avenue and crosses the American Tobacco Company's track on the 14-foot strip before it goes in between the buildings one and two of the American Tobacco Company."

The foregoing testimony of Purdon clearly indicates that there is a hump at the point before mentioned, which was about to be brought out, when the witness's attention was called to other matters and the point was lost, but nevertheless, the hump must of necessity be there, as appears by City Exhibits 67

and 68, near the part indicated on the plat by the red arrow.

We will now consider tracing of City Exhibits. No. 68, which is hereto attached and marked "Exhibit No. 68" and made a part hereof.*

In general it shows the location of the Car Works with respect to the intersections of Old Manchester road, Tower Grove avenue, Park avenue, and the Frisco and Oak Hill railways; and in particular it shows the connection of the Car Works track marked Track C, with the Oak Hill track marked Track D, leading to the Tobacco Company and the connection of Track C with the Frisco, the three connections being marked Track A and B, respectively. Also a Frisco connection marked Track X leading to the Car Works' tracks on the west side of the buildings.

The grades of these tracks marked Tracks A, B, C and D, respectively, are shown on the profile drawing in the lower left hand corner marked Proposed Grades of Tracks A, B, C, D.

This tracing also shows the location of the Car Works tracks marked Tracks E, F, H and J respectively and the connections marked Track G, of these tracks with the main line of the Oak Hill railroad at the west end of the Car Works plant.

The grades of these tracks and of Track X before mentioned are shown at the bottom of the tracing and marked Proposed Grades of Tracks E, F, G, H, J.

This tracing also shows the location of the McRee avenue viaduct, marked McRee Ave. and at the lower right hand corner of the tracing a sectional view of the viaduct, marked Section of McRee Ave. Viaduct.

The red lines shown on the tracings represent the location of the retaining walls necessary to preserve the track connections and buildings of the Car Works.

*Note.—See footnote on page 478.—*Reporter*.

All other representations on this tracing are immaterial to the treatment of the American Car Company.

The same fatal defects exist in this plan that were disclosed in the discussion of the Tobacco Company's plan; that is, the omission of the vertical curves.

In discussing the Tobacco Company's plan, we set out a part of the testimony of the witness Purdon, which also applies to this plan of the Car Works, which will not be restated here,. but reference is hereby made thereto. Touching this question he further testified as follows:

"Q. Is it customary to put a vertical curve in every case of a change of grade? A. No, the change of grade might be so slight it might not be necessary.

"Q. What do you mean by that? A. If you had a one per cent grade going up and changed to .9 it would hardly be necessary, going in the same direction, because the change of grade would be only .1. ·

"Q. If you had a change of grade less than .1 —.1, or less, I should say, you wouldn't put in a vertical curve at all? A. I don't think I would. I am not prepared to say where I would put them in, but a change of, well, .5 say, about.

"Q. You would put in a vertical curve if the change of grade was one-half of one per cent? A. Yes, sir; I said I would.

"Q. Suppose it was .4? A. Then I would put it in, too, if I had room enough I would put it in if there was any at all.

"Q. Suppose .3? A. I say if I had plenty of room I would put it in; it makes it that much better.

"Q. Now, that is one of the criticisms that you make of these plats of the city, that they don't show the vertical curves? A. Those four exhibits."

He stated that he criticises City's Exhibit 101 for the same reason, also the exhibit referring to the Oak

Hill line, for the reason that it did not show places in the retaining walls where the spur track would lead from the depressed tracks into the industries along there.

He stated that City's Exhibit 76a was not correctly drawn; it would indicate to him that the draftsman forgot the spur tracks until after he had drawn the retaining wall. He was asked to take this plat in connection with another plat, putting the two together, if he would still insist upon his criticism about the plat, and stated that he modified his criticism as to the last plat, but not as to the other plat.

He stated that Exhibit 101 would not enable him to say whether it would be necessary to depress the tracks into the plant of the American Tobacco Company to provide vertical curves, because it simply shows the plane of the tracks. He was asked if Exhibit 67 would show it, how much further it would be necessary to go back to put in the vertical curves and preserve the same grade and said that it does, that it would be necessary to go back probably 100 feet or a little more, because it is on the down grade.

"Q. For spur tracks like these, switch tracks, would it not be sufficient to extend the depression from ten to fifteen feet at either end of where they intersect the present grade? A. No, sir; you have to consider the drawbars on the two cars and if you make a change from a level grade to a grade of over two per cent without a vertical curve you will only get four and one-half inches, each drawbar engaging four and one-half inches of the other. The Master Car Builders' rules only allow three inches variation, but with slow speed it is a matter of judgment. I think it will be safe to allow four and one-half inches, that means it would go from a level to about two per cent without the vertical curve. The conditions are different if you have to go up a five per cent grade, you would have

247 Mo.—32

to introduce such vertical curves as would give you the same relative position as if one was two per cent and the other one level, and that curve would be, according to my figuring, seventy-four feet long.

"Q. Are there any established grades for any of those streets, Eager road, Shaw avenue or McRee avenue? A. It is my understanding that there is.

"Q. You testified that if you were to put in a vertical curve in the track leading into the American Tobacco Company's plant and were to begin the ascending grade at the point shown on the city's plat which you have just examined, that it would increase the grade about five per cent, keeping it in the same points shown on the plat? A. Yes, sir, it would be five per cent between the ends of the two vertical curves."

Referring to City's Exhibit 67 he stated:

"If you start here with the vertical curve at the east side of Tower Grove avenue, say 100 feet long, half of it is fifty feet and the same here 100 feet, one-half is fifty feet, you shorten up the distance 100 feet, and we divide into the difference in elevations.

"Q. What length did you base your opinion that it would be five per cent on? A. By taking the elevation of these points I calculated how much of 3.5 per cent it would take to get from one point to the other.

"Q. To get the percentage of grade you have to know the distance? A. No, if you know the elevation and the grade you know the distance."

He says the distance is about 550 to 560 feet, that includes the 100 feet and is the total distance.

"Q. In order to put in your vertical curves you cut down the distance 100 feet? A. Something like that; fifty feet at each end."

The testimony of the witness Mitchell, heretofore stated, bearing on vertical curves, is also referred to.

This evidence shows beyond cavil that vertical curves must be used in connection with sharp changes

of grades; in fact, on all grades of more than one per cent. The use of vertical curves makes it possible to use grades much greater than would otherwise be possible, but their omission from the grades under consideration makes it appear possible to use grades much higher than would result if inserted.

In addition to increasing the grades shown on this tracing by the addition of vertical curves, these grades must be further increased by the necessity of considering the tracks as a flat plain instead of a line making it necessary to use short pieces of level track at crossings. This is fully shown by the testimony of Purdon, Brown and Brick.

The testimony of Purdon has heretofore been stated upon this point and the witness Brown's attention was then called to City's Exhibit No. 68, and he was asked to state his objections to that plan and said the objections are the grades there, which are 5, 4.7 and 4.5.

"Q. Where is it shown on this plan that those grades enter the Car Company's plant, how far distant before they enter the Car Company's property? A. The points marked A, B and C on the profile, as I figure, that starts from the St. Louis & San Francisco track about 100 feet west of the Old Manchester road and extends to the transfer track. The five per cent grade commences about 100 feet from the Manchester roads and extends about 125 feet, then breaks to a four per cent grade about 100 feet, before it enters the Car Company's plant; that four per cent grade is at the crossing of the track on the 14-foot strip of the Frisco road; the 4.5 per cent grade extends into the works about 220 to 225 feet and shows going just to the transfer table."

He says the plat does not show the per cent of grade after it leaves the table.

"Q. I will ask you if there is room enough here to practically operate a train of cars on that grade

into these works, to make a run, to make the ascent?
A. Yes, sir; I think there is, but one point occurs to
me in regard to the matter, there is a crossing and the
cars on the 14-foot strip, the grades are drawn to a
point, they show the center line. I don't think it can
be carried out in a practical solution of it in the work
because the tracks are a plane, not a line, you must
make allowance for the crossing frog to be practically
on a level which would make some difference in the
grade, it would not make much.''

He stated there were no vertical curves shown on
the original drawing; it was necessary to have verti-
cal curves to operate on that grade; it would increase
the grade by putting in vertical curves, offhand, he
should say, .4 or .5 per cent. Where you have a ver-
tical curve there is so much added to every 100 feet
of grade.

''Q. You estimate six inches to every 100 feet?
A. That would be all right, except in this case you
are governed by the bridge at Manchester avenue, and
then by the transfer tracks. If you extend the dis-
tance you can have the same grade.

''Q. On account of this bridge you have to have
that grade? State whether that is the case in accord-
ance with this plat, as it had been presented, the bridge
over the 14-foot strip. A. That would be a fixed
point, a fixed elevation, and the transfer track is an-
other fixed elevation.

''Q. You have got to place the vertical curves in
that distance? A. Yes, sir; or else change the plan
of the bridge, get more clearance.

''Q. What is the plan of the bridge for sidewalks?
A. The detail is not shown here.

''Q. What other criticism have you to offer of
that plan? A. It shows a five per cent grade getting
off of the Oak Hill track. It commences at McRee
avenue.

"Q. Where is the point of intersection of that grade as shown on this plan? A. It would be the west line of McRee avenue. It shows a grade starting right under the bridge, entirely under the bridge proposed over McRee avenue. That five per cent grade commences under that bridge. There is no run on the sidetrack, not enough; the sidetrack ends about 200 feet south of the bridge, a little less than 200 feet south of McRee avenue.

"Q. Do you mean to say the five per cent grade commences under the bridge? A. According to the profile, and goes into the plant from that point, at the south line of McRee avenue. That five per cent grade extends about 400 feet on the American Car Company's property, past number 6 to the point marked J on the drawing here.

"Q. What is the grade of this track that extends along the north line of this building? A. The track is shown on the plat, but I do not see where it is shown on the profile at all.

"Q. There is nothing to show what is the grade of the track? A. Not as I understand the profile.

"Q. You do not know whether that is the place they deposit coal for the power house of the plant? A. No, I don't know the details of the buildings.

"Q. What other criticism have you to offer against that plan? A. They show a connection of five per cent grades connecting this five per cent grade we have just been speaking of on the track marked E, which leads along the north side of the building 6 and apparently a short distance along the building marked F, all shown on a five per cent grade and with a short allowance of a level grade to switch, about fifty feet.

"Q. Is it possible to operate a train of cars on a short grade, a five per cent grade, like that? A. It is possible in some respects, it is not practicable in the common sense of railroading, a car could be got over this, but it is not good railroading.

"Q. Would an ordinary switch engine do it? A. An ordinary switch engine will move some cars.

"Q. You have heard the testimony that they have 1500 to 2000 cars a year? A. Yes, sir.

"Q. And one car has to occupy more than two flat cars, three cars take six cars? A. I have heard it stated.

"Q. Is it possible to operate that kind of trains? A. Not at that particular point, it would be dangerous."

Witness Breck was shown City's Exhibit 68, which he said he had examined.

"Q. State what grade is indicated on that plat at the north end of the American Car Company in the spur reaching the plant? A. A five per cent grade ascending into the American Car Company's plant.

"Q. What is the point of junction with the main track of the railroad? A. That point of junction is shown as being immediately under the overhead bridge and there is no provision made for a vertical curve. Now, by following that line further along, it only runs in one direction from there, starting at this point it runs west and by following that line we find an apex here on which a four per cent grade ascending in what is shown as a point, a three-degree curve descending without a vertical curve. Now, that is an impossibility and that changes the whole situation, because what is shown here cannot be done. Those two points in the first place, that is not a point it can't be treated as a point—for a distance of at least twenty feet those two lines must be part of the same plane. If you are coming four degrees up and three degrees down, by the time it has gone twenty feet you have separated the grade over a foot and a half, it is entirely impossible to overcome that, it cannot be done in practice—what is shown in this plan. A plan drawn in that way, dealing with such a sharp curve and making no provision whatever for a vertical curve, I do not mean not show-

ing them, but not making the necessary provision, having the necessary space for them to be put in, does not represent a suggestion that can be done. It cannot be done and it would have to be so materially altered that the grade instead of three, four or five per cent would be something very much different; I do not know what it is without working it out, but it would not be the grade shown in the plan.

"Q. Taking the point of junction with the main track, how far is it from the point of the switch to the clearance of the frog? A. On the main line it ought to be about seventy feet, but it varies in the yard limit from thirty-five to seventy feet.

"Q. It must always be taken into account when forming a junction of a siding spur track or lead? A. You are bound to do that, you follow the same plan, the grade cannot be separated because the frog is bound to be the common point of both grades.

"Q. Taking the point fixed as the point of junction on the main track and the point reaching the summit of the grade, I will ask what grade would be created by the establishment of proper and necessary vertical curves in the construction of that track? A. I can't answer that question offhand, that will require going into calculations and I do not think it is necessary; I would rather not waste the court's time in going into it.

"Q. It will increase them? A. It will increase them and increase them very substantially. It will increase them so much that this plan is not available and another plan has to be substituted for this. It means different grades, it means reaching the points on different grades or not reaching them at all. This plan 68, in my opinion, is such that the American Car Company cannot do their business if this plan is adopted. In my opinion, it is the best to be adopted under the circumstances, but this plan is objectionable under the circumstances.

"By the Court (Q.) : You said also it applied to the Tobacco Company? A. This doesn't show it as bad as it will be by reason of the omission; it does not show the grade as bad as it will be or the plant cut up as bad as it will be, but along the general lines it is the best that can be suggested, but this is an impossibility in my opinion.

"By Mr. Cashman (Q.) : Take the south end of the American Car Company on this plan, a spur track connecting with the Oak Hill, and see what the grade is there and state it. A. The grade is five per cent. As near as I can make the plan out both connections are to be maintained. The first part will have to be so modified that I am unable to say whether it will be possible after the modifications have been made to maintain the connection with this part down here; if not, it will cut it in two and one part would have to be handled from here (indicating) and one part from here (indicating).

"Q. Now, assuming that plan submitted contemplates and indicates a continuous track·from the connection at the south end of the American Car Company's plant with the Oak Hill line and a connection at the other end, the north end, with the present lead or the 14-foot strip, that or the main line of the Frisco, and having in mind your objection to the connection at the north end, state what your judgment is in regard to the grade from the south end. A. You will find the same thing exactly, all *the connections treated on lines instead of planes, and it is impossible to carry out anything like what is suggested here* without making such material changes that I cannot say offhand whether it can be done at all. I am satisfied it shows the north end cannot be served with proper allowance for the greater distances required by the switches being planes and by the necessary vertical curves and still have this connection shown at the north end with the track that runs into the south end. I can find ex-

actly the same thing here at the south end or west end, I find a five per cent grade leading off with no allowance for vertical curves."

The effect of this plan will be considered later.

A third plan of the work to be done and the improvements to be made under said ordinances in and about the American Car Works is shown on City's Exhibit No. 70, which can be readily understood from the tracking marked "Exhibit No. 68" now under consideration, in the following manner.

Consider Tracks J & F eliminated therefrom, and tracks marked Track G, Track H and Track X as forming one continuous track from McRee avenue to a connection with the Frisco near Old Manchester road. This long track, to be depressed to the level of the Oak Hill main line, except where it crosses over the hump in the Oak Hill connection to Tobacco Company's plant, is to have a powerful elevator at the point marked L in blue color.

By this plan it is designed to hoist cars loaded with coal and heavy merchandise to be unloaded in the works and to lower finished products from the works to the tracks for shipment. The connection at the north end to remain the same, as it appears in the second plan.

In reference to this plan, the witness Mitchell was asked to state his objection to the plan of the city suggesting an elevator, and replied that there would be no objection from an elevator man's standpoint, but from a railroad man's standpoint it is a barrier; that a railroad man can't deliver the cars into that plant with his appliance; he must depend on some intermediate thing. To illustrate, he might just as well have a sidetrack some distance away and deliver the cars there and let them have conveyers, a series of elevators, or haul them in a wagon. The elevator scheme is combined with another scheme for the incoming freight which from a construction standpoint

is out of the question. In regard to the elevator plan, taking care of the outgoing freight, there would be the objection that it would mean a delay to its equipment in handling the output of the plant.

"This elevator plan is not entirely clear to me; it says 'elevator' on here and shows lines which indicate its position, and then towards the north tracks upon which is indicated the transfer table, I am not quite sure how the young man intended this to operate, whether he was going to put the cars—or first run the elevator up, put the transfer table on it, lower it, run all the cars onto it, raise the car and the transfer table, and then transfer the car back and forth to such tracks as would connect therewith.

"Q. That has not been suggested, there is no suggestion of that kind, but it is lowering the street cars down? A. If they had one street car to load it would require the placing of that car, that is one street car a day to load, it would be only necessary to place a car there once a day; if they had two, after one was loaded it would be necessary to go there and take the first away, or have some means of getting rid of it.

"Q. That is all there would be in the way of inconvenience to the railroad company? A. Yes; there would be that inconvenience to the railroad company, and that is about all as far as loading is concerned. I take it, it is not very material to the railroad company whether the car is loaded in that way or in some other way, but as a practical loading proposition it is not economical."

I copy from brief of counsel for the city what they say in support of this plan:

"The third plan for the treatment of the American Car Company's plant is graphically shown on defendant City's Exhibit No. 70. This plan involved the changing of the connections of the Frisco on the north of the plant, and bringing it in on a five per cent compound grade between the buildings, with retaining

walls on each side, very similar in this respect to the treatment proposed in the first plan mentioned. This connection from the Frisco and with the track of the American Tobacco Company on the thirteen-foot strip on the north of the Car Company's property would reach the present grade of the ground at a point slightly north of the transfer table, from which point the track would continue in the same direction and under the same conditions as it now exists. The essential features of this plan involved the building of a retaining wall along the western side of the property of the Car Company, the retention of all of its other tracks inside of its property at the present level and instead of bringing the Oak Hill connection inside this retaining wall, to establish this connection outside the retaining wall by running the Oak Hill spur track at the level of the proposed depressed main line tracks, and loading the output of the Car Company from the transfer table onto the flat cars of the railroad company by means of an elevator; that is to say, the finished product of the Car Company would be placed upon the transfer table which they now have, and the same would be carried over on the present transfer table tracks to the retaining wall, in which there would be an insertion where an elevator would be established for lowering the freight from the transfer table to the railroad cars.

"Mr. Morsman, the secretary and treasurer of the Car Company, testified that he had never investigated this plan.

"Mr. Tontrup testified to the same effect.

"As a matter of fact, and in striking contrast with the apparent ignorance of these gentlemen who were supposed to be familiar with what is and has been done in other places, Abraham Cook, who has been with the St. Louis Car Company for many years and is familiar with the plant of the J. B. Brill Company in Philadelphia, who manufacture three times as many cars

as the American Car Company, testified that the product of that company is handled to a considerable extent by an elevator similar to that proposed by the city in this third plan.

"The witnesses for the city made two estimates of the cost of carrying out this third scheme for treating the American Car Company's plant. The first estimate totals $43,000, which includes the depression of the Car Company's track leading up from the northern part of the property at a grade not exceeding five per cent; also constructing along the north line of their property a depressed track parallel to and at the grade of the depressed Oak Hill tracks, with the necessary retaining walls, the extension of the transfer tracks and the construction of an elevator such as would be required to receive the transfer carriage with its maximum load, and to lower the same to the depressed grade. The second estimate contemplates the depression with a five per cent grade of the track between the buildings as indicated above, also the construction of an elevator along the Car Company's north property line the same as in estimate one, except that the track serving the elevator is reduced in length about 300 feet and the power of the elevator reduced to handle loads down only. This estimate totals $29,000.

"Finally in this connection, the testimony of Daniel J. Lucas, who was thoroughly familiar with the method of treating the industries along the line of the Reading subway in Philadelphia, will be of value in considering this subject from any one of the three points of view. It will be recalled that the Philadelphia and Reading subway was constructed by vacating a street, which was built up with immense industries extending over a mile and one quarter. The railroad tracks were depressed, and in consequence of this depression the industries were compelled either to maintain connections at a considerable grade or

else to underpin their buildings and construct basements or substories.''

We will call attention to this plan later in the opinion.

The second proposed plan of treatment of the Car Works, by the city, is shown by tracing No. 69 (made from City's Exhibit No. 69) which is hereto attached and made a part hereof.*

Counsel for the city have collected the substance of the evidence regarding this plan, and have stated it as follows:

''The second plan proposed by the city's engineers for treating the American Car Company's plant is shown graphically on defendant City's Exhibit 69. This plan provides for a discontinuance of the Oak Hill connections southwest of the plant and connecting the plant with the Missouri Pacific by bringing a spur from the west on the south side of the main tracks of the Missouri Pacific across the depressed tracks of the Frisco and Oak Hill on two trestles and entering the plant on its present grade at about the point where the transfer table is located. The track would then run southwestwardly between the main plants and circle the southernmost of the buildings. This plan does not contemplate the depression of any tracks inside the property of the Car Company. It involves the maintenance of a retaining wall from Mc-Ree avenue to Manchester road on the outermost boundary of the Car Company's property. The connection with the Frisco railroad would be maintained by a switch connection between the Frisco and the Missouri Pacific at a point west of the point where the proposed trestle from the Missouri Pacific would begin. In this way both the Missouri Pacific and the Frisco would be directly connected with the plant, and the Oak Hill would be indirectly connected on account of

NOTE.—See footnote on page 478.—*Reporter.*

its connection with the Missouri Pacific main lines at the Tower Grove crossing. The proposed trestle would be carried from a point about 1100 feet west of Tower Grove avenue on a three per cent grade a distance of about 300 feet parallel to the main tracks of the Missouri Pacific, and would there begin to diverge and run in a curve on a bridge over the Frisco, and still curving to the south and southwest would pass over the Oak Hill on a trestle and into the property of the Car Company. West of the point where the trestle would begin there would be a direct connection between the Missouri Pacific and the Frisco tracks, and in this way any cars destined for the plant or coming out of the plant of the Car Company on the Frisco would be carried over the trestle. And the same way any shipping on the Oak Hill would come from the Tower Grove avenue connection of the Oak Hill and Missouri Pacific westwardly over the Missouri Pacific to the trestle connection and thence into the plant of the company. Outbound freight would be reversed in its operation.''

This tracing as explained by the evidence shows in general the location of the Car Works with respect to the intersections of Tower Grove avenue, Old Manchester road, Park avenue, and the Oak Hill, Frisco and Missouri Pacific railways.

In particular it shows the location of an elevated track marked ''Track A'' leading out of the Car Works near the north end on a twenty degree curve, crossing over the tracks of the Oak Hill and the Frisco on steel bridges, and coming down to the level of the Frisco and Missouri Pacific on a long timber trestle terminating in a long tail track which extends westerly towards Kingshighway, between the Missouri Pacific and the Frisco main tracks, this tail track being connected by short tracks to the Missouri Pacific and Frisco tracks near the foot of the incline.

These connecting tracks appear at the lower right hand corner of this tracing, and are marked "Frisco Connection" and "Mo. Pac. Connection."

A profile of this elevated connecting track A is shown on the lower portion of this tracing.

The tracing also shows the location of the two steel bridges and the 350 feet timber trestle at points marked "50 Ft. Br. 85 Ft. Br.  Proposed trestle."  It also shows the proposed arrangements of tracks within the factory using a 36-degree curve to circle the buildings in the southwest end of the works and returning to the extreme northeast corner of the plant crossing the connective tracks.

The red lines on the tracing indicate the location of the retaining walls made necessary to preserve these track connections, and the buildings of the American Car Works.

This treatment of the Car Works cuts off all the other track connections shown on all other plans and tracings at both ends of the plant and gives the Car Works switching service for all three of said railroads over a single track.

The witness Brown on cross-examination was asked in regard to City's Exhibit 69, from which tracing No. 3 was made, what objections he had, if any, as far as they relate to the American Car Company, to the mode of treating that property from an operating and engineering standpoint, and answered:

"A.  Well, one objection that I see to the suggestion is their 36-degree curve as proposed near the south end of the property, or southwest end; it is too sharp a curve for the practical handling of cars; unless you introduce a special connection between the cars to allow them to go around, they will pinch.

"Q.  What is the mode of switching cars into there?  A.  As I understand the plan, it is proposed to construct an incline between the St. Louis & San Francisco and the Missouri Pacific main line on a three

per cent grade, crossing over the main line of the St. Louis & San Francisco on a bridge and also the main line of the Oak Hill track on another bridge, and that would be on a three per cent grade with a 20-degree curve according to this plan.

"Q. Now, would it be practicable to operate cars on such a grade as that and on such a curve? A. It can be done; a three per cent grade on a 20-degree curve is about equal to 3.8.

"Q. It is not impossible, but it is not what railroad engineers would call desirable? A. No, sir.

"Q. What other objections have you to the plan as far as engineering and operating questions are concerned? A. It has a switch right across the tracks on the transfer table that will interfere to a certain extent with the convenience of switching at that point.

"Q. Will it interfere with the system of transfering cars from one point to another in that plant? A. To some extent, yes, sir; it may not make it impossible, but it will interfere with it as compared with the present conditions.

"Q. Do you see any other objections to that plan? A. I do not see any way for the main line of the Oak Hill to get into the property directly. Apparently, as I understand the plan, there will be no direct connection between that plant and the Oak Hill.

"Q. The only connection will be a trestle to the St. Louis & San Francisco and Missouri Pacific? A. Yes, sir; a joint connection.

"Q. No connection with the lead into the Oak Hill? A. I do not see any."

He explains further objections to the plan and says:

"Then I understood the plan to get around the building is to go around on a 36-degree curve, and another way proposed is to switch with the tail track as shown among railroad men and also switch this way (indicating). A 36-degree curve is pretty sharp; it is

possible, but it will require an arrangement of separating the cars. It would have to be kept in nice condition to kick the car around safely, better than the average industrial track.

"Q. Would that curve interfere with the connections with the buildings as they now exist? A. Yes, sir; there is a corner cut into one of the buildings.

"Q. Where is the point for loading their street cars? A. My understanding is they load right here (indicating); the track crossing at a tangent; the point is to load at this point.

"Q. Doesn't this transfer table travel up and down here? A. Yes, sir; but the Oak Hill track will be depressed twenty-five feet.

"Q. They can go to the edge of the property? A. The track will be twenty feet below.

"Q. That is what you meant when you said there was no connection a moment ago? A. Yes, sir; there are no tracks leading into the property.

"Q. This plan cuts off the switching connections with the Oak Hill? A. Yes, sir.

"Q. You mean if there was no other way of operating and using this plant, except by means of the curve, it might be used for one car around there? State what you mean. A. I mean while it is not impossible, in the strict sense of the word impossible, it is a poor proposition, it is what a railroad man understands as impracticable. To put a string of cars there it is necessary to spread the cars, which means loss of time for the crew. You can kick a single car there if the track is in good condition all the time.

"By the Court: Instead of going clear around here, can't they back back? A. They can, except in the buildings here.

"By Mr. Thompson (Q.): Doesn't this plan contemplate a destruction of the building at the corner? A. It shows the track would cut the corner of the

247 Mo.—33

building, the track will have to be moved or the building cut off. That is No. 4 marked in pencil."

The witness Breck was shown City's Exhibit 69 and asked what grade does that indicate should be established, on a theory of adopting the plan suggested by the plat on the northeast side of the American Car Company, and states that it shows a three per cent grade. He was asked what he had to say about the practicability of carrying out the suggestions on that plan from a practical operating railroad point of view, and stated:

"It shows a 36-degree curve, which is very, very unusual, and can only be operated in a special manner, not with any freedom at all. I am sure on a curve that sharp special couplings would have to be provided for the cars to make that curve, but from an engineering point of view, which is the commercial engineer's point of view—looking into the commercial questions to which engineers must give their proper weight, I would say it would be unjustifiable to supply the amount of money to put in bridges and this long trestle in order to enable an industry to remain at this particular location. You should not spend $1,000,000 to get on this piece of ground.

."Q. Tell what the estimated cost would be to build that trestle? A. That is an unusual method of reaching a plant, so much so that I do not know of any plant of this general character that has expended that amount of money in order to continue its track connection. It is a very unusual method. I do not know of any such 36-degree curve. That is a very unusual curve and one that cannot be operated in the ordinary way, and that is a necessary part of that plan.

"By the Court (Q.): That is the curve at the rear end of the Tobacco Company's plant on plat 69, that you are looking at? A. Yes, sir; that is the curve on which the business passes into the plant.

"Q. Your answer is based on the assumption that the majority of business going into that plant would pass over that curve? A. Yes, sir; it would be necessary. The greatest portion of the plant can only be reached by passing over that, you can't reach any part of it without going around the curve, not in a practical way.

"Q. What do you mean by a practical way? A. It is absurd. *Well, one reason why the plant should not be carried out is that it approaches the plant by a bridge which covers three St. Louis & San Francisco tracks and restricts the number of tracks that the St. Louis & San Francisco may have on its right of way at that point to three, which is a very serious objection to that plan.* Then you reach the greater portion of the tract shown by going over a 36-degree curve which probably and in my opinion will require the adoption of a special equipment, special coupling, in order to get around that curve.

"Q. Why will it require a special coupler? A. Because the radius within which the cars may bend is too restricted and will bring the corners of the cars together and will crowd them over the outer rail of the track and cause a derailment. The only other alternative of going around that track is a switch back movement of two or three cars and an engine, which is slow and objectionable and an expensive way of doing switching."

The witness was shown City's Exhibit 68, which he said he had examined.

"Q. State what grade is indicated on that plan at the north end of the American Car Company in the spur reaching that plant? A. A five per cent grade ascending into the American Car Company's plant.

"Q. What is the point of junction with the main track of the railroad? A. That point of junction is shown as being immediately under the overhead bridge

and there is no provision made for a vertical curve. Now, by following that line further along, it only runs in one direction from there, starting at this point it runs west and by following that line we find an apex here on which a four per cent grade ascending in what is shown as a point a three degree grade descending without a vertical curve. Now, that is an impossibility and that changes the whole situation, because what is shown here cannot be done. *Those two points; in the first place, that is not a point, it can't be treated as a point—for a distance of at least twenty feet those two lines must be part of the same plane.* If you are coming four degrees up and three degrees down, by the time it has gone twenty feet you have separated the grade over a foot and a half, it is entirely impossible to overcome that, it cannot be done in practice what is shown in this plan. A plan drawn in that way, dealing with such a sharp curve and making no provision whatever for a vertical curve, I do not mean not showing them, but not making the necessary provision, having the necessary space for them to be put in does not represent a suggestion that can be done. It cannot be done and it would have to be so materially altered that the grade instead of three, four or five per cent would be something very much different, I do not know what it is without working it out, but it would not be the grade shown in the plan. Now, one of the great objections to the plan as proposed by the city; it allows only three tracks for the railroad between its terminus down at the east end of the city and its main lines outside of the city, there is only a possible provision for three running tracks, the others are set aside for the special purpose of switching, will be useless for general movement because they are not continuous, they are broken at Kingshighway, and you are limited to three tracks with heavy retaining walls which strtch about half a mile or more in each direction.''

TOWER GROVE TRACK DEPRESSION
PROFILES OF
MO.PAC., ST.L.&S.F. and ST.L.O.H.&C.Rys
Scales Hor.1"=400' Vert.1"=20'

LEGEND
Viaducts, Proposed by Ordinances 21358,24359,21360&24361
Present Viaducts & Subways
Proposed Viaducts not specified in Ordinances

PROFILE OF
MISSOURI PACIFIC RY.

PROFILE OF
ST.LOUIS & SAN FRANCISCO RY.

PROFILE OF
ST.LOUIS, OAK HILL & CARONDELET RY

Defendant City's Exhibit No 75A

Vol. 247 Mo. Sup.

All other representations in this tracing are immaterial in the consideration of this treatment of the Car Works.

Later, particular attention will be called to this proposed plan.

City Exhibit No. 75 A, which is hereto attached and marked Exhibit 4, shows at the top of the sheet a profile of the Missouri Pacific main tracks extending east from Tower Grove avenue to Chouteau avenue, and west from Tower Grove to Kingshighway. On this profile is shown in white dotted lines the present grades, on elevation of top of rail between the eastern and western limits of the proposed depression of tracks to pass under Tower Grove avenue and Old Manchester road. Below this white dotted line is shown the proposed grade, by white continuous lines.

Below the profile of the Missouri Pacific and near the center of the sheet is a profile of the Frisco railway, between the same streets, and showing in the same manner the present grades and the proposed grades for the Frisco main tracks. This profile also shows the natural surface of the ground by a white shaded line and a sectional or end view of the Tower Grove Storm Sewer in Park avenue. The sewer is shown in block.

Below this, at the bottom of the sheet is a profile of the Oak Hill line in which is shown in the same manner, also the same information for the Oak Hill line between Tower Grove avenue and the second crossing of Kingshighway.

Purdon testified in regard to the expenses of depressing the tracks, and in regard to track work, and when asked why he made provision in his estimates for more than two tracks that existed there at the present time said:

"Because, as I have stated before, I think it *would be suicidal policy for a railroad to build these expensive retaining walls and only leave themselves room*

*for two tracks when* undoubtedly some time in the future they would require more, and then they would have to tear down the retaining walls and build the whole thing over again."

The disadvantage of the two humps, on the main tracks, before mentioned, is pointed out by the witnesses Brown and Breck.

The former testified:

"Q. Will you proceed? A. Another point on the main line of the Missouri Pacific and the St. Louis & San Francisco, it introduces adverse grades of one per cent in order to get under the Manchester road, both on the main line of the Missouri Pacific and Frisco, in order to lower the grade to clear Manchester avenue and Tower Grove.

"Q. What do you mean by adverse grades? A. Grades adverse to the traffic of the road in either direction, that is to say, they have one grade from Kingshighway to the Old Manchester road and Tower Grove avenue and then descend towards Chouteau avenue under the present plan; under this plan they have an ascent from Kingshighway, then a falling grade to Old Manchester road and Tower Grove avenue, and then another rise towards Chouteau avenue to meet the present grade. As I figure it from this plan, the total ascents of those two summits or humps, as they have been called, is more than the present ascent on the present grade. *One is about fifteen-foot rise and the other approximately about nineteen; I judge from this, making a total of about thirty-four feet as against about twenty-three or twenty-four at present, a difference of thirteen or fourteen feet,* something of that nature. Another point that occurs to me that will necessarily interfere with the St. Louis and San Francisco Railroad is that it will do away with the *present gravity switching* and place part of their *yard on a one* per cent grade in order to have it confirm *with the main* line grades.

"Q. That is a proposition that has not been gone into very fully here, I would like you to explain it a little further, the effect upon the operation of the Frisco yard if that plan were carried out? A. Well, instead of leaving the grade of the tracks favorable for switching, so it is very simple for switch engines to switch cars into the various tracks, if this grade is adopted as proposed, the engines will be required to switch uphill and it will necessarily interfere with handling of cars and increase the cost on account of overcoming the gravity of the grade. Additional power they would have to use to switch instead of on a light descending grade, as they have at present. If there are no vertical curves placed in the line, that possibility is more than if vertical curves are introduced, and this plan would make two summits and two sags so far as vertical curves are concerned as against one summit at present. The sags are really freer from danger of breaking in two than a summit is.

"By the Court (Q.): On account of the humps? A. Yes, sir; for instance, a one per cent grade from the west towards Tower Grove and Manchester the train is liable to bunch together, to use the common term, and running for this hill if the train is not started there is danger of jerking and pulling a drawhead.

"Q. Explain it on the plat. A. Suppose a train is coming from the west from Kingshighway and comes up this grade, the cars as they run here bunch together and when the engine starts to pull up this grade the engineer applies more steam and jerks the cars ahead in order to get speed to go up the grade; on the main line there is danger from that; the yellow line is allowing for vertical curves, that is illustrated right there; that would make a grade line several feet lower. A vertical curve is largely for the purpose of avoiding the breaking in two of trains and easing the trains in making those grades. It is almost as impor-

tant as horizontal curves, in fact, in some respects it is more important, you cannot get around an angle on a horizontal line.

"Q. What have you to say, if anything, respecting the adverse grade conditions presented by the proposed plan? A. They are propositions to be avoided when possible and railroads are spending a great deal of money to avoid the cost of hauling trains over them.

"Q. Are there objections suggested by that plan? A. Yes. In addition to the general operation of the trains it involves to some the crossing between the St. Louis & San Francisco and Oak Hill line; under the present condition the trains from the west will approach that grade on an upgrade, or, in other words, in a position where the danger of overrunning the crossing is very much reduced, while with this grade there is an element of danger in there of overrunning the crossing and possibly a collision. The same has a small bearing on the connection between the Oak Hill and Missouri Pacific. There is also this disadvantage of stopping trains, east-bound trains of the three roads at Tower Grove Station; it would be necessary to stop on one per cent grades.

"Q. Why is that a disadvantage, what are the reasons that make it a disadvantage? A. The trouble of starting on a one per cent grade instead of starting on a level grade—climbing another grade.

"Q. How about the question of stopping cars at Tower Grove Station on a descending one per cent grade? A. Well, it adds somewhat to the difficulty of operation as compared with the practically level grade that now exists there and increases the cost."

Breck's testimony was substantially the same as that of Brown.

It must be perfectly apparent to any one who has considered the tracing of City's Exhibit No. 67, regarding the Tobacco Company and the railroads in that immediate vicinity, and who has read the ordi-

nances relating thereto, in the light of the testimony
bearing upon the situation, that the plan of the city's
treatment of said company and the railroads in that
locality, is wholly impracticable, if not totally destruc-
tive of the former's business, and the latter's ability
to serve it and others in that vicinity.

With much care and great pains I have waded
through the mountainous record in this case, and have
extracted therefrom and compiled the vital parts of
the evidence bearing upon the various plans submit-
ted by city for performing the work and making the
improvements, called for by the ordinances in ques-
tion, in and about the Car Works, and I am satisfied
that they are not feasible, if possible. In my opinion
no fair-minded and disinterested person can examine
Exhibit No. 68, and read the evidence relating there-
to, and can for one moment seriously contend that
the plan proposed thereby is either reasonable, or pos-
sible of performance with the present manufacturing
and railroading instrumentalities. But be that as it
may, I am fully satisfied that it would be impossible
for the Car Company and the railroads to continue
their business in that vicinity, at a profit, if the changes
and improvements proposed to be made are done in
compliance to said plan and the provisions of said or-
dinances. And in this connection, I will add that the
plan suggested by the City's Exhibit No. 70, previously
considered in connection with tracing No. 68, for the
treatment of the Car Works plant, is so obviously weak
and impracticable, counsel for the city do not seriously
consider it.

The next plan proposed for treating the Car
Works and the railroads at that point, as shown by
tracing No. 69, taken from City's Exhibit No. 69,
greatly complicates the switching movements within
the plant, by reason of the 36-degree curve shown
thereon, and the doubling of the track back upon and
over itself. This scheme, even if possible, is more

impracticable and less feasible, it seems to me, than any of the plans submitted, and it does not and cannot successfully appeal to the minds of any sensible business man, much less to practical manufacturers and railroad operators.

Moreover, the bridges provided for in this plan are particularly objectionable, because they permit only three tracks each for the Oak Hill and Frisco to pass under them, which will effectually stop the increase and expansion of their business in the future without a complete reconstruction of the bridges, and even that costly privilege might not be granted to them by the city when the necessity therefor might arise, and by that means the railroads might be forced to locate their yards elsewhere, which in such cities, as we know, costs millions of dollars.

The evidence shows that the necessity of using retaining walls makes it necessary from an economical standpoint to excavate the railway right of way the full width thereof. This is made clear by the testimony of Purdon regarding that matter. His views of the situation commend themselves to a man of common sense and practical experience.

It would be a wilful waste of time and money to grade the streets to such width as would only accommodate two tracks, when it is certain that it will be but a short time until the increase of business will demand additional tracks, which would necessitate the destruction of those expensive walls, if the right of way is only graded to accommodate the two. The present cost of extending the excavation to the full width of the right of way, would be almost inestimable in comparison to the damages, cost, and expense which would be incident to the destruction of the old walls, the subsequent excavation of the right of way to the full width thereof and the construction of new walls.

There is another serious objection to the city's plans which existed at the date of the institution of

this suit, and that is the condition in which they left the grade of the Oak Hill Railway tracks at Kingshighway, which was from eight to twelve feet below the grade of that street, thereby making it physically impossible for the trains of the company to pass beyond that point.

In order to overcome this objection the court on July 25, 1910, rendered a conditional decree in favor of the city on her cross-bills, and against all the defendants upon condition, however, that the city of St. Louis would, within four months from the date of the decree, grant to the Oak Hill Company permission to cross Kingshighway and other streets mentioned. That permission was by ordinance No. 25389 duly granted, and on October 5, 1910, the conditional decree was by the court made final. Waiving the question of the authority of the city by ordinance to change the scheme of depressing the tracks after the suit was instituted, nevertheless that fact cut an important figure in the scheme of the depression, in that it requires the Oak Hill Company to excavate its right of way to a depth of about twelve feet for a distance of about three quarters of a mile, and to construct two retaining walls one along each side thereof for the entire distance, which would cost somewhere between $350,-000 and $400,000 in addition to the cost and expense of doing the other work called for by ordinances Nos. 24358 to 24360 inclusive.

The important fact just considered is but one of the many disclosed by the record which shows that the ordinances in question were not drawn by an engineer, or by one acting under his counsel and control. This fact was also established by the uncontradicted oral evidence introduced at the trial, a fact which was perfectly clear without it, for the reason that its insurmountable defects appear at many points where applied to the physical conditions to be affected by

them, as previously pointed out, which was done without the assistance of the oral testimony.

I have carefully read all the evidence bearing upon the probable cost of doing the work called for by the ordinances last mentioned, and find that the estimates placed thereon by the witnesses for the plaintiffs and the railway companies, and those for the city differ widely; but I believe the greater part of the difference is due to the fact that the witnesses for the city placed their estimates upon the city's erroneous understanding of the ordinances, and its theory of the work to be done according to the plans and specifications, while the witnesses for the plaintiffs and the railway companies based theirs upon the theory contended for by said companies. But be that as it may we are satisfied that the estimate of the railway companies is by far nearer the true mark than is that of the city. Some of the witnesses for the plaintiffs and the railway companies place the cost at or about $400,000, while those for the city place it not to exceed one-fourth of that sum.

After a careful consideration of all the evidence upon that subject we believe the greater weight of the evidence shows that the cost would be between $2,000,000 and $2,125,000, to say nothing of the damages that would be done to the property of the plaintiffs, and other property abutting the improvements, which probobly would amount to several hundred thousand more.

So considering the enormous sums of money which would be required to depress the tracks, in the manner provided for by the ordinances, and the burden that would impose upon the railroad companies, which would not be compensated by the advantages of retaining their yards in that locality, especially in view of the fact that the growth of the city with its increase of business will, in the very nature of things, require of the railroad companies a corresponding in-

crease of transportation facilities in order to handle that increase, and this record discloses the fact that the room for such expansions is limited, and that at no distant date the railroads will be required to go elsewhere in order to handle the commerce of the city and properly serve the people. When that time arrives they must either move their yards or suffer their business to become stifled by its own environments, which would mean death, decay and destruction for the reason that railroads like new states and nations must grow and expand. They cannot stand still. Where progress stops death begins.

That being true, it seems to me that it would be unwise for any class of business men of their own volition to expend that sum of money in an undertaking of that character, which in all probability will have to be moved or additional yards built further out, in the next ten or twelve years. It seems to me that it would show better business judgment on their part to take that $2,000,000 and invest it in new yards than to expend it in depressing the tracks in the manner provided for by said ordinances.

Under those conditions without other controlling influences, a court of equity might well hesitate to order said railroad companies to expend that sum of money for the purposes stated in the ordinances, and especially should it hesitate, when it is considered that the depression of the tracks would relieve the congested traffic at only one crossing or practically so.

Another important factor in the case is the fact, that all the evidence of both sides shows that the streets can be depressed under the railway tracks at the crossings in question at a cost not to exceed $350,-000 to $400,000, not more than one-fifth of what it would cost to depress the tracks under the streets, and thereby furnish practically as free and safe a crossing for the traffic at Tower Grove as it would be

if the tracks were depressed below the streets, and certainly it would give the pedestrians, vehicles and street cars, at that point, a better crossing to have the streets depressed, than the railway trains would have if the tracks were depressed. But counsel for the city do not seem to attach much importance to that fact, because it seems that they treat and consider railways as private property, which must yield to the public good. That in one sense is true, but in another, and in a most important sense, they are public corporations, and render as great service to the public as any public institution in the country, and for that reason they should not be unnecessarily handicapped in the performance of their public duties. At a low estimate, if I correctly understand the evidence, the railroads interested carry from 15,000 to 20,000 tons of freight, and about 18,000 passengers over that crossing every twenty-four hours—about four times as many passengers as there are pedestrians who pass over that crossing and probably twenty times as much freight as passes over it in vehicles. While this is not controling, yet it is a factor which should be considered in connection with all other facts and circumstances in evidence, in passing upon the reasonableness of the ordinances in question.

It may be that under proper ordinances, recommended by the Board of Public Improvements, for the purpose, the city council can present a possible, feasible and reasonable plan for a separation of the grade crossings at the points indicated, by a depression of the railroad tracks, beneath the streets, but that is a matter with which at the present time this court has nothing to do.

All things considered we have no hesitancy whatever in saying that the ordinances in question are unreasonable and oppressive and should for that reason be declared null and void.

V. Counsel for plaintiffs and the railway companies insist that ordinances 24358 to 24361, inclusive, are void for the reason that they were not recommended to the Municipal Assembly by the Board of Public Improvements, as required by the charter of the city of St. Louis. Their contention is, that the improvements ordered by said ordinances are such as come within the provisions of the charter governing public works, which are under the care and control of said board. This contention is denied by counsel for the city, which fact calls for a construction of certain provisions of the city charter.

The provisions of the charter, or rather so much of them as are material to the issues of this case, as announced in 1901, are as follows (which will be found printed in full in volume 4 of Missouri Annotated Statutes, 1906, pages 4775 and following):

Section 3 of article 4 of the city charter, supra, provides the manner in which the Board of Public Improvements shall be constituted.

Section 33 of said article relates to the meetings and duties of said Board of Public Improvements.

Section 41 of said article 4 provides that the president of the board shall have supervision over other commissioners, etc.

Section 1 of article 6 reads as follows: "The Municipal Assembly shall, by ordinances recommended by the Board of Public Improvements, establish from time to time such streets as may be necessary to provide public thoroughfares for free and convenient traffic and communication between different parts of the city."

Section 14 of said article 6 provides that: "No ordinance for the construction or reconstruction of any street, avenue, boulevard, alley or public highway of the city shall be passed unless recommended by the Board of Public Improvements, as hereinafter provided."

Said section 14 likewise contains the following: "The terms 'reconstructing' and 'repaving' as herein employed shall be construed to give full power and authority to reconstruct or repave by removing the foundations, curbing, guttering and wearing surface of the roadway paving, or only such portion of any or all thereof as the ordinance may prescribe."

Section 17 of article 6 reads as follows: "Sec. 17. All Ordinances for Public Work to be Recommended by the Board of Public Improvements. The Board of Public Improvements shall recommend to the Assembly all ordinances for the establishment or change of grade of streets, avenues, boulevards, public highways and alleys, and also for the construction or reconstruction of streets, avenues, boulevards and public highways, and for the maintenance, repairing, lighting, cleaning, and sprinkling thereof."

Section 18 of article 6, provides for the apportionment of the cost of improvements between the city and the property owners respectively.

Section 19 of article 6 provides that all nuisances caused by public works shall be abated by the city at its expense, and that whenever the grade of a street is fixed by the city and improvements have been made in conformity thereto, if the city should afterwards change the grade, it shall indemnify the owners of the improvements for such damage.

Section 27 of article 6 of said charter provides that: "The Assembly shall have no power directly to contract for any public work or improvement, or repairs thereof, contemplated by this charter, nor to fix the price or rate therefor; but in all cases, except in cases of emergency work or necessary repairs requiring prompt attention, the Board of Public Improvements shall prepare and submit to the Assembly an ordinance, with an estimate of the cost endorsed thereon by the president of the board, authorizing the doing of any proposed work."

The second paragraph of section 1913, article 1, chapter 24, of the Revised Code of St. Louis, relating to the general duties of the Board of Public Improvements, provides that it shall be the duty of said board "To prepare, consider and recommend to the Municipal Assembly all ordinances required for the establishment of the opening, location and graduation of streets, avenues, alleys, highways and public places, other than parks, and the construction of crosswalks; . . . and for the improving, constructing, reconstructing; repairing, cleaning, sprinkling and lighting of streets, avenues, highways, alleys and public places."

The only justification counsel for the city offer for the action of the city council in ignoring the ordinances proposed by the Board of Public Improvements for depressing the railway tracks of the Frisco, Oak Hill and Missouri Pacific companies at the Tower Grove crossing, and for doing the other work provided for therein, and for enacting at its own instance, in lieu thereof, ordinances Nos. 24358 to 24361 inclusive, ordering the tracks of said railway companies to be depressed, and for doing the other work therein provided for, is the following:

"The ordinances in question were not required under the charter to originate with the Board of Public Improvements.

"(1)   The ordinances do not direct a change of grade of the street.   (a)   They provide that the viaducts shall be constructed of design and character to be approved by the Board of Public Improvements, and that the viaducts, may, to permit drainage, have a rise of two feet in the center above the extremities at either side, which extremities shall not be above the present grade of the street.   The rise of two feet in the center is permissive only—not mandatory.   (b) The rise is too insignificant to be considered by the court.   At only one point—the center of the right of

way of the railroads—is any rise permissible, and it must be sloped towards the ends so that the extremities of the viaduct will be on the present grade of the streets. Considering the length of the viaducts, this rise is almost infinitesimal, and warrants the application of the maxim *'de minimis non curat lex.'* (c) Should the plan presented by the railroad companies, and approved by the board, actually involve a change of grade, a further ordinance authorizing such change could be passed. (d) But even if the ordinance necessarily involved a change in the grade of the street or called for public work, it is not necessary under the present city charter that the same should first be recommended by the Boar dof Public Improvements.

"(2). The ordinances in question here do not direct the doing of 'public work' within the meaning of that term as used in the charter provisions requiring contracts for such work to be let by the Board of Public improvements."

In my opinion, the justification or excuse, or more broadly speaking, the contention of counsel for the city, that, under the charter of the city of St. Louis, ordinances of the character in question and especially these, are not required to originate with the Board of Public Improvements, is untenable.

In my opinion, no intelligent man, be he lawyer or layman, reading those provisions of the charter of the city of St. Louis, in connection with the general provisions thereof regarding public improvements, can come to any conclusion, except that it was the design of the framers thereof, that every kind and character of the public work or improvement, or the reconstruction and repairs thereof should be under the supervision and control of the Board of Public Improvements, and that no work or improvements of that character or any contract for the doing of the same should be valid or binding without being authorized by ordinance recommended by said board, after faithfully

complying with all charter requirements prerequisite to its action in the premises. The clear purpose of the charter is and was to provide a wise, comprehensive, durable and symetrical system of public improvements, and create a board of public improvements, and place it in charge thereof, with power and authority to see that all public work desired by the city should conform to that system. The object of placing the system of improvements in the hands of the board was to secure to the public and the owners of the property affected by the work, the benefit of the knowledge, skill and unbiased judgment of a body of scientific men, unaffected by local influences incident to all public improvements. [State v. Butler, 178 Mo. 272; Bambrick v. Campbell, 37 Mo. App. 460.]

Now let us briefly consider the facts of this case and see if they come within the meaning of public improvements as those words are used in the charter; and in doing so we must not overlook the fact, which we have heretofore pointed out in another paragraph of the opinion, that the city has the exclusive care and control of all the streets and highways therein. And it was for that reason, among others, that induced us to hold that the railway companies had no right of election between depressing the tracks below the streets or depressing the streets below the tracks. In other words, no one had the authority to disturb the streets in any manner without authority from the city to so do.

Now to the facts: The ordinances in question require the railway companies to excavate trenches or ditches extending in length, in the aggregate, two miles or more, from twenty to twenty-five feet in depth, and varying in width, in the streets of the city, for the use of their respective rights of way, and at the intersections of the streets affected to construct steel bridges over and across the railway tracks according to certain plans and specifications, and to

construct retaining walls along each side of said ditches, as provided for by the ordinances, plans and specifications; and in addition to do certain other work not specially mentioned.

If the provisions of those ordinances, plans and specifications are complied with, it will necessarily result in the movement of large sections of earth in each of said streets, and the construction across their intersections of steel bridges in order that traffic may pass over the excavations, which it is conceded, will, if constructed, be two feet above the present grades of those streets.

Are not those matters public improvements or public works within the meaning of the city charter? There can be but one answer to that question, and that is, they are.

The mere fact that the presence of the railway tracks in the streets, with their accompanied traffic, makes it necessary to have the work done or the improvements made, in no manner changes the character of the work or improvements, any more than if the necessity had arisen from any other cause. Or in other words, suppose there were no railway tracks there at all, and the ordinances still required those identical things to be done, would they not be public works within the meaning of the charter, and ordinances of the city? I think so, unquestionably. And if not, then by what authority does the city order the work to be done, and by what power does it prescribe the terms, plans and specifications for making the improvement? None, earthly, I respectfully submit.

Again: Is not the construction of large steel bridges across creeks, branches and ditches in the streets of a city, public work? I think so. Would the character of the work be changed if, perchance, a railway track ran along one of the streams or the ditch? I think not. Or would the character of the work be changed if the bridge was being constructed over a

ditch previously dug by a railway company? I think not.

If the improvements I have referred to in the supposed cases are not public in character, then no town or city in this State would be authorized to expend public money for the construction of a bridge or viaduct over any such streams or excavations, because the Constitution of the State limits the authority of expenditure of public money, for public purposes.

Of the scores of cases I have read involving this class of litigation, I have not found a single one but what expressly holds that such work and improvements are public in character, or which assumes that to be true without discussing the question. For instance, in the case of Northern Pacific Railway Co. v. Duluth, 208 U. S. 583, the character of the work ordered to be done was one of the important factors in that case, which will be seen by reading that case.

Again: As contended by counsel for the railroad companies: "The removal of this part of the streets and the building of viaducts to take the place of the same must necessarily be a reconstruction of that portion of the streets where these improvements are made." That contention is unquestionably true, because it is nothing more than a tearing up of a portion of the street, and reconstructing it on a different plan, and with different materials. If that character of work constitutes a reconstruction of the streets in question, then it comes within both the letter and spirit of the city charter heretofore quoted. Moreover, it is conceded that the bridges ordered to be constructed, are to be two feet above the present grades of the streets to be affected.

The establishment of streets, and their construction and reconstruction, as provided for by sections 1 and 14 of article 6 of the charter, previously quoted, necessarily implies that the establishment of and the change of grades of the streets of the city must be

done "by ordinance recommended by the Board of Public Improvements."

It is perfectly clear from reading these provisions of the charter, that the city council has no authority, without the recommendation of the Board of Public Improvements, to change the grade of any street or public highway in the city, or to construct or reconstruct the same.

But according to the conceded facts the council in this case has by ordinance ordered both of those things to be done, without the recommendation of the Board of Public Improvements, and in fact, against its recommendations, because the board drew and recommended to the council, Bill No. 529, which provided for a separation of the grades crossing at Tower Grove avenue and Old Manchester road, etc., by depressing the streets beneath the railroad tracks. Not only did the board recommend the passage of Bill No. 529, but both branches of the city council duly enacted it, but subsequently, on motion to reconsider, a reconsideration was ordered, the bill withdrawn, and ordinances 24358 to 24360 were introduced in lieu thereof, without the recommendation of the Board of Public Improvements.

This was clearly in violation of the plain letter and meaning of the charter provisions previously mentioned.

Counsel for all parties have presented dozens of elementary questions of law, and have cited in support thereof scores of authorities, but we have not noticed many of them in this opinion and most of those noticed were accepted without comment, because of their elementary character.

A number of other most important questions were presented and ably discussed, which under the view of the case we have taken, are not now necessary to be considered, and for that reason we have passed them by, unnoticed in this opinion.

After weeks of time spent and labor devoted to the reading of this unparalleled record, and in investigating the hundreds of authorities cited in support of the respective petitions presented by counsel for the respective parties, we have come to the conclusion that the ordinances in question are void, for the reason before stated, and because they are so unreasonable and oppressive that no court which has the authority to pass upon the reasonableness of an ordinance should hesitate to declare them null and void; also for the reason that they were not introduced in the council upon the recommendation of the Board of Public Improvements, as required by the charter of the city of St. Louis.

We are, therefore, of the opinion that the judgment should be reversed and remanded to the circuit court with directions to enter judgment for the plaintiffs and the railway companies on their cross-bills.

All concur.*

The words on page 526, to-wit, "It may be that under proper ordinances, recommended by the Board of Public Improvements, for the purpose, the city council can present a possible, feasible and reasonable plan for a separation of the grade crossings at the points indicated, by a depression of the railroad tracks beneath the streets, but that is a matter with which at the present time this court has nothing to do," were not a part of the opinion as originally written by WOODSON, J., but were added by the other judges. WOODSON, J., is of the opinion that they are not necessary to a proper disposition of the case, and should not be made a part of the opinion, since they suggest legislative action.